**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| ) | |
| IN RE AMITIZA ANTITRUST ) | Civil Action No. 21-11057-MJJ |
| LITIGATION ) | |
| ) | |
| _____) | |

**<u>MEMORANDUM OF DECISION</u>**

January 14, 2026

JOUN, D.J.

Plaintiffs Walgreen Co., The Kroger Co., Albertsons Companies, Inc., H-E-B, LLP and CVS Pharmacy, Inc. ("Retailer Plaintiffs") and Defendants Takeda Pharmaceutical Company Ltd. and Takeda Pharmaceuticals USA, Inc. ("Takeda") have filed cross-motions for summary judgment with respect to the validity and enforceability of the Retailer Plaintiffs' Assignments. [Doc. Nos. 597, 601]. Takeda argues that the assignment of antitrust claims that each of the Retailer Plaintiffs received from various national wholesalers are invalid for lack of consideration. Takeda also argues that CVS lacks standing because its assignment post-dates the filing of its complaint. Retailer Plaintiffs argue that consideration is not required, but in any event, the assignments are supported by consideration. As explained below, I find that the assignments are supported by consideration, and CVS's assignment from Cardinal Health, which pre-dates CVS's complaint, confers standing. Accordingly, Defendants' Motion for Summary Judgment, [Doc. No. 597], is <u>DENIED</u>, and Plaintiffs' Motion for Partial Summary Judgment, [Doc. No. 601], is <u>GRANTED</u>.

I.    **BACKGROUND**[1]

The following facts are undisputed unless noted otherwise.

A.  **The Parties**

Retailer Plaintiffs are Albertsons, H-E-B, Kroger, Walgreen, and CVS. [Doc. No. 624 at ¶ 1]. Retailer Plaintiffs Albertsons, H-E-B, Kroger, and Walgreen are pursuing claims against Takeda in *Walgreen Co. et al v. Takeda Pharm. Co. Ltd. et al*, No. 1:23-cv-13061 (D. Mass. Dec 13, 2023) ("Walgreen Action"). [*Id.* at ¶ 7]. Retailer Plaintiff CVS is pursuing claims against Takeda in *CVS Pharmacy, Inc. v. Takeda Pharmaceutical Company Limited et al.*, No. 1:24-cv-10223 (D. Mass. Jan 29, 2024) ("CVS Action"). [*Id.* at ¶ 8]. Retailer Plaintiffs are pursuing claims against Takeda in the Walgreen Action and the CVS Action based upon purported assignments of antitrust claims from the drug wholesalers McKesson Corporation ("McKesson"), Cardinal Health, Inc. ("Cardinal"), and AmerisourceBergen Drug Corporation ("AmerisourceBergen"). [*Id.* at ¶ 9].

B.  **The Assignments**

Each Retailer Plaintiff holds one or more assignments of claims from a national wholesaler with which that Retailer Plaintiff does business, assigning the wholesaler's claims against Defendants in this action to the extent that the claim arises from purchases of Amitiza or generic Amitiza by the wholesaler that was resold to that Retailer Plaintiff. [Doc. No. 614 at ¶ 1; Doc. No. 602-1; Doc. No. 602-2; Doc. No. 602-3; Doc. No. 602-4; Doc. No. 602-5; Doc. No. 602-6]. Defendants dispute the validity and enforceability of these assignments. The parties dispute whether each assigning wholesaler is contractually obligated to provide such assignments to Retailer Plaintiffs upon request. [Doc. No. 614 at ¶ 2; *see also* Doc. No. 602-7; Doc. No. 602-8;

---

[1] I assume the parties' familiarity with the facts. As such, this background will be limited to the facts relevant to the cross-motions at issue.

Doc. No. 602-9; Doc. No. 602-10; Doc. No. 602-11 (excerpted testimony from Retailer Plaintiffs' Rule 30(b)(6) witnesses testifying that the assignments were conveyed as part of the overall wholesaler contracts)]. As explained in more detail below, each assignment includes agreements by the assignee to coordinate discovery with other parties and to indemnify the assignor with respect to any claim or expenses arising out of or relating to the assignment, including attorneys' fees. [Doc. No. 614 at ¶ 3].

### 1. CVS-Cardinal Agreement

On December 20, 2023, CVS and Cardinal Health, Inc. executed a document entitled "Agreement for Assignment of Claims" ("CVS-Cardinal Agreement"). [Doc. No. 624 at ¶ 13; Doc. No. 600-1]. The CVS-Cardinal Agreement stated that CVS purchases, among other things, pharmaceutical products from Cardinal Health, including Amitiza, for resale to the public. [Doc. No. 624 at ¶ 14; Doc. No. 600-1 at 2]. The CVS-Cardinal Agreement then stated:

> Cardinal Health conveys, assigns and transfers to CVS all rights, title and interest in and to all causes of action it may have against Defendants under the laws of the United States or of any State arising out of or relating to Cardinal Health's purchase of Amitiza and/or its generic equivalent(s) that were subsequently resold to CVS during the period from January 1, 2015 to [December 20th, 2023].

[Doc. No. 624 at ¶ 15; Doc. No. 600-1 at 2]. In the CVS-Cardinal Agreement, CVS agreed to indemnify Cardinal Health from any claims or causes of action asserted against Cardinal Health arising out of or relating to the CVS-Cardinal Agreement, or any assignment provided for in that agreement. [Doc. No. 624 at ¶ 16; Doc. No. 600-1 at 2–3]. CVS also agreed to use its best efforts to conduct and to coordinate discovery with all other parties in any action brought on the claims assigned in the CVS-Cardinal agreement. [Doc. No. 624 at ¶ 17; Doc. No. 600-1 at 3]. CVS agreed it would not assign or otherwise transfer any claims or causes of action assigned to it through the CVS-Cardinal Agreement without Cardinal Health's prior written consent. [Doc. No.

624 at ¶ 18; Doc. No. 600-1 at 3]. It is undisputed that the CVS-Cardinal Agreement states that

the agreement is made "in consideration of the mutual covenants contained in this agreement,

and for other consideration . . . ." [Doc. No. 624 at ¶ 20; Doc. No. 600-1 at 2]. However, the

parties dispute whether the CVS-Cardinal Agreement describes any consideration provided from

CVS to Cardinal Health in exchange for all rights, title, and interest in any cause of action that

Cardinal Health may have against Takeda and others arising out of Cardinal Health's purchases

of Amitiza or generic Amitiza that were later resold to CVS between the period of January 1,

2015 to the date of the agreement (i.e., December 20th , 2023). [Doc. No. 624 at ¶ 19].

     Kristin Alves, Director of Trade for Brands for CVS and CVS's Rule 30(b)(6) designee,

testified to confirm that, with respect to the CVS-Cardinal Agreement, "CVS doesn't have to pay

Cardinal any portion of the damages it recovers"; "CVS didn't pay Cardinal for this assignment

of claims"; and "CVS didn't transfer anything specifically in exchange for this assignment to

Cardinal." [Doc. No. 624 at ¶¶ 63–65; Doc. No. 600-7 at 134:13–135:9]. With respect to the

CVS-McKesson Agreement, which is outlined in more detail below, Ms. Alves testified that

"CVS doesn't have to pay McKesson any portion of the damages it recovers"; "CVS didn't pay

McKesson for this assignment of claims"; and that "CVS did not transfer anything of value to

McKesson in exchange for this assignment." [Doc. No. 624 at ¶ 66; Doc. No. 600-7 at 138:17–

139:8]. At her deposition, Ms. Alves was also asked "And CVS didn't transfer anything else of

value to Cardinal in exchange for the assignment; right?" to which she responded, "CVS does

billions of dollars of business with Cardinal and McKesson, and that's – that's it. Nothing else –

nothing's been transferred to them." [Doc. No. 600-7 at 134:20–135:2]. She also testified that the

assignments were granted as part of their "wholesaler contracts, and they've been in place for

decades." [Doc. No. 602-11 at 132:19–23]. With respect to both the CVS-Cardinal Health

Agreement and the CVS-McKesson Agreement, Ms. Alves also confirmed that each was a "form agreement and that there was not a specific negotiation process for this assignment agreement." [Doc. No. 624 at ¶ 67; Doc. No. 600-7 at 137:19–24].

### 2. CVS-McKesson Agreement

On February 9, 2024, CVS and McKesson executed a document entitled "Agreement for Assignment of Claims" ("CVS-McKesson Agreement"). [Doc. No. 624 at ¶ 21; Doc. No. 600-2]. CVS and McKesson executed the CVS-McKesson Agreement after CVS filed its complaint in *CVS Pharmacy, Inc. v. Takeda Pharmaceutical Company Limited et al.*, No. 1:24- cv-10223 (D. Mass. Jan 29, 2024). [Doc. No. 624 at ¶ 22]. The CVS-McKesson Agreement stated that CVS purchases, among other things, pharmaceutical products from McKesson, including Amitiza, for resale to the public. [*Id.* at ¶ 23; Doc. No. 600-2 at 2]. The CVS-McKesson Agreement stated that:

> McKesson conveys, assigns and transfers to CVS all rights, title and interest in and to all antitrust, unfair competition, or similar causes of action it may have against Defendants under the laws of the United States or of any State arising out of or relating to McKesson's purchase of Amitiza and/or its generic equivalent that was subsequently resold to CVS during the period from January 1, 2015 to [February 9, 2024] for any claims brought pursuant to a civil antitrust action against Takeda and others in order to recover allegedly illegal overcharges imposed on purchasers of Amitiza.

[Doc. No. 624 at ¶ 24; Doc. No. 600-2 at 2]. Like the CVS-Cardinal agreement, the CVS-McKesson Agreement stated that CVS agreed to indemnify McKesson, use its best efforts to conduct and to coordinate discovery with all other parties in any action brought on the claims assigned in the CVS-McKesson Agreement, and CVS would not assign or transfer any claims assigned to it through the CVS-McKesson Agreement without McKesson's consent. [Doc. No. 624 at ¶¶ 25–27; Doc. No. 600-2 at 2–3]. Similarly, the CVS-McKesson Agreement states that the agreement is "in consideration of the mutual covenants contained in this agreement, and for

other consideration . . . ." [Doc. No. 624 at ¶ 29; Doc. No. 600-2 at 2]. Again, the parties dispute

whether the CVS-McKesson Agreement describes any valid consideration. [Doc. No. 624 at ¶

28].

### 3. McKesson-Albertsons Agreement

On December 1, 2023, Albertsons and McKesson executed a document entitled

"Agreement for Assignment of Claims" ("Albertsons-McKesson Agreement"). [*Id.* at ¶ 30; Doc.

No. 600-3]. The Albertsons-McKesson Agreement stated that Albertsons purchases, among other

things, pharmaceutical products from McKesson, including Amitiza, for resale to the public.

[Doc. No. 624 at ¶ 31; Doc. No. 600-3 at 2]. The Albertsons-McKesson Agreement stated that:

> McKesson conveys, assigns and transfers to Albertsons 100 percent (100%) of all
> rights, title and interest in and to all causes of action it may have against
> Defendants under the antitrust laws of the United States or of any State thereof
> that arise out of McKesson's purchases of Amitiza or its generic equivalent that
> was then subsequently resold to any affiliate of Albertsons during the period from
> April 1, 2016 to [December 1, 2023], and which causes of action are based on the
> allegation that Defendants delayed or frustrated the introduction of generic
> versions of Amitiza.

[Doc. No. 624 at ¶ 32; Doc. No. 600-3 at 2]. Like the CVS Agreements, the Albertsons-

McKesson Agreement stated that Albertsons agreed to indemnify McKesson, use its best efforts

to coordinate discovery, and agreed that it would not transfer or assign its rights assigned to it

without McKesson's consent. [Doc. No. 624 at ¶¶ 33–35; Doc. No. 600-3 at 2–3]. Similarly, the

McKesson-Albertsons Agreement states that the agreement is "in consideration of the mutual

covenants contained in this agreement, and for other consideration . . . ." [Doc. No. 624 at ¶ 37;

Doc. No. 600-3 at 2].

The parties dispute whether the McKesson-Albertsons Agreement describes any valid

consideration. [Doc. No. 624 at ¶ 36]. Erin Shaal, Albertsons's Rule 30(b)(6) witness and VP of

Pharmacy Procurement, Patient Care Services and Specialty Care at the time Albertsons

executed the agreement, testified that, with respect to the Albertsons-McKesson Agreement,

"[n]o payment at all" was made in exchange for the purported assignment of claims from

McKesson, that the assignment of claims was "not in exchange for" any purchases of brand or

generic Amitiza by Albertsons, and that Ms. Shaal was not aware of Albertsons having any

"responsibility for sharing any potential damages recovered in this action with McKesson."

[Doc. No. 624 at ¶¶ 68–72; Doc. No. 600-9 at 116:22–120:3]. In her testimony, Ms. Shaal

clarified that "the assignment of claims is part of the larger agreement with McKesson that they

assign us these claims based upon our larger agreement," specifying that in Albertsons's

"wholesaler agreement with Mckesson and the fact that [Albertsons] buy[s] brands and generics

amongst other products from McKesson, they have an assignment of claims language in there

that allows us to be assigned these claims." [Doc. No. 600-9 at 116:22–117:19]. When asked if

Albertsons promised "to buy brands and generics in exchange for assignment of claims," Ms.

Shaal responded that "[i]t's not in exchange for, it's that [Albertsons] ha[s] a larger agreement

with McKesson to buy pharmaceutical brand and generic products, and in that same agreement it

allows the assignment of claims." [*Id.* at 117:21–118:8].

### 4. HEB-McKesson Agreement

On December 1, 2023, H-E-B and McKesson executed a document entitled "Agreement for

Assignment of Claims" ("HEB-McKesson Agreement"). [Doc. No. 624 at ¶ 38; Doc. No. 600-4].

The HEB-McKesson Agreement stated that HEB purchases pharmaceutical products from

McKesson, including Amitiza, for resale to the public. [Doc. No. 624 at ¶ 39; Doc. No. 600-4 at

2]. The H-E-B-McKesson Agreement stated that:

> McKesson hereby conveys, assigns and transfers to HEB one hundred percent
> (100%) of all rights, title and interest in and to all causes of action it may have
> against Defendants under the antitrust laws of the United States or of any State
> thereof that arise out of McKesson's purchases of Amitiza or its generic

equivalents that was then subsequently resold to HEB during the period from
April 1, 2012 to [December 1, 2023], and which causes of action are based on the
allegation that Defendants delayed or frustrated the introduction of generic
versions of those three drugs.

[Doc. No. 624 at ¶ 40; Doc. No. 600-4 at 2]. Like the above discussed agreements, HEB agreed

to indemnify McKesson, use its best efforts to coordinate discovery, and agreed that it would not

transfer or assign its rights assigned to it without McKesson's consent. [Doc. No. 624 at ¶¶ 41–

43; Doc. No. 600-4 at 2–3]. Similarly, the HEB-McKesson Agreement states that the agreement

is "in consideration of the mutual covenants contained in this agreement, and for other

consideration . . . ." [Doc. No. 624 at ¶ 45; Doc. No. 600-4 at 2].

   The parties dispute whether the HEB-McKesson Agreement describes any valid

consideration. [Doc. No. 624 at ¶ 44]. Ina Perales, HEB's Rule 30(b)(6) witness and Business

Development Manager at the time of the agreement, testified, with respect to the HEB-

McKesson Agreement, that "HEB didn't give anything or anything like that for this agreement"

when asked "HEB didn't pay McKesson for the assignment of its claims, did it?" [*Id.* at ¶¶ 73–

75; Doc. No. 600-11 at 106:9–13]. When asked, "Did HEB provide anything of value or any sort

of promise to do so to McKesson in exchange for the assignment of claims?" Ms. Perales

responded, "[b]ased on my years of experience, this agreement or assignment is – it's negotiated

along with our overall contract. McKesson is our primary wholesaler which we do business with

every day, but no, we are not giving them anything or promising them anything." [Doc. No. 600-

11 at 106:20–107:6; Doc. No. 624 at ¶ 76]. When asked "HEB did not pay or give McKesson

anything for this specific assignment; is that correct?" Ms. Perales responded, "Correct." [Doc.

No. 600-11 at 135:5–8].

5.   **Kroger-Cardinal Health Agreement**

On September 19, 2023, Kroger and Cardinal Health executed a document entitled "Agreement for Assignment of Claims" ("Kroger-Cardinal Health Agreement"). [*Id.* at ¶ 46; Doc. No. 600-5]. The Kroger-Cardinal Health Agreement stated that Kroger purchases pharmaceutical products from Cardinal Health for resale to the public. [*Id.* at ¶ 47; Doc. No. 600-5 at 2]. The Kroger-Cardinal Health Agreement stated that:

> Cardinal Health conveys, assigns and transfers to Kroger all rights, title and interest in and to all causes of action it may have against Defendants under the antitrust laws of the United States or of any State arising out of or relating to Cardinal Health's purchases of Amitiza or its generic equivalents that was subsequently resold to Kroger or any of its affiliates during the period from January 1, 2015 to the conclusion of the damage period relevant to the action.

[Doc. No. 624 at ¶ 48; Doc. No. 600-5 at 2]. Like the above discussed agreements, Kroger agreed to indemnify Cardinal Health, use its best efforts to coordinate discovery, and agreed that it would not transfer or assign its rights assigned to it without McKesson's consent. [Doc. No. 624 at ¶¶ 49–51; Doc. No. 600-5 at 2–3]. Similarly, the Kroger-Cardinal Health Agreement states that the agreement is "in consideration of the mutual covenants contained in this agreement, and for other consideration . . . ." [Doc. No. 624 at ¶ 53; Doc. No. 600-5 at 2].

The parties dispute whether the Kroger-Cardinal Health Agreement describes any valid consideration. [Doc. No. 624 at ¶ 52]. Dick Derks, Kroger's Rule 30(b)(6) witness and Director of Pharmacy Procurement at the time of the agreement, testified "no" when asked "Kroger didn't pay Cardinal for this assignment of claims, did it?"—with respect to the Kroger-Cardinal Health Agreement. [*Id.* at ¶¶ 77–79; Doc. No. 600-13 at 148:15–18]. When asked, "[d]id Kroger provide anything else of value to Cardinal in exchange for the assignment of these claims?" Mr. Derks responded, "Kroger supplies Cardinal Health with a large volume of business each year." [Doc. No. 600-13 at 148:19–25]. When asked, "Did Kroger promise Cardinal a certain volume of

9

business in exchange for assignment of these claims" Mr. Derks responded, "no." [*Id.* at 149:2–6; Doc. No. 624 at ¶ 80].

### 6. Walgreen-AmerisourceBergen Agreement

On September 26, 2023, Walgreen and AmerisourceBergen executed a document entitled "Agreement for Assignment of Claims" ("Walgreen-AmerisourceBergen Agreement"). [*Id.* at ¶ 54; Doc. No. 600-6]. The Walgreen-AmerisourceBergen Agreement stated that Walgreen purchases pharmaceutical products from AmerisourceBergen, including Amitiza, for resale to the public, under the Walgreen-AmerisourceBergen Purchase Agreement for Walgreen's Facilities dated April 1, 2008 ("Mail/Specialty Agreement"), the Supply Agreement (Hawaii Purchases) dated June 15, 2009 ("Hawaii Agreement") between Walgreen of Hawaii, LLC and ABDC, and the Walgreen-AmerisourceBergen Pharmaceutical Purchase and Distribution Agreement dated March 18, 2013 ("Pharmaceutical Purchase and Distribution Agreement"). [Doc. No. 624 at ¶ 55; Doc. No. 600-6 at 2]. The Walgreen-AmerisourceBergen Agreement stated that AmerisourceBergen "has not brought suit and does not anticipate bringing suit to recover overcharges on Amitiza, but has or may do so for other claims." [Doc. No. 624 at ¶ 56; Doc. No. 600-6 at 2]. The Walgreen-AmerisourceBergen Agreement stated that AmerisourceBergen:

> [C]onveys, assigns and transfers to Walgreen all of its rights, title and interest in and to all Direct Purchaser Claims it may have against Defendants under the antitrust laws of the United States or of any State arising out of or relating to [AmerisourceBergen]'s purchase of Amitiza or its generic equivalent, which was subsequently resold to Walgreen, Walgreens Health Initiatives or Walgreen of Hawaii during the period from April 1, 2008 to the present pursuant to the Mail/Specialty Agreement, from June 15, 2009 to the present pursuant to the Hawaii Agreement, and from March 18, 2013 to the present pursuant to the Pharmaceutical Purchase and Distribution Agreement and which relate to a civil antitrust action against Takeda and others to seek to recover overcharges incurred by purchasers of Amitiza.

[Doc. No. 624 at ¶ 57; Doc. No. 600-6 at 2]. Like the above discussed agreements, Walgreen agreed to indemnify AmerisourceBergen, use its best efforts to coordinate discovery in any action brought on the "Direct Purchaser Claims," assigned in the Walgreen-AmerisourceBergen Agreement, and agreed that it would not transfer or assign its "Direct Purchaser Claims" or causes of action without AmerisourceBergen's consent. [Doc. No. 624 at ¶¶ 58–60; Doc. No. 600-6 at 2–3]. Similarly, the Walgreen-AmerisourceBergen Agreement states that the agreement is "in consideration of the mutual covenants contained in this agreement, and for other consideration . . . ." [Doc. No. 624 at ¶ 62; Doc. No. 600-6 at 2].

The parties dispute whether the Walgreen-AmerisourceBergen Agreement describes any valid consideration. [Doc. No. 624 at ¶ 61]. Zachary Mikulak, Walgreen's Rule 30(b)(6) witness and Senior Director of Generic Purchasing and Analytics, was asked at his deposition if Walgreen paid AmerisourceBergen for the assignment of claims, to which he responded "[i]t's my understanding that it's in our prime vendor agreement language with AmerisourceBergen." [*Id.* at ¶¶ 81–82; Doc. No. 600-15 at 70:5–12]. When asked, "[d]oes the prime vendor agreement state that Walgreen is paying AmerisourceBergen anything in exchange of the assignment of claims?" Mr. Mikulak responded "[n]o, I do not believe there's anything that states the premium. There's purchase requirements on the generic and branded through AmerisourceBergen." [*Id.* at 70:14–25]. When asked, "[w]ere the purchase requirements on the generic and branded in exchange for the assignment of claims?" Mr. Mikulak responded, "I don't think it's anything stated as an exchange. There's just a language in there that states the assignment of claims." [*Id.* at 71:3–12; Doc. No. 624 at ¶¶ 83–84].

## II.   ANALYSIS

### A.  <u>Whether Federal Common Law Or Choice-Of-Law Rules Apply</u>

While the parties raise numerous arguments, my finding on only one issue is dispositive: the Retailer Plaintiffs' assignments are supported by consideration. However, I will briefly address the parties' debate as to whether federal common law or Massachusetts choice-of-law rules apply in determining the validity of the assignments. The First Circuit has not yet had an opportunity to weigh in. Retailer Plaintiffs argue that an assignment of antitrust claims need not be supported by consideration and rely on the Third Circuit's holding in *Wallach v. Eaton Corp.*, 837 F.3d 356, 366 (3d Cir. 2016) that I must "apply federal common law, as opposed to the law of the state." In *Wallach*, the Third Circuit relied on the Restatement (Second) of Contracts § 332 (Am. Law Inst. 1981), to find that, "so long as an assignment is written and express, it is valid under the Restatement, even absent consideration." *Id.* at 368–369; *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 437 (3d Cir. 1993) ("[T]he validity of the assignment of an antitrust claim is a matter of federal common law."). The Third Circuit's holding was based on two reasons: "First, the issue of assignment is appropriate for the development of interstitial federal common law in harmony with the overall purposes of the antitrust statutes. Second, assignments of antitrust claims cannot appropriately be left to determination under possibly differing state law standards, because such assignments may implicate the 'direct purchaser' rule." *Gulfstream III*, 995 F.2d at 438. The Southern District of New York has also followed the Third Circuit's reasoning, finding that "the issue of assignability of a federal statutory claim is itself an issue of federal law is entirely consistent with ordinary choice of law principles." *DNAML Pty, Ltd. v. Apple Inc.*, No. 13-cv-6516, 2015 WL 9077075, at

*3 (S.D.N.Y. Dec. 16, 2015) ("[I]t is unsurprising that Courts of Appeals have fashioned a uniform rule for the assignment of a federal antitrust claim").

Defendants argue that because the assignments here do not contain a governing law provision, the validity of those assignments presents a choice-of-law question. They argue that Massachusetts choice-of-law rules apply "because this Court sits in Massachusetts." *Kaur v. World Bus. Lenders, LLC*, 440 F. Supp. 3d 111, 116 (D. Mass. 2020). Under the laws of each of the Retailer Plaintiffs' and their assignors' states of incorporation and principal places of business, consideration is necessary to form a valid contract. [*See* Doc. No. 598 at 5–8]. Because the outcome would be the same regardless of which state's law applies, Defendants argue that there is no need to engage in a choice-of-law analysis. [*Id.* at 5]. They also argue that the principles underlying the out-of-circuit *Wallach* decision are inapplicable here, as that decision was based on a policy of encouraging private enforcement of antitrust laws, and the direct purchasers, whose claims encompass those of Retailer Plaintiffs', already filed suit. *See Wallach*, 837 F.3d at 369 (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730–732, 745–747 (1977)).

While I need not decide this issue to grant summary judgment in favor of Retailer Plaintiffs, the reasoning of the Third Circuit is more persuasive. "The Supreme Court concluded long ago that the first two sections of the Sherman Act, with their 'sweeping language,' are among those instances in which courts are empowered to create governing rules of law." *DNAML*, 2015 WL 9077075, at *3 (citing *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 644 (1981)). Congress "expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition." *Texas Industries*, 451 U.S. at 643 (citation omitted). These principles, in combination with other courts that have indicated that consideration may be unnecessary for gratuitous assignments, demonstrate that a federal common law rule that

13

antitrust claims may be assigned without consideration is sound. *United States v. Currency Totalling $48,318.08*, 609 F.2d 210, 213 (5th Cir. 1980) ("The general rule is that an assignment is not ineffective because it is voidable by the assignor for lack of consideration") (citing Restatement of Contracts § 150(2) (1932)). *El Paso Healthcare Sys., LTD v. Molina Healthcare of New Mexico, Inc.*, 683 F. Supp. 2d 454, 459 (W.D. Tex. 2010) ("[A]s a matter of hornbook law, contractual rights may be assigned gratuitously—such an assignment is not void for lack of consideration, and the assignee has standing to sue to enforce or protect those gratuitously obtained rights") (citing Restatement (Second) of Contracts § 332).[2] However, as explained below, the assignments at issue here are not merely gratuitous.

### B.  The Assignments Are Supported By Consideration

Regardless of whether federal common law applies, Takeda has not shown that *no* consideration was exchanged for the assignments at issue here. Takeda argues that testimony from 30(b)(6) witnesses demonstrate that no consideration was exchanged. For example, testimony from the corporate representatives of CVS, Walgreen, Albertsons, HEB, and Kroger demonstrates that no payment was provided in exchange for the assignment of these claims. [Doc. No. ¶¶ 65–66, 70, 75, 79, 83]. Of course, consideration need not be monetary, as "any performance which is bargained for is consideration." Restatement (Second) of Contracts § 72 (1981). Defendants further argue that the witness testimony shows that the assignments were not transferred in exchange for any purchases of brand or generic Amitiza, for a certain volume of business, for any promise, or for anything else of value. [*See* Doc. No. ¶¶ 66, 71, 76, 80, 84].

---

[2] I also consider that this is not a case brought under diversity jurisdiction. *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 176 (1942) ("When a federal statute condemns an act as unlawful the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield").

However, specific portions of this testimony are removed from their larger context. "[C]onsideration must consist of a 'benefit to the promisor' or a 'detriment to the promisee'" and it is no matter that "the economic value given in exchange was much less than that of the promise or the promised performance." Restatement (Second) of Contracts § 79 (1981). The same witness testimony upon which Defendants rely confirm that the reason there was no need to pay or exchange separate consideration for the assignments was because the assignments were transferred in connection with the overall wholesaler supply contracts between Retailer Plaintiffs and their primary wholesalers, which Defendants do not argue were unsupported by consideration. [*See, e.g.*, Doc. No. 602-11 at 132:19–23; Doc. No. 600-9 at 116:25–118:8; Doc. No. 600-11 at 106:20–107:6; Doc. No. 600-15 at 70:5–12]. These witnesses also confirmed that the business that the assignees provide to the assignors, as negotiated part of the overall wholesaler contract, form the consideration underlying the overall contract and, therefore, the assignments received in exchange. [Doc. No. 600-7 at 134:20–135:2 ("CVS does billions of dollars of business with Cardinal and McKesson, and that's – that's it. Nothing else – nothing's been transferred to them"); Doc. No. 600-13 at 148:19–25 ("Kroger supplies Cardinal Health with a large volume of business each year")].

Indeed, the face of the complaint demonstrates that the assignments are supported by consideration. The assignments clarify that the assignees purchase "substantial quantities of pharmaceutical products" from the assignors. [*See* Doc. Nos. 600-1 at 2; 600-2 at 2; 600-3 at 2; 600-4 at 2; 600-5 at 2; 600-6 at 2]. Furthermore, as also explained in my ruling on the direct purchasers' motion for class certification, there is no dispute that the face of the agreement states that the agreement is supported by consideration. [*See* Doc. No. 616 at 35]. While Defendants may quibble that these are boilerplate contracts, they have not shown a complete lack of

15

consideration. *Peterson v. Binnacle Cap. Servs*. LLC, 364 F. Supp. 3d 108, 115 (D. Mass. 2019) ("The definition of a benefit is extremely broad. Thus, even a very slight advantage is sufficient to constitute consideration.") (citations omitted). Accordingly, I find the assignments valid.[3]

### C.  Whether CVS's Assignment Confers Standing

Defendants argue that even if the CVS-McKesson Agreement were not invalid for lack of consideration, CVS still lacks standing because their assignment was executed on February 9, 2024, after CVS filed its complaint on January 29, 2024. Defendants are correct that standing must be established at the time the complaint is filed. Article III mandates that "a plaintiff have a 'personal stake' at the outset of an action (standing) and throughout all stages of review (mootness)." *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 909 (1st Cir. 2024); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed"). But CVS had standing to bring the same antitrust claims based on its assignment from Cardinal Health, which was executed on December 20, 2023. [Doc. No. 624 at ¶ 13]. And, as discussed, CVS's assignment from Cardinal Health is valid. Therefore, CVS has standing to bring its antitrust claims in this action, and the issue of its post-complaint assignment from McKesson "may become relevant in determining damages, but need not be considered at this stage." *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, No. 14-md-02521, 2015 WL 4397396, at *6 (N.D. Cal. July 17, 2015) (finding that Walgreen Plaintiffs had standing under their assignments, and the issue of any future assignments were not relevant);

---

[3] Defendants argue that Retailer Plaintiffs cannot meet their burden on summary judgment to demonstrate a dispute of fact because they have not put forth evidence in the record of the underlying supply contracts. However, the evidence of consideration detailed here is sufficient to find that the assignments are supported by consideration. To the extent that Takeda complains of Retailer Plaintiffs' failure to respond to discovery requests seeking this evidence, such a complaint should have been raised during the discovery period, which has long passed.

*See In re SLM Corp. Sec. Litig.,* 258 F.R.D. 112, 115 (S.D.N.Y.2009) ("To the extent courts

allow assignment of a claim after litigation commences, the plaintiff generally has Article III

standing on at least one other claim at the time the action was filed").

## III.    CONCLUSION

For the above reasons, Defendants' Motion for Summary Judgment, [Doc. No. 597], is

DENIED, and Plaintiffs' Motion for Partial Summary Judgment, [Doc. No. 601], is GRANTED.[4]

**SO ORDERED.**

/s/ Myong J. Joun
United States District Judge

---

[4] I decline to address Retailer Plaintiffs' arguments regarding Takeda's standing to challenge their assignments, as my ruling effectively moots that argument.