**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE AMITIZA ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>*All Actions* | Master Docket.<br>No. 1-21-cv-11057-MJJ |

<u>**DEFENDANT TAKEDA'S TRIAL BRIEF**</u>

**TABLE OF CONTENTS**

I.    Statement of Claims and Defenses To Be Read at Venire Before Empanelment ................... 1

II.   Voir Dire ................................................................................................................................. 2

III.  Requested Rulings, Instructions, and Evidentiary Issues ..................................................... 2

    A.   Pending Motions in Limine ............................................................................................. 2

    B.   Summary of Stipulations Concerning Motions in Limine ................................................ 4

    C.   Takeda's Requests for Pre-Trial Rulings and Instructions ............................................. 4

        1.   Plaintiffs Must Prove the Existence of the Alleged No-AG Agreement They Alleged and Should be Estopped from Arguing Otherwise ......................................................... 4

        2.   Direct Evidence of Market Power Requires Plaintiffs to Define a Relevant Market as well as Provide Evidence of Output Restriction ........................................................... 11

        3.   The Jury Must Be Instructed on the Governing Standards of the Underlying Patent Litigation .................................................................................................................... 12

        4.   Evidence Limited by Delaware Canons of Construction ............................................ 15

        5.   Takeda Has Not Waived Privilege and Seeks Guidance on Subjective Belief............. 17

        6.   To Overcome Regulatory Bars to Causation, Plaintiffs Must Prove that Par "Would Have" Launched Generic Amitiza Before January 2021 ............................................ 19

        7.   Collapse of Payment and Rule of Reason Analysis .................................................... 21

        8.   Class Plaintiffs Must Prove that All Class Members Are Injured ............................... 24

        9.   Plaintiffs Must Prove Damages by a Preponderance of the Evidence ........................ 26

        10.  EPPs' Damages, If Any, Must Be Reduced to Account for Takeda Rebates and Medicare Part D Subsidies and Discounts ................................................................. 27

        11.  Unjust Enrichment Claims Must Be Decided by this Court, Rather Than By the Jury ... ................................................................................................................................... 27

IV.   Conclusion ............................................................................................................................ 28

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Aggrenox Antitrust Litig.*,
  94 F. Supp. 3d 224 (D. Conn. 2015)..................................................................................24

*Alig v. Rocket Mortg., LLC*,
  126 F.4th 965 (4th Cir.) .....................................................................................................25

*Apotex, Inc. v. Cephalon, Inc.*,
  Index No. 2:06-cv-02768, Doc. No. 1259 (E.D. Pa. July 6, 2017).....................................14

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)................................................................................................25

*In re Cardizem CD Antitrust Litig.*,
  200 F.R.D. 297 (E.D. Mich. 2001) ....................................................................................27

*Caribbean Ins. Servs., Inc. v. Am. Bankers Life Assur. Co. of Fla.*,
  754 F.2d 2 (1st Cir. 1985)....................................................................................................7

*Cercare Health, LLC v. Philips N. Am., LLC*,
  2026 WL 396273 (D. Mass. Feb. 12, 2026) .......................................................................28

*Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*,
  79 F.3d 182 (1st Cir. 1996)...........................................................................................11, 26

*Cox v. Adminstr. U.S. Steel & Carnegie*,
  17 F.3d 1386 (11th Cir. 1994), opinion modified on reh'g, 30 F.3d 1347
  (11th Cir. 1994)..................................................................................................................17

*Fed. Ins. Co. v. MATEP, LLC*,
  2008 WL 11511401 (D. Mass. Dec. 1, 2008).......................................................................7

*FTC v. Actavis, Inc.*,
  570 U.S. 136 (2013)...................................................................................................... passim

*Healy v. Milliman, Inc.*,
  164 F.4th 701 (9th Cir. 2026) ............................................................................................25

*In re HIV Antitrust Litig.*,
  656 F. Supp. 3d 963 (N.D. Cal. 2023) ...............................................................................11

*In re HIV Antitrust Litig.*,
  2023 WL 5670808 (N.D. Cal. Mar. 19, 2023).....................................................................23

*In re HIV Antitrust Litig.*,
   Index No. 3:19-cv-2573, Doc. 2018 (N.D. Cal. Jun. 27, 2023).....................................15, 18

*In re Intuniv Antitrust Litig.*,
   496 F. Supp. 3d 639 (D. Mass. 2020) ................................................................................8, 9

*Inv. Almaz v. Temple-Inland Forest Prods. Corp.*,
   2000 WL 36938 (D.N.H. Nov. 22, 1999) ...............................................................................28

*In re Keeper of Records (Grand Jury Subp. Addressed to XYZ Corp.)*,
   348 F.3d 16 (1st Cir. 2003)......................................................................................................18

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
   791 F.3d 388 (3d Cir. 2015)......................................................................................................10

*In re Lamictal Direct Purchaser Antitrust Litig.*,
   18 F.Supp.3d 560 (D.N.J. 2014) ..............................................................................................22

*In re Loestrin 24 Fe Antitrust Litig.*,
   410 F. Supp. 3d 352 (D.R.I. 2019)...........................................................................................25

*In re Loestrin 24 Fe Antitrust Litig.*,
   45 F. Supp. 3d 180 (D.R.I. 2014) ............................................................................................22

*In re Loestrin 24 Fe Antitrust Litig.*,
   814 F.3d 538 (1st Cir. 2016).......................................................................................10, 13, 22

*Loughlin v. Vi-Jon, LLC*,
   728 F. Supp. 3d 163 (D. Mass. 2024) ......................................................................................25

*Macaulay v. Anas*,
   321 F.3d 45 (1st Cir. 2003).........................................................................................................4

*Massachusetts Eye & Ear Infirmary v. QLT, Inc.*,
   495 F. Supp. 2d 188 (D. Mass. 2007) ......................................................................................28

*Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*,
   552 F.3d 47 (1st Cir. 2009)......................................................................................................28

*Microsoft Corp. v. I4I Ltd. P'ship*,
   564 U.S. 91 (2011).....................................................................................................................12

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   No. 1:15-CV-6549, Doc. No. 890 (S.D.N.Y. Aug. 15, 2022) ............................................27

*NCAA v. Alston*,
   594 U.S. 69 (2021).....................................................................................................................16

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ............................................................................25, 27

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
632 F. Supp. 2d 42 (D. Me. 2009) .....................................................................25

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015) ..................................................................................25

*In re Nexium (Esomeprazole) Antitrust Litig.*,
42 F.Supp. 3d 231 (D. Mass. 2014) ............................................................ *passim*

*In re Nexium (Esomeprazole) Antitrust Litig.*,
842 F.3d 34 (1st Cir. 2016)............................................................14, 20, 21, 26

*In re Nexium (Esomeprazole) Antitrust Litigation*,
Index No. 12-md-02409, Doc. No. 1439 (D. Mass. Dec. 11, 2014)................22, 24

*Nypl v. JP Morgan Chase & Co.*,
No. 15-CV-9300, 2022 WL 819771 (S.D.N.Y. Mar. 18, 2022)..........................27

*Ohio v. American Express Co.*,
585 U.S. 529 (2018).....................................................................................11, 16

*In re Opana ER Antitrust Litigation*,
Index No. 14-cv-10150 Doc. No. 1004 (N.D. Ill. July 1, 2022),...................22, 24

*In re Revlimid & Thalomid Purchaser Antitrust Litig.*,
2024 WL 2861865 (D.N.J. June 6, 2024) .......................................................9, 10

*In re Sims*,
534 F.3d 117 (2d Cir. 2008).................................................................................17

*Spartan Concrete Prods., LLC v. Argos USVI, Corp.*,
929 F.3d 107 (3d Cir. 2019).................................................................................26

*Tassinari v. Salvation Army*,
349 F.R.D. 10 (D. Mass. 2025)............................................................................25

*In re TelexFree Sec. Litig.*,
777 F. Supp. 3d 47 (D. Mass. 2025) ....................................................................25

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)......................................................................................24, 25

*Traverse v. Gutierrez Co.*,
2019 WL 12291347 (D. Mass. May 6, 2019)......................................................18

*U.S. Bank Nat'l Ass'n v. Richmond*,
   2025 WL 3002049 (D. Me. Oct. 27, 2025) .................................................................28

*In re Veeco Instruments, Inc. Sec. Litig.*,
   2007 WL 7630569 (S.D.N.Y. Jun. 28, 2007) ...........................................................17

*In re Wellbutrin XL Antitrust Litig.*,
   133 F. Supp. 3d 734 (E.D. Pa. 2015) ......................................................................13

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
   868 F.3d 132 (3d Cir. 2017)........................................................................13, 14, 22

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
   2024 U.S. Dist. LEXIS 167408 (N.D. Cal. Aug. 16, 2024)....................................8, 9

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   400 F. Supp. 3d 418 (E.D. Va. 2019) .........................................................................8

Pursuant to this Court's Pre-Trial Scheduling Order, Doc. No. 620, and Local Rule 16.5(f), Defendants Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc., and Takeda Pharmaceuticals America, Inc. (collectively "Takeda") respectfully submit this Trial Brief.

## I.    Statement of Claims and Defenses To Be Read at Venire Before Empanelment

This is a civil antitrust case brought by several individual plaintiffs and class action plaintiffs, all of whom are companies that purchased or paid for Amitiza. Amitiza is a medicine used to treat constipation and Irritable Bowel Syndrome that is marketed by Defendant Takeda.

Amitiza was developed by a company called Sucampo Pharmaceuticals, Inc., which obtained several patents covering Amitiza, some of which remain in force until 2027. Sucampo later entered into an agreement with the Defendant, Takeda, under which Takeda obtained an exclusive license to Sucampo's patents covering Amitiza and agreed to market and sell Amitiza in the United States.

In 2012, another pharmaceutical company, Par Pharmaceuticals, Inc. ("Par"), following a process laid out by a law called the Hatch-Waxman Act, submitted an application with the U.S. Food and Drug Administration (also referred to as FDA) for approval of a generic version of Amitiza. As part of its application to FDA and as required by the Hatch-Waxman Act, Par notified Sucampo of Par's claim that its generic version of Amitiza would not infringe on Sucampo's patents, and that those patents were invalid. Sucampo and Takeda then sued Par for patent infringement as permitted by the Hatch-Waxman Act. That patent lawsuit ended in October 2014, when Sucampo and Takeda entered into a written settlement agreement (the "Settlement Agreement") with Par. Neither Sucampo nor Par are parties in this case.

The Plaintiffs claim that Takeda and Sucampo, as part of the Settlement Agreement, entered into an anticompetitive agreement to restrain competition and delay the launch of a generic version of Amitiza. Plaintiffs claim that, as a result of the allegedly anticompetitive agreement, they paid higher prices for Amitiza and/or generic Amitiza than they otherwise would have.

Takeda denies the Plaintiffs' claims that it and Sucampo entered into an anticompetitive agreement to delay the launch of generic Amitiza and denies that Par would have launched generic Amitiza earlier in the absence of any such agreement. Takeda contends that the Settlement Agreement between it, Sucampo, and Par was procompetitive for several reasons, including that the settlement allowed Par to launch its generic product several years before all of Sucampo's patents on Amitiza would expire. Takeda also disputes Plaintiffs' claims that all plaintiffs were injured by, or incurred damages as a result of, the allegedly anticompetitive agreement.

## II.    Voir Dire

The parties have agreed upon a list of joint voir dire questions, and Takeda has proposed additional voir dire questions, all of which will be submitted with the Plaintiffs' Trial Brief.

## III.    Requested Rulings, Instructions, and Evidentiary Issues

### A.    Pending Motions in Limine

Takeda filed twenty-five pre-trial motions *in limine*, Doc. Nos. 682-684. The parties have resolved eight of these motions in full by stipulation.[1]  Doc. No. 695. The following motions remain pending:

1. Plaintiffs should not be allowed to reference, elicit, or comment on Takeda's invocation of attorney-client privilege, suggest that such invocation supports a

---

[1] The parties also partially resolved motions *in limine* 3 and 9, marked by "*" above. Doc. No. 695.

negative inference of wrongdoing, or argue waiver based on Takeda's generalized statements (MIL No. 1);

2. Plaintiffs should not be allowed to draw adverse inferences based on the absence of defense witnesses at trial (MIL No. 2);

3. Plaintiffs' counsel and witnesses should not be allowed to use pejorative or inflammatory terms (MIL No. 3*);

4. Plaintiffs should not be allowed to introduce evidence or argument regarding pretrial disputes, motions, or orders  (MIL No. 4);

5. Plaintiffs should not be allowed to introduce evidence, testimony, or argument that Sucampo's FDA citizen petition was without basis or a sham (MIL No. 7);

6. Plaintiffs should not be allowed to refer to Federal Trade Commission statements, publications, or other FTC materials (MIL No. 8);

7. Plaintiffs should not be allowed to introduce evidence, testimony, or argument directed at the pharmaceutical industry generally or public policy issues (MIL No. 9*);

8. Plaintiffs' experts, Dr. Michael Davitz and Dr. Paul Warfield, should not be allowed to offer opinions not disclosed in their expert reports (MIL No. 10);

9. Plaintiffs' expert, Dr. Michael Davitz, should not be allowed to opine on baseline likelihoods of success in Hatch-Waxman litigation or Par's percentage likelihood of success (MIL No. 11);

10. Plaintiffs should not be allowed to pursue a theory of liability based solely on the Settlement Agreement's 50% royalty rate (MIL No. 12);

11. Plaintiffs should not be allowed to characterize themselves as "consumers" or present evidence or argument referring to consumer or patient harm (MIL No. 13);

12. Plaintiffs' experts should not be allowed to offer legal opinions construing the terms of the Settlement Agreement (MIL No. 19);

13. Plaintiffs should not be allowed to present evidence, argument, or testimony concerning damages or restitution for claims dismissed by the Court (MIL No. 20);

14. Plaintiffs' experts should not be allowed to offer testimony that misstates the law on procompetitive benefits (MIL No. 21);

15. Plaintiffs' expert witnesses should not be allowed to testify regarding principles of law (MIL No. 22);

3

16. Plaintiffs should not be allowed to introduce evidence, argument, or testimony regarding indemnification or related negotiations (MIL No. 23); and

17. Plaintiffs' expert, Dr. Martin Kovach, should not be allowed to opine that "all or virtually all" class members were injured, or alternatively Plaintiffs should be required to provide a mechanism to challenge injury as to uninjured class members (MIL No. 24).

Takeda incorporates its motions, the supporting briefs, and all exhibits, by reference.

### B.      Summary of Stipulations Concerning Motions in Limine

On March 13, 2026, the parties filed a Joint Notice and Proposed Order regarding Withdrawal or Resolution in Part of Motions *in Limine*, Doc. No. 695, which Takeda incorporates by reference.

### C.      Takeda's Requests for Pre-Trial Rulings and Instructions

To streamline trial and to protect the parties' rights, Takeda respectfully requests additional pre-trial rulings and guidance on the following issues.

#### 1.      Plaintiffs Must Prove the Existence of the Alleged No-AG Agreement They Alleged and Should be Estopped from Arguing Otherwise

At the charge conference, Plaintiffs announced that they intend to proceed at trial on a theory that departs materially from both the governing law and their own pleadings. Specifically, Plaintiffs took the position that they need not prove that Takeda and Par reached an agreement—expressly or implicitly—that Takeda would refrain from launching an authorized generic ("AG"). Instead, Plaintiffs argued that they need only prove that certain settlement terms created economic "disincentives" for Takeda to launch an AG, and that this alleged disincentive alone suffices to establish liability. As Plaintiffs' counsel stated: "We do not think we have to prove

an implicit agreement."[2]  That position cannot be reconciled with the governing case law, this Court's summary judgment ruling, or Plaintiffs' longstanding theory of this case.

a)  **Plaintiffs Should Be Estopped From Changing Their Theory of Liability On the Eve of Trial**

Consistent with the express terms of the statute under which they brought suit, until a week ago Plaintiffs consistently based their case upon the existence of an alleged "No-AG agreement" between Takeda, Sucampo, and Par. Section 1 requires proof of a "contract, combination, or conspiracy"—that is, an agreement. In this case, Plaintiffs' own theory has always depended on the existence of a "No-AG agreement"—that is, an agreement between Takeda, Sucampo, and Par that Takeda would not launch an AG in exchange for Par's delayed entry. Plaintiffs' own complaints repeatedly allege that the parties to the patent litigation entered into a No-AG agreement, either expressly or implicitly.[3]  In response to an interrogatory issued by Takeda, Plaintiffs similarly stated that "Takeda *agreed* to withhold from consumers a competing product, which would have reduced the prices paid for Amitiza and Par's generic Amitiza."[4]  Consistent with these assertions, Plaintiffs' experts also restate the alleged existence of a No-AG agreement.[5]  At a hearing on summary judgment, Plaintiffs' repeatedly referenced

---

[2] *See* **Exhibit A** (excerpt from March 19, 2026 Hearing Tr.) at  18.  All Exhibits referenced herein are submitted with the March 26, 2026 Declaration of Joshua Barlow, Esq., filed contemporaneously.

[3] *See* Doc. No. 28 at ¶ 245 (DPP Am. Class Action Compl.) ("Takeda *agreed* not to enter the market with its own, competing authorized generic product") (emphasis added); Index No. 23-cv-13061 Doc. No. 1 at ¶ 149 (Walgreens Compl., same); Index No. 24-cv-10223 Doc. No. 1 at ¶ 142 (CVS Compl.) ("Takeda, Sucampo, and Par all *knew* that while Par had the choice to either market the AG or launch its own ANDA product, *Takeda would not launch its own AG* in either case") (emphasis added); Index N. 23-cv-12918 Doc. No. 1 at ¶¶ 97, 149, 152 (EPP Compl.) (Sucampo's effective commitment not to launch an AG constituted an unlawful reverse payment to Par, the alleged infringer of its Amitiza patents.").

[4] **Exhibit B** (Excerpt from DPPs' Am. Resps. and Objs. to First Interrogatories) at 38 (emphasis added).

[5] *See, e.g.* Doc. No. 684, Ex. 14 (6/7/24 Clark Rep.) at ¶ 9 ("pursuant to this anticompetitive agreement…when Par eventually did launch, there would only be one generic in the market"), ¶ 203 (characterizing the alleged agreement as including a "no-AG agreement" implemented through the royalty structure); Doc. No. 684, Ex. 20 (6/14/24 Conti Rep.) at ¶ 23 ("Takeda/Sucampo entered into an agreement with Par in which…[w]hen Par eventually did launch, there would only be one generic lubiprostone in the U.S. Market"); Doc. No. 684, Ex. 22 (6/7/24 Johnson Rep.) at ¶ 27 (stating the settlement contained "A no-second-generic provision provided for in the declining royalty

5

the "implicit" No-AG agreement and told this Court that "the extrinsic evidence supports the jury finding an implicit no AG agreement."[6] Even Direct Purchaser Plaintiffs' class notice states that "*Par received a guarantee* that, when it did enter the market, it would not face competition from a Takeda authorized generic."[7]

As recently as March 6, 2026, in their summary of the evidence in the parties' joint pretrial memorandum, Plaintiffs continued to assert that Takeda made a reverse payment by agreeing not to launch an AG.[8] On March 24, 2026, two days before the parties' submission of the Pretrial Memorandum, an excerpt of which is attached hereto as **Exhibit E**, Plaintiffs struck these statements to conform to their newfound theory that liability may be found merely on the basis of "disincentives" to the launch of an AG as opposed to an agreement not to do so.[9]

Plaintiffs should be estopped from engaging in such gamesmanship on the eve of trial to account for the lack of evidence supporting the theory of liability they have been litigating for

---

provisions"); Doc. No. 684, Ex. 28 (10/22/2024 Kovach Rep.) at ¶ 49 ("[Plaintiffs] allege that this [reverse] payment took the form of a 'no-AG' agreement: Takeda and Sucampo agreed not to launch an AG when Par launched its generic lubiprostone."); Doc. No. 684, Ex. 15 (6/14/24 Leffler Rep.) at ¶ 9 ("According to Plaintiffs, as part of the Settlement Agreement Takeda agreed not to introduce an authorized generic . . . .").

[6] **Exhibit C** (excerpt from May 29, 2025 Hearing Tr.) at 61 (counsel explaining "how the court and how the jury can find *an implicit no AG agreement*."); 62 ("if the Court does not grant our motion for summary judgment, we clearly, the plaintiffs clearly believe that the extrinsic evidence supports the jury finding *an implicit no AG agreement*. . . So if the Court doesn't agree with us on the *implicit terms of the agreement*, the jury clearly gets to look at evidence outside the written agreement to find out -- to figure out and determine whether there is an antitrust violation.") (emphasis added).

[7] Doc. No. 640-2 ("The plaintiffs allege that in September 2014, Takeda and its then-partner, Sucampo, colluded with generic drug manufacturer Par to delay entry and forestall competition of generic Amitiza using a reverse payment provision in the form of a profit split in a settlement agreement. Pursuant to the agreement, Par agreed to delay launching its generic product by more than five years and create a bottleneck for all other generics. *In exchange, Par received a guarantee* that, when it did enter the market, it would not face competition from a Takeda authorized generic.") (emphasis added).

[8] *See* **Exhibit D** (excerpt from Plaintiffs' March 6, 2026 Draft Joint Pretrial Mem.), at 1 (Plaintiffs' Summary: "The reverse payment took the form of a 50/50 profit split between the brand and the generic conditioned upon the absence of a second generic Amitiza (lubiprostone) product in the market."); *id.* at 2 ("In exchange [for Par's purported delayed entry], Takeda and Sucampo *agreed* that when Par launched a generic product—whether it was an AG or an ANDA generic—it would not face generic competition from a Takeda/Sucampo AG.") (emphasis added).

[9] **Exhibit E** at 2 (deleting statement "that when Par launched a generic product—whether it was an AG or an ANDA generic—it would not face generic competition from a Takeda/Sucampo AG.").

years. *Caribbean Ins. Servs., Inc. v. Am. Bankers Life Assur. Co. of Fla.*, 754 F.2d 2, 6-7 (1st Cir. 1985) (affirming district court's order that the "plaintiff was estopped from adopting a theory of the case inconsistent with his previous allegations" because to permit "a whole new theory of liability . . . . on the eve of trial, would have unfairly surprised the defendant who had already devoted much time and expense to the case as earlier framed"). If Plaintiffs' untimely tactical shift is accommodated, Takeda will be severely prejudiced in having to reform its strategy, and the scope of the evidence it plans to present, less than three weeks away from a trial in which an adverse verdict may expose it to several billions of dollars in liability. This is precisely the egregiously unfair result courts have sought to prevent by estopping parties from asserting new theories of liability long after the time permitted to do so has passed and no showing of good cause has been made.[10]  The same result should follow here. The Court should not permit Plaintiffs to proceed on any theory of liability other than the one they pleaded – that "Takeda *agreed* not to enter the market with its own, competing authorized generic product"[11]

> **b)    Plaintiffs Must Prove the Existence of an Anticompetitive Agreement Under Governing Law**

This Court's summary judgment ruling confirms that Plaintiffs must prove the existence of at least an implicit No-AG agreement and cannot rely on the Settlement Agreement itself, or its alleged economic effects, to satisfy that requirement. There, this Court held that the written Settlement Agreement does not contain an explicit No-AG commitment and therefore constitutes

---

[10] *Macaulay v. Anas*, 321 F.3d 45, 52–53 (1st Cir. 2003) ("appellant introduced a new theory of liability only days before the anticipated trial date. Allowing her to pursue that theory would have placed an untenable burden on the defense and, in the bargain, would have contravened the spirit of the discovery rules."); *Fed. Ins. Co. v. MATEP, LLC*, No. CV 05-12391-NMG, 2008 WL 11511401, at *6 (D. Mass. Dec. 1, 2008) (preventing plaintiffs from asserting new theory of liability "less than two weeks before the scheduled trial" because "[e]ven assuming that the new claim require no additional discovery, its introduction would unfairly affect [defendant's] ability to prepare its defense").

[11] DPP Am. Class Action Compl. ¶ 245 (emphasis added).

"circumstantial evidence of a conspiracy at best," but concluded that "a reasonable jury may still find that there is an implicit no-AG agreement, which could not have resulted from the independent actions of either Par or Takeda/Sucampo."[12] Plaintiffs cannot now avoid that burden by redefining their claim.

Nor does the case law support Plaintiffs' newly articulated theory that evidence of a "disincentive" in a settlement agreement is sufficient to prove a reverse payment. In every reverse-payment case Plaintiffs rely on—including *Zetia*, *Intuniv*, and *Xyrem*—liability turned on the existence of a reverse payment in the form of an agreement, express or implicit, that the brand would not launch an authorized generic. Economic incentives or "disincentives" were relevant only as circumstantial evidence from which such an agreement could be inferred. In *Zetia*, for example, the district court denied dismissal where the settlement could "plausibly be read to be an anticompetitive agreement … not to compete … by launching an AG," explaining that the agreement allegedly "did not allow Merck to sell a generic product, including an AG."[13] And at summary judgment, the court found triable issues regarding a no-AG agreement—but critically, based on additional evidence that the parties actually understood and intended the settlement to preclude the brand from launching an AG (*i.e.*, an implicit no-AG agreement), not merely on settlement terms that might have created an economic disincentive to do so.[14]

Similarly, in *Intuniv*, the court denied summary judgment where plaintiffs advanced a theory of an "implicit no-AG agreement," explaining that liability would turn on whether "Shire and Actavis agreed that Shire would not launch an AG so that Actavis would be free from generic competition…."[15] The court found a triable issue only because plaintiffs had adduced additional

---

[12] Doc. No. 632 at 87-88.
[13] *In re Zetia (Ezetimibe) Antitrust Litig.*, 400 F. Supp. 3d 418, 428, 430 (E.D. Va. 2019).
[14] *Id.* at 418-19.
[15] *In re Intuniv Antitrust Litig.*, 496 F. Supp. 3d 639, 671-72 (D. Mass. 2020).

evidence—beyond the settlement terms themselves—that both parties to the settlement agreement "understood that [the brand company] would make more from the royalty agreement than from distributing an AG," as well as economic analyses, internal forecasts, and expert testimony that the royalty structure functioned as an enforcement mechanism for that implicit agreement.[16]

Likewise, in *Xyrem*, the court denied summary judgment only in connection with plaintiffs' theory that the settlement embodied an "implicit no-AG agreement," explaining that a jury could find such an agreement where the settlement restricted the brand's ability to distribute an AG through a third party and the economic terms indicated that the brand would forgo launching an AG on its own.[17]  That conclusion also rested on additional evidence— beyond a mere economic disincentive— from which a reasonable jury could conclude that the settlement terms "were part of an implicit no-AG agreement."[18]

Indeed, the only case to confront Plaintiffs' theory directly rejects it. In *Revlimid*, plaintiffs did not allege any express or implicit no-AG agreement, but instead claimed that a settlement term—a volume-limited license—amounted to a reverse payment because it "disincentivized" the brand from launching an authorized generic.[19]  The court dismissed the claim, emphasizing that plaintiffs "ha[d] not alleged that [the brand] promised not to produce an AG" and declining to extend *Actavis* to reach a theory based on economic incentives alone.[20]  It explained that if a mere "disincentive" were sufficient, "countless settlement terms could be characterized as disincentivizing an authorized generic," which would improperly sweep in

---

[16] *Id.* at 670-71.

[17] *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2024 U.S. Dist. LEXIS 167408, at *30-31 (N.D. Cal. Aug. 16, 2024).

[18] *Id.*

[19] *In re Revlimid & Thalomid Purchaser Antitrust Litig.*, 2024 WL 2861865, at *57-58, *62 (D.N.J. June 6, 2024).

[20] *Id.*

"commonplace" patent settlements that *Actavis* expressly left undisturbed.[21]  In short, *Revlimid* holds that economic disincentives alone—without any actual agreement, express or implicit, not to launch an AG—cannot establish a reverse payment as a matter of law.

Plaintiffs' contrary position would expand *Actavis* beyond recognition. Under their theory, any settlement term that arguably affects a party's incentives could be treated as a "reverse payment," even absent any agreement restraining competition. That is not the law. *Actavis* and its progeny focus on reverse payments, which have been held to include agreements—whether express or implicit—by the brand company not to launch an AG.[22]  They do not impose liability based solely on economic incentives created by contract terms.

Plaintiffs' eleventh-hour shift in theory is also reflected in their proposed jury instructions, which omit any requirement that the jury find an agreement—express or implied—that Takeda would not launch an AG. Instead, Plaintiffs' instructions would permit the jury to impose liability based solely on the existence and alleged economic effects of the settlement terms themselves.[23]  That approach is inconsistent with § 1 and this Court's prior ruling.

Accordingly, the Court should reject Plaintiffs' attempt to recast their case on the eve of trial and should instruct the jury consistent with the governing law. It should clarify that Plaintiffs bear the burden of proving the existence of the alleged agreement—namely, that Takeda, Sucampo, and Par reached an agreement, express or implied, that Takeda and Sucampo would not launch an AG. And it should clarify that economic incentives arising from the structure of a settlement, without more, cannot establish the "reverse payment" required under *Actavis* to trigger antitrust scrutiny of a patent settlement in the first place. If Plaintiffs cannot prove that

---

[21] *Id.* at *64.

[22] *See, e.g.*, *In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 550 (1st Cir. 2016); *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 403-04 (3d Cir. 2015).

[23] Doc. No. 698 at 2-4.

10

Takeda and Sucampo agreed—explicitly or implicitly—not to launch an authorized generic, then their claims fail as a matter of law.

### 2. Direct Evidence of Market Power Requires Plaintiffs to Define a Relevant Market as well as Provide Evidence of Output Restriction

The Court should instruct the jury that direct evidence of market power requires proof of a relevant market **and** proof of output restriction. First, the Supreme Court has held that to prove market power through direct evidence, plaintiffs must define a relevant market.[24] Second, evidence of allegedly high prices or high margins—without output restriction—is insufficient to prove market power. As the Supreme Court explained, "[m]arket power is the ability to raise price profitably *by restricting output*."[25] Plaintiffs' contrary position—that prices or margins alone constitute direct evidence of market power—conflicts with controlling First Circuit law.[26] Moreover, as Plaintiffs' counsel has acknowledged, Plaintiffs' definition of "supracompetitive pricing" as prices higher than the generic price has been rejected by multiple courts.[27] Takeda further addresses the governing standard and the proper instructions in greater detail in Defendants' Memorandum in Opposition to Plaintiffs' Proposed Jury Instructions ("Defs.' Opp. to Prop. Jury Instructions"), Doc. No. 698 at 6.

---

[24] *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018) ("[W]e must first define the relevant market."). At the Jury Instruction Conference on March 19, 2026, Plaintiffs' counsel attempted to distinguish *AmEx*'s holding, arguing it applies only to cases involving vertical (rather than horizontal) agreements. This argument is unavailing for two reasons: (1) the court in *HIV* applied *AmEx*'s holding in a similar reverse-payment case (*In re HIV Antitrust Litig.*, No. 3:19-cv-2573, Doc. No. 2018, at 21 (N.D. Cal. June 27, 2023)); and (2) in any event, the Settlement Agreement here includes a vertical agreement between Sucampo and Par, as licensor-licensee as well as manufacturer-distributor for the authorized generic product.

[25] *American Express*, 585 U.S. at 549 (citation omitted) (emphasis by Supreme Court).

[26] *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996).

[27] **Exhibit A**. at 33:12-14 ("We have lost this issue before. One of the places was *HIV*."); *see, e.g., In re HIV Antitrust Litig.*, 656 F. Supp. 3d 963, 984 (N.D. Cal. 2023).

11

### 3. The Jury Must Be Instructed on the Governing Standards of the Underlying Patent Litigation

Plaintiffs' objections to a "trial within the trial" on the validity of Par's patents is a strategic maneuver to deemphasize one of the most glaring weaknesses in their case veiled as an appeal to judicial economy. Plaintiffs' causation theories require the jury to determine whether Par was likely to have prevailed in the underlying Hatch-Waxman litigation. That inquiry cannot be performed in a vacuum. It must be grounded in the legal standards that would have governed that litigation, including the presumption of patent validity and the clear-and-convincing evidence standard for invalidity. Plaintiffs' own complaints underscore why such instruction is essential: they assert that the Sucampo patents were "no impediment" to entry and would have been found invalid or not infringed—*see, e.g.*, Doc. No. 28 at ¶¶ 262-269—placing the merits of the underlying patent litigation squarely at the center of their case.

The risk of juror confusion among the differing standards of proof required to prove the existence of an anticompetitive agreement and the standard required to prove patent invalidity—a necessary component of Plaintiffs' causation theory—is compounded by the parties' joint (and standard) instruction on the meaning of the "preponderance of the evidence" standard, which appropriately governs Plaintiffs' antitrust claims. That instruction emphasizes that a party prevails if "the scales tip, however slightly." But patent invalidity is governed by a different, higher standard. Without being instructed on the "clear and convincing evidence" standard applicable to Par's invalidity claim in the underlying patent litigation, jurors may be misled into applying the wrong, lower burden to issues of patent invalidity.[28]

---

[28] *Compare* Doc. No. 696 at 15 (Joint Instruction No. 6), 41 (Joint Instruction No. 25) *with id.* at 169-172 (Defendants' Instruction No. 7); *see also Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95 (2011) ("We consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does.").

Courts addressing reverse-payment claims have emphasized that antitrust plaintiffs must prove that it was the settlement—not the underlying patents or regulatory constraints—that caused delayed entry.[29] The *Wellbutrin* court further explained that, unlike the FTC in enforcement actions, private plaintiffs seeking damages must satisfy a stricter "by reason of" causation standard and therefore cannot rely on a payment as a proxy for patent weakness or litigation outcome.[30] Without clear instructions on these governing standards, the jury would be left to consider a hypothetical patent outcome untethered from the law that would have controlled it. The Court should therefore instruct the jury on the relevant patent-law standards to ensure that any causation determination reflects the governing legal framework rather than hindsight or conjecture.

Plaintiffs' assertion that "patent law" and the "patent merits" have "no role" in the jury's consideration of antitrust liability is not just incorrect—it is untenable.[31] Their entire theory depends on proving that, but for the settlement, Par would have entered earlier, which necessarily requires the jury to evaluate whether Par could have lawfully done so under the governing patent framework.[32] Patent law defines the scope of lawful exclusion; it is the baseline against which any alleged restraint must be measured. Stripping patent law out of the analysis would ask the

---

[29] *See, e.g.*, *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 762-65 (E.D. Pa. 2015) (holding that plaintiffs must show that the settlement, rather than the underlying patents or regulatory barriers, caused delayed entry and that a valid patent or independent regulatory scheme "cuts off the chain of causation").

[30] *See Wellbutrin*, 133 F. Supp. 3d at 764-65 (distinguishing *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013) on the ground that the FTC need show only a likelihood of harm, whereas private plaintiffs must prove but-for and proximate causation).

[31] **Exhibit A** at 35:16-22. In support of their position, Plaintiffs' cite *Actavis* and *Loestrin*, neither of which is on-point. *See id*. at 36:8-24. As discussed above, *Actavis* was a case brought by the FTC, so causation was not at issue because the FTC, unlike a private plaintiff, does not need to prove causation. Since then, the Third Circuit in *Wellbutrin* held that, despite what *Actavis* says, where there is an issue of whether the brand patent "defeats the [Plaintiffs'] suit … [the court] cannot resolve this aspect of the case without considering the merits of the underlying patent dispute." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 165 n.58 (3d Cir. 2017). Plaintiffs' citation to *Loestrin* has nothing to do with causation, and is instead simply summarizing the holding in *Actavis* that the existence of a patent does not render a settlement automatically immune from antitrust scrutiny. *See In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 544 (1st Cir. 2016).

[32] *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 168 (3d Cir. 2017).

jury to assume away the very legal rights that define the competitive landscape and would collapse the rule-of-reason inquiry into speculation untethered from the real-world constraints imposed by patents. Courts have repeatedly rejected that approach, including this Court (Doc. No. 632 at 90), recognizing that where a patent could have independently blocked entry, it breaks the chain of causation and defeats antitrust liability.[33] Plaintiffs cannot both rely on a hypothetical earlier entry and then insist that the legal framework governing that entry is irrelevant.

Nor is there a risk of a full-blown trial-within-a-trial. Nobody wants that; nor is that what Defendants are suggesting. The most in-depth inquiry into the patent litigation is with respect to Plaintiffs' "Patent Litigation Victory" causation theory. "In order to evaluate the merit of the litigation-based scenario [the jury] must consider the substance of the underlying litigation."[34] Despite the need to consider the underlying substance of the patent litigation, that does not require a full set of patent instructions—*e.g.*, instructions on claim construction or prior art.[35] Rather, the issue is no different than the number of other things Plaintiffs' must prove to establish causation.

This approach is consistent with how courts have instructed juries in reverse-payment cases that have proceeded to trial. In those cases, courts have expressly instructed that patent invalidity must be proven by clear and convincing evidence, ensuring that the jury evaluates the but-for patent outcome under the correct, heightened legal standard.[36] These instructions reflect

---

[33] *See*, *e.g.*, *Nexium*, 842 F.3d at 63-64 (affirming jury verdict for antitrust defendant in part because plaintiff did not present "evidence that the brand-name's patents would have been declared invalid or that an at-risk launch would not have infringed the patents").

[34] *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 168 (3d Cir. 2017).

[35] To the extent there is a risk of a trial-within-a-trial it is the result of the causation theories that Plaintiffs chose to bring in this case; they are pursuing: a "litigation-based  scenario [that] is premised on the idea that [Par] would have prevailed in [Sucampo and Takeda's] infringement suit."  *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 168 (3d Cir. 2017).

[36] *See Apotex, Inc. v. Cephalon, Inc.*, No. 2:06-cv-02768, Doc. No. 1259, at 5 (E.D. Pa. July 6, 2017) (as-given instruction) ("A company that argues in litigation that a patent is invalid must prove its case by clear and convincing evidence. Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction as to

14

the settled principle that, where antitrust liability turns on a hypothetical patent outcome, the jury must be guided by the same heightened burden that would have applied in the underlying litigation. The same instruction is necessary here to ensure that the jury's causation analysis is legally sound.

### 4.    Evidence Limited by Delaware Canons of Construction

Because the Court has determined that key provisions of the Settlement Agreement are ambiguous, their meaning is not resolved as a matter of law but must be determined by the jury under Delaware law. The Court has already held that these provisions—including the royalty terms at the center of Plaintiffs' theory—are "susceptible to two equally reasonable, but conflicting, interpretations."[37] Accordingly, the jury's role is to interpret those provisions by applying the governing principles of Delaware contract law, not to disregard the Agreement's text or adopt constructions untethered to it. While the jury may consider extrinsic evidence to resolve the identified ambiguities, such evidence must be used only for that limited purpose and cannot be invoked to contradict the Agreement's language or to advance interpretations inconsistent with the Court's rulings. Plaintiffs therefore may not use expert opinion or testimony regarding subjective intent to supplant the contractual text or to invite the jury to adopt constructions that depart from the interpretive framework established by Delaware law and the Court's decision.[38]

Plaintiffs' newly asserted theory—that antitrust liability attaches regardless of whether any alleged anticompetitive effects were ever realized—is wrong as a matter of law and

---

the matter at issue. It is a higher standard than the preponderance of the evidence standard."); *In re HIV Antitrust Litig.*, No. 3:19-cv-2573, Doc. No. 2018, at 16 (N.D. Cal. June 27, 2023) (as-given instruction) ("Once a patent is issued by the PTO, the party challenging the validity must prove invalidity by clear and convincing evidence, which means highly probable.").

[37] Doc. No. 632 at 63, 70.

[38] *See* Defendant's Memorandum in Opposition to Plaintiffs' Proposed Jury Instructions, Doc. No. 698, at 12-13.

untethered from the facts. Plaintiffs argue that their burden is satisfied by showing only that the "agreement creates a disincentive … to launch a second generic" and that they "do not have to prove anything else beyond that."[39] But that is not the law. Under the rule of reason, Plaintiffs bear "the initial burden to prove that the challenged restraint *has a substantial anticompetitive effect that harms consumers* in the relevant market"[40] Indeed, "[t]he whole point of the rule of reason" is to "look[ ] to the circumstances, details, and logic of a restraint *to ensure that it unduly harms competition* before a court declares it unlawful."[41] Plaintiffs' "disincentive" theory—divorced from any requirement that those effects were actually realized—would collapse this settled framework and impose liability based on speculation rather than proof of real-world harm.

Even if Plaintiffs' theory were legally sound (it is not), it still fails. As an initial matter, Plaintiffs' premise is flawed because the declining royalty provision does not apply to authorized generic sales and therefore would not have been triggered by AG entry. Even setting that aside, Plaintiffs' new argument does not establish liability; it merely reframes their theory as a contingent story about potential effects. Plaintiffs contend that the declining royalty created a disincentive for Takeda to launch a competing AG, but that theory depends on a series of events that must actually occur for any competitive harm to arise. Under Plaintiffs' own framework, Par would have to launch an AG, and a second AG would then have to enter the market, triggering a decline in the royalty from 50% to 15% – the claimed disincentive. If those alleged anticompetitive effects were never realized, that necessarily means the declining royalty was never triggered. And if the royalty was never triggered, Plaintiffs cannot show that the challenged

---

[39] **Exhibit A** at 12:2-8.

[40] *Amex*, 585 U.S. at 541 (emphasis added).

[41] *NCAA v. Alston*, 594 U.S.69, 97 (2021) (emphasis added) (citation omitted); *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F.Supp. 3d 231, 294 (D. Mass. 2014) ("The Supreme Court has made it clear that reverse payments are not presumptively unlawful and *must be evaluated for anticompetitive harm* under a holistic rule-of-reason approach."), *aff'd* 842 F.3d 34 (1st Cir. 2016) (emphasis added).

provision operated to restrain competition. Their theory therefore collapses into a failure of harm *and* causation. Absent realized effects, there is no injury and no antitrust liability.

      **5.**      **Takeda Has Not Waived Privilege and Seeks Guidance on Subjective Belief**

Takeda's MIL No. 1 and Plaintiffs' MIL No. 2 raise the same underlying privilege issue and underscore the need for clear guidance from the Court before trial regarding the permissible scope of testimony about the parties' beliefs concerning broad subject matter such as the Par litigation, the terms of the settlement, and the business justification for actions and circumstances alleged to be conspiratorial. Takeda seeks to prevent Plaintiffs from referencing Takeda's invocation of the attorney-client privilege or inviting the jury to draw improper adverse inferences from that privilege, while Plaintiffs seek to bar certain testimony about unspecified "subjective beliefs" that they contend could place attorney advice at issue. At bottom, both motions concern where the line should be drawn between testimony that necessarily implicates attorney-advice—which must remain protected—and non-privileged facts, business judgments, public statements, and third-party information that do not implicate attorney advice and are properly the subject of trial testimony. Takeda is entitled to rebut Plaintiffs' accusations of unlawful conduct by explaining its business motivations and other circumstances that disprove the existence of an anticompetitive agreement without facing the constant threat of opportunistic claims of implied privilege waiver.[42]

---

[42] *See, e.g.*, *Cox v. Adminstr. U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir. 1994), opinion modified on reh'g, 30 F.3d 1347 (11th Cir. 1994) ("mere denial" cannot cause waiver); *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (a party "does not forfeit [the attorney-client privilege] merely by asserting to his adversary that he believes he has done nothing wrong."). *See also In re Veeco Instruments, Inc. Sec. Litig.*, No. 05-MD-01695 CM GAY, 2007 WL 7630569, at *8 (S.D.N.Y. Jun. 28, 2007) ("[P]laintiff has [no] right to preclude a defendant from simply denying [allegations] …, or explaining why it believed its factual certifications were made in good faith …. To so hold would vitiate the attorney-client privilege altogether."), *abrogated on other grounds by Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34 (2d Cir. 2012).

Because the parties' examinations of fact witnesses and third parties will necessarily depend on that boundary, Takeda respectfully requests that the Court clarify the permissible scope of such testimony in advance of trial so the parties can structure their direct and cross-examinations accordingly and avoid repeated privilege disputes in the presence of the jury. Therefore, in light of Plaintiffs seeking broad exclusions and risks of waiver under undefined standards, Takeda believes it is necessary for the Court to provide clear guidance on the governing standard for when testimony or evidence places privileged communications "at issue." The authorities cited in Takeda's MIL No. 1[43] and opposition to Plaintiffs' MIL No. 2[44], including controlling First Circuit law, establish several guiding principles. Waiver requires an affirmative act by the privilege holder placing the substance of attorney advice at issue; the mere existence of legal consultation or generalized statements about litigation risk or business considerations is insufficient. Nor can waiver be manufactured through Plaintiffs' questioning—answers elicited on cross-examination do not constitute the type of disclosure required for waiver. [45]

These principles provide clear guidance for trial and are memorialized in Takeda's proposed order, submitted herewith as **Exhibit F**. Once the Court confirms that it will apply these guidelines, the parties will be better able to  resolve disputes on their own, reduce the need for the Court's intervention, and mitigate prejudicial questioning and argument before the jury. With that standard in place, any legitimate privilege concerns can be efficiently addressed through targeted objections rather than sweeping pretrial exclusions.

---

[43] Doc. No. 683 at 1.
[44] Doc. No. 708 at 2.
[45] *See In re Keeper of Records (Grand Jury Subp. Addressed to XYZ Corp.)*, 348 F.3d 16, 23-24 (1st Cir. 2003); *Traverse v. Gutierrez Co.*, No. CV 18-10175-DJC, 2019 WL 12291347, at *6 (D. Mass. May 6, 2019) (citing *XYZ Corp.*, 348 F.3d at 24).

Takeda's proposal is consistent with the approach used by Judge Young in *In re Nexium (Esomeprazole) Antitrust Litigation*, which required any party claiming waiver to raise that issue ***before*** the challenged testimony or evidence is presented to the jury.[46] For deposition designations and exhibits, claims of waiver can be resolved during the pretrial designation process; for live testimony, they can be addressed outside the jury's presence—whether at sidebar, during breaks, or before the day's testimony begins. This approach ensures any alleged "sword-and-shield" issues are resolved on a concrete record, prevents unfair prejudice from jury exposure to privilege disputes, and provides the clarity necessary for the parties to plan for the permissible scope of direct and cross-examination.

### 6. To Overcome Regulatory Bars to Causation, Plaintiffs Must Prove that Par "Would Have" Launched Generic Amitiza Before January 2021

Takeda also seeks clarification, in advance of trial, of the Plaintiffs' burden to prove causation by a preponderance of the evidence. Plaintiffs have asserted three theories of causation. Across all three, they must prove by a preponderance of the evidence that generic Amitiza would have entered the market before January 2021—not merely that it could have. This standard will shape what evidence Plaintiffs must present at trial, how the jury will be asked to decide what Plaintiffs have proved, and ultimately what damages, if any, can be calculated.

How Plaintiffs must satisfy that burden varies by theory of causation. For their first two theories, which assume Par would have continued to litigate the Amitiza patents, this Court recognized at summary judgment that Plaintiffs "must also show that the launch ***would have*** been legal"—because if the launch were stopped as illegal, "then the [Plaintiffs' injury] … would

---

[46] *In re Nexium (Esomeprazole) Antitrust Litig.*, No. 1:12-md-02409-WGY, July 11, 2014 Hearing Tr., Doc. No. 968, at 23:23-25:25 (D. Mass. Jul. 11, 2014).

be caused not by the settlement but by the patent laws prohibiting the launch."[47] For their alternative settlement theory, the patent bar is not the obstacle, but the "would have" standard still applies: Plaintiffs must prove the parties would have agreed to an earlier entry date, not merely that they could have.

*Nexium* provides clear guidance. There, the First Circuit upheld a verdict form asking whether the parties "would have" allowed earlier generic entry, rejecting plaintiffs' argument that this was an "impermissibly stringent causation standard."[48] Further, the Court rejected plaintiffs' argument that, at summary judgment, they should have been given an opportunity to demonstrate that a generic company "*could have won* a final, non-appealable judgment in its paragraph IV suit."[49] The Court explained that without "evidence that the brand-name's patents *would have* been declared invalid or that an at-risk launch *would not* have infringed the patents . . . the 'patent served as an independent regulatory bar to [a generic's] launch.'"[50]

Plaintiffs' initial instructions—though otherwise deficient—confirmed this standard and reflected the "would have" formulation.[51] And at the March 19 pre-trial conference before this Court, Plaintiffs' counsel argued their burden is to prove "that there was some evidence that Par would have prevailed."[52] But counsel then stopped to correct himself: "when I use the word 'would,' I meant 'could' and I would like to amend that. Sorry. I made that mistake several times

---

[47] Doc. No. 632 at 90 (quoting *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 165 (3d Cir. 2017)) (emphasis added).

[48] *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 59 (1st Cir. 2016).

[49] *Id*. at 62 (emphasis added).

[50] *Id.* at 63 (quoting *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 767 (E.D. Pa. 2015)) (emphases added).

[51] Doc No. 696 at 135 (P-43, stating "[i]n this case, the purchasers must prove, by a preponderance of the evidence, that the violation you have found caused harm in the form of higher prices for Amitiza (lubiprostone), because 'a cheaper, generic option would have been available sooner than it was.'"); 138 (P-45, stating "[i]n this case, you must consider what would have happened in a hypothetical market free from the antitrust violation.").

[52] Ex. A at 44:8-10; Doc. No. 696 at 140 (P-46, stating "you must decide what reasonable companies...would have done").

here." Plaintiffs' subsequent proposal of Instruction 46A doubled down on the incorrect "could have" standard, and further stated that Plaintiffs may offer only "some evidence" to that effect—a standard foreclosed by *Nexium and Wellbutrin XL*.[53]  Takeda has provided a summary of its objections to that proposed order on March 23, 2026.[54]

Given Plaintiffs' recent emphasis on the incorrect "could have" standard, Takeda respectfully requests that this Court confirm that the "would have" standard applies to all of their causation scenarios, and that Plaintiffs must satisfy their burden by a preponderance of the evidence.

### 7.    Collapse of Payment and Rule of Reason Analysis

Defendants' proposed jury instructions and verdict form require the jury to determine whether or not the Settlement Agreement contains a large and unexplained reverse payment before analyzing the Settlement Agreement under the antitrust rule of reason. This is the framework articulated by the Supreme Court in *Actavis*, where it explained that "reverse payment settlements … can sometimes violate the antitrust laws," and that settlements that include a large and unexplained reverse payment should be assessed under the rule of reason.[55]  Because the presence of a large and unexplained payment is what subjects a settlement to rule of reason scrutiny, the jury should make that determination first.

In *Nexium*, the only reverse payment case in the First Circuit to go to a jury, the Court followed *Actavis*' logic in instructing the jury and crafting the verdict form. Question 2 on the verdict form asked whether there had been a large and unjustified payment, while Question 3 asked the jury to assess its anticompetitive effects under the rule of reason.[56] As the trial judge

---

[53] Doc. No. 699-1.
[54] Doc. No. 707.
[55] *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 141, 156-57 (2013).
[56] *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 59 (1st Cir. 2016).

explained to the jury, "Question 2, is there a red flag here, does this require increased scrutiny for a possible violation of the antitrust laws? Well, the plaintiffs, have they proved a large and unjustified payment? If they have, then the red flag has gone up, you can answer that question 'yes,' and we get to Question 3."[57] If the jury proceeded to Question 3, it would still have to assess "whether the plaintiffs have proven the challenged restraint has harmed competition."[58] In *Opana*, one of the two reverse payment cases other than *Nexium* to reach a jury verdict, the verdict form similarly required the jury to determine the existence of a large and unjustified payment before assessing its anticompetitive effects.[59]

Other courts have held that that the question whether a settlement contains a large and unexplained reverse payment is a threshold determination. In *Loestrin*, the court read Actavis to impose a "three-part inquiry":

> In Step One, a district court must ask, is there a reverse payment? . . . In Step Two, a district court must ask, is that reverse payment large and unjustified?. . . Step Three is the rule of reason." The first inquiry, then, is whether the consideration paid by the patent holder to the generic competitor constitutes a "reverse payment" at all. If it does not, the Court does not reach steps two or three. [60]

Plaintiffs' proposed instructions inappropriately combine the question whether plaintiffs have proven that the settlement contains a large and unexplained reverse payment with steps one and two of the rule of reason inquiry, which ask the analytically distinct questions whether

---

[57] *In re Nexium (Esomeprazole) Antitrust Litigation*, Case No. 1:12-md-02409 (D. Mass.), Doc. No. 1439, at 45.
[58] *Id.* at 46.
[59] Question 2 asked the jury whether it had found "a reverse payment as defined in the Court's instructions." *In re Opana ER Antitrust Litigation*, Case No. 1:14-cv-10150 (N.D. Ill.), Doc. No. 1004, at 36. The Court's Instruction 6 defined a reverse payment by reference to its size and justification. *Id.* at 30.
[60] *In re Loestrin 24 Fe Antitrust Litig.*, 45 F. Supp. 3d 180, 189 (D.R.I. 2014), *vacated and remanded on other grounds*, 814 F.3d 538 (1st Cir. 2016) (quoting from *In re Lamictal Direct Purchaser Antitrust Litig.*, 18 F.Supp.3d 560, 565 (D.N.J. 2014); *see also In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 163 (3d Cir. 2017), *judgment entered sub nom. In re Wellbutrin XL Antitrust Litig.*, No. 15-2875, 2017 WL 3529114 (3d Cir. Aug. 9, 2017) (finding support in the record that the payment was large and unjustified, and thus that the agreements "are not immune from antitrust scrutiny and must, to a degree, be evaluated under the rule of reason test.").

Plaintiffs have proven that the Settlement Agreement has substantial anticompetitive effects and, if so, whether defendants have proven any procompetitive benefits (also referred to as "procompetitive justifications"). Plaintiffs' instructions inappropriately tell the jury that anticompetitive effects can be inferred from a large payment, thus satisfying step one of the rule of reason, after which the burden shifts to Takeda to "justify" the alleged reverse payment.[61] But the Court concluded on summary judgment that it "certainly cannot instruct the jury to *assume* the anti-competitive potential or effects based solely on a finding of a large, unexplained reverse payment.[62] Moreover, as explained above, Plaintiffs must prove that a payment is large and unjustified before reaching the rule of reason. Even outlier cases that fold the "large and unexplained" inquiry into step one of the rule of reason, which is out of line with in-circuit cases, have been clear that justification for the payment (*i.e.*, whether the payment is unexplained by anything other than delay) is analytically distinct from the question of whether procompetitive justifications exist for the defendant's conduct under step two of the rule of reason.[63] The Supreme Court identified saved litigation expenses and compensation for services the generic has promised to perform as possible (but not exclusive) explanations for a reverse payment[64]—neither of which can be characterized as benefiting competition in the way that procompetitive benefits under step two of the rule of reason are considered to do.

---

[61] Doc. No. 696, at 125 ("Plaintiffs' Jury Instruction No. 37: Payment—Inference from Large Payment"), 128 ("Plaintiffs' Jury Instruction No. 39: Payment—Burden Shift to Takeda to Justify").

[62] Doc. No. 632 at 109.

[63] *In re HIV Antitrust Litig.*, No. 19-CV-02573-EMC, 2023 WL 5670808, at *8 (N.D. Cal. Mar. 19, 2023) ("[T]here is a difference between whether a payment is 'large and unjustified' for purposes of step one and whether a defendant's conduct has procompetitive benefits for purposes of step two. There may be some confusion here because the term "procompetitive justification" is sometimes used in discussing step two of the rule of reason. To be sure, it may be possible for a justification for a large payment to be procompetitive. However, the defendant does not necessarily have to justify a large payment as procompetitive.").

[64] *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 156 (2013).

It is Plaintiffs' burden to prove that the alleged reverse payment is unjustified or unexplained to begin with.[65] Accordingly, in *Nexium*, Judge Young instructed the jury that the "initial burden of proof lies with the plaintiffs" to show that the alleged reverse payment "exceeded anticipated future litigation costs, exceeded the costs of other services, and lacked 'any other convincing justification.'"[66] If Plaintiffs carry that burden, the Settlement Agreement is then to be evaluated under the rule of reason. If Plaintiffs prove substantial anticompetitive effects in step one, the burden shifts in step two to Takeda to show procompetitive benefits of the agreement. As the Court ruled on summary judgment, such "procompetitive benefits need not be limited to" the challenged royalty terms, as Plaintiffs continue to insist, but can include procompetitive benefits of the Settlement Agreement as a whole.[67]

Takeda respectfully requests that this Court follow the weight of authority and the logic of *Actavis* in making clear to the jury that Plaintiffs must first prove that the Settlement Agreement includes a large and unjustified reverse payment. Only if they carry that burden will the jury need to consider whether the Plaintiffs have proved that the agreement had substantial anticompetitive effects.

### 8.    Class Plaintiffs Must Prove that All Class Members Are Injured

As explained in Takeda's Opposition to Plaintiffs' Proposed Jury Instructions, and in Takeda's MIL No. 17, the law is settled: at trial, to establish liability and standing, Class Plaintiffs must prove that all class members were injured.[68] To date, EPPs have fallen short of

---

[65] *In re Nexium (Esomeprazole) Antitrust Litigation*, Case No. 1:12-md-02409 (D. Mass.), Doc. No. 1439, at 45 ("the plaintiffs, have they proved a large and unjustified payment?"); *In re Opana ER Antitrust Litigation*, Case No. 1:14-cv-10150 (N.D. Ill.), Doc. No. 1004, at 36; *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 240 (D. Conn. 2015) (plaintiffs "must plead facts sufficient to infer (and they must ultimately prove, within the rule-of-reason framework) that a large and otherwise unjustified reverse-payment was made").

[66] *Nexium*, 42 F.Supp. 3d at 262 (citing *Actavis*, 570 U.S. at 158).

[67] Doc. No. 632 at 104.

[68] Doc. No. 653 at 9 (class plaintiffs must "establish that *all* class members paid a higher price"); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (all class members must prove injury for purposes of Article III standing at

24

this standard. EPPs' expert Martin Kovach opines only that "all *or virtually all*" class members were injured and confirmed at his deposition that he is not prepared to provide a more definitive analysis. [69]   Under the well-established law of the First Circuit, if EPPs intend to rely on the opinion that "virtually all" class members are injured, this trial cannot proceed before a mechanism has been established to remove potentially uninjured class members. If Plaintiffs intend to maintain the position that merely "virtually all" class members were injured, this Court must determine *now*, *before trial begins*, whether there is a mechanism—consistent with the Seventh Amendment and due process—for identifying and removing uninjured class members.[70] Finally, to avoid juror confusion on a dispositive constitutional issue, the jury should be instructed in clear terms that EPPs cannot prevail unless they prove injury to every class member.[71]

---

trial); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 56 (1st Cir. 2018); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 28-29 (1st Cir. 2008); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 632 F. Supp. 2d 42, 56 (D. Me. 2009); *Alig v. Rocket Mortg., LLC*, 126 F.4th 965, 975 (4th Cir.), *cert. denied*, 145 S. Ct. 2855 (2025) ("*TransUnion* requires the plaintiffs to 'set forth' 'specific facts,' 'supported adequately by the evidence,' to show each class member's standing to recover damages."); *Healy v. Milliman, Inc.*, 164 F.4th 701, 709 (9th Cir. 2026) (explaining that "prior to class certification or summary judgment, mere allegations of classwide injury were sufficient without individualized proof[,] but "[h]ad the parties brought the case to trial, as in *TransUnion*, plaintiffs' allegation of classwide injury would have been either proven or disproven").

[69] Doc. No. 684, Ex. 53 (Kovach Tr.) at 157:3-12 ("I did not calculate a percentage of the proposed classes that were uninjured."; *see also* Doc. No. 683 at 50 (MIL No. 24) (summarizing Kovach's opinions).

[70] *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015); ("the court must be satisfied that, *prior to judgment*, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members.") (emphasis added); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018) (in a case where not all class members may be presumed injured, there must be a way to "pick[ ] off" uninjured class members in "a manageable, individualized process *at or before trial*") (emphasis added); *see also Tassinari v. Salvation Army*, 349 F.R.D. 10, 31-32 (D. Mass. 2025) (rejecting plan to distinguish between injured and uninjured class members where the plan would "wait until after liability has been determined to address injury, thereby depriving Defendant of its constitutional rights to contest each element of Named Plaintiffs' claims."); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 367 (D.R.I. 2019) ("the class action plaintiff must provide a plan to identify and remove any uninjured entities and/or persons from the class in a manner that is both administratively feasible and protective of the defendant's Seventh Amendment and due process rights"); *In re TelexFree Sec. Litig.*, 777 F. Supp. 3d 47, 59 (D. Mass. 2025) ("As a general matter, a plaintiff seeking money damages must prove actual harm. Class members must be able to prove their damages without violating Seventh Amendment and due process rights of defendants, i.e., defendants must be able to challenge the testimony of each participant and rebut the claimed loss amount.") (internal citations omitted); *Loughlin v. Vi-Jon, LLC*, 728 F. Supp. 3d 163, 183 (D. Mass. 2024) ("[T]he court may certify a class containing a de minimis number of uninjured members if there is an administratively feasible mechanism for identifying and excluding them from the class before trial.") (emphasis added).

[71] *Id.; see also* Doc. No. 683 at 50 (MIL No. 24) (incorporated herein by reference).

25

### 9.    Plaintiffs Must Prove Damages by a Preponderance of the Evidence

At trial, a private plaintiff seeking monetary relief must show by a preponderance of the evidence, "actual, quantifiable damages 'by reason of' the antitrust violation"[72]  Plaintiffs' instructions imply that proof of damages are subject to a lower standard. Specifically, plaintiffs suggest in their objection to D47 that "the burden of proof on damages is lessened once the jury finds a violation [of the Sherman Act]."[73]   That is incorrect. Plaintiffs must prove by a preponderance of the evidence that the damages they claim are a result of the alleged misconduct, and must be able to establish that their damages estimates are based on reasonable assumptions.[74] Plaintiffs' burden to prove damages is not lessened upon a finding of liability. Thus, in *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, the First Circuit held that a district court erred when it instructed a jury tasked only with issuing a finding with respect to damages "to disregard the preponderance-of-the-evidence standard and to apply a lesser standard."[75] While some courts grant antitrust plaintiffs some flexibility as to proof of the precise "amount of damages," that flexibility does not mean that a lesser standard would be applied to proof of damages overall.[76] As with all other elements, Plaintiffs will have to prove by a preponderance of the evidence that the damages claimed were actually caused by the allegedly wrongful conduct, and that Plaintiffs' damages estimates are based on reasonable, non-speculative assumptions and estimates.[77]

---

[72] *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 60 (1st Cir. 2016).

[73] Doc. No. 697-1 at 16.

[74] *Spartan Concrete Prods., LLC v. Argos USVI, Corp.*, 929 F.3d 107, 113 (3d Cir. 2019) ("relaxed measure of proof is afforded to the amount, not the causation of loss—the nexus between the defendant's illegal activity and the injuries suffered must be reasonably proven" (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993)).

[75] 175 F.3d 18, 32 (1st Cir. 1999)

[76] *Id.* at 32-33.

[77] *Id.* at 33 ("damages is an issue on which reasonable estimates based on inferences are permissible. But this does not mean that the jury is free to act on less than a preponderance of the evidence").

26

### 10. EPPs' Damages, If Any, Must Be Reduced to Account for Takeda Rebates and Medicare Part D Subsidies and Discounts

EPPs must prove damages by a preponderance of the evidence,[78] and must calculate those damages to determine the "net" amount of harm to EPPs, i.e., their "actual damages." [79]  This includes netting out all discounts, rebates, and allowances, to base damages on the prices EPPs "actually paid in the most literal sense." [80]  Accordingly, "as a matter of law, to the extent Class Members receive any form of payment that covers all of part of its [Amitiza/lubiprostone] prescription costs, those payments must be deducted from damages. This is not even a close question – subsidies, of all forms, are a damages set off and the jury … will be so instructed." [81] Therefore, to the extent they prove a violation, EPPs' damages must be offset by at least (1) rebates paid by Takeda, (2) coupons provided by Takeda, (3) Medicare Part D payments, and (4) copayments or coinsurance from EPPs' members, as well as any other benefit, subsidy, discount, rebate, or allowance that reduced the actual amount paid by EPPs for Amitiza/lubiprostone.

### 11. Unjust Enrichment Claims Must Be Decided by this Court, Rather Than By the Jury

As explained in Takeda's Opposition to Plaintiffs Proposed Jury Instructions (Doc No. 698), and in the parties' Joint Pretrial Memo (submitted concurrently herewith), in this case, EPPs have asserted unjust enrichment claims under the laws of 18 states and territories, seeking

---

[78] *See, e.g.*, *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 19 n.18 (1st Cir. 2008); Decision & Order on Mot. Lim. and Defs.' Mot for "Clarification," *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-CV-6549, Doc. No. 890 at 22 (S.D.N.Y. Aug. 15, 2022) (EPPs must prove "actual damages").

[79] *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 313 (E.D. Mich. 2001); *Nypl v. JP Morgan Chase & Co.*, No. 15-CV-9300, 2022 WL 819771, at *4 (S.D.N.Y. Mar. 18, 2022).

[80] Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (CCH)) § 395 n.11; *see also id.* at § 396.

[81] Decision & Order on Mot. Lim. and Defs.' Mot for "Clarification," *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 1:15-CV-6549, Doc. No. 890 at 22 (S.D.N.Y. Aug. 15, 2022).

disgorgement and imposition of a constructive trust – *i.e.*, equitable relief. Under First Circuit law, equitable claims are properly decided by a Court, not a jury. And courts in the circuit routinely find that unjust enrichment claims seeking equitable remedies, like EPPs' claims here, are equitable and not subject to trial by jury.[82]  This approach promotes judicial efficiency and properly allocates decision-making authority between judge and jury. Plaintiffs have no substantive objections to this approach; they simply attempt to point to isolated instances where juries decided unjust enrichment cases, but even those cases do not stand for the proposition that unjust enrichment claims seeking equitable remedies must or should be tried by a jury.[83]

## IV.    Conclusion

For the foregoing reasons, Takeda respectfully requests that the Court adopt its proposed rulings and instructions, preclude Plaintiffs from advancing theories inconsistent with their pleadings, court submissions, governing law, and the positions they have taken up until the eve of trial, and ensure that the jury is properly instructed on the legal standards governing reverse-payment claims, causation, and damages. These rulings are necessary to ensure a fair trial. Takeda further requests such other and further relief as the Court deems just and proper.

---

[82] *See Massachusetts Eye & Ear Infirmary v. QLT, Inc.*, 495 F. Supp. 2d 188, 193 (D. Mass. 2007); *Cercare Health, LLC v. Philips N. Am., LLC*, 2026 WL 396273, at *10 (D. Mass. Feb. 12, 2026); *Inv. Almaz v. Temple-Inland Forest Prods. Corp.*, 2000 WL 36938, at *2 (D.N.H. Nov. 22, 1999).

[83] For example, Plaintiffs' reliance on *Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47 (1st Cir. 2009), is misplaced. While the First Circuit's opinion references a jury deciding the unjust enrichment claim in the district court below, the district court itself ruled — on a motion to overturn the jury verdict as an advisory verdict — that the unjust enrichment claim was properly decided by the court, not the jury. *Massachusetts Eye & Ear Infirmary v. QLT, Inc.*, 495 F. Supp. 2d 188, 191 (D. Mass. 2007). The district court then issued its own independent findings of fact and law. *Id.* Far from supporting Plaintiffs' position, the case confirms that unjust enrichment claims are properly resolved by the court. *U.S. Bank Nat'l Ass'n v. Richmond*, 2025 WL 3002049, at *18 (D. Me. Oct. 27, 2025) holds that the unjust enrichment claims in that case would be decided by the court.

Dated: March 26, 2026

Respectfully submitted,

*/s/ Joshua S. Barlow*
Fred A. Kelly, Jr. Esq., BBO #544046
Joshua S. Barlow, Esq., BBO #667472
**ARNOLD & PORTER KAYE SCHOLER LLP**
500 Boylston St., 20th Floor
Boston, MA 02116
Telephone: (617) 351-8050
Fred.Kelly@arnoldporter.com
Joshua.Barlow@arnoldporter.com

Andre Geverola (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
70 West Madison Street, Suite 4200
Chicago, IL 60602-4231
Telephone: (312) 583-2430
andre.geverola@arnoldporter.com

Laura Shores (*pro hac vice*)
Thomas J. Carr (*pro hac vice*)
Ali Nayfeh (*pro hac vice*)
Elizabeth Trentacost (*pro hac vice*)
Drew Needham (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave. NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
laura.shores@arnoldporter.com
thomas.carr@arnoldporter.com
ali.nayfeh@arnoldporter.com
drew.needham@arnoldporter.com
elizabeth.trentacost@arnoldporter.com

Wallace Wu (*pro hac vice*)
Seth Engel (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 South Figueroa Street,
44th Floor
Los Angeles, CA 90017-5844
Telephone: (213) 243-4000
wallace.wu@arnoldporter.com
seth.engel@arnoldporter.com

29

Assad Rajani (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
3000 El Camino Real
Five Palo Alto Square,
Suite 500
Palo Alto, CA 94306-3807
Telephone: (650) 319-4500
assad.rajani@arnoldporter.com

Ada Añon (*pro hac vice*)
Michael Sapiro (*pro hac vice*)
Matthew Wilk (*pro hac vice*)
Sam Sullivan (*pro hac vice*)
Eliza Buergenthal (*pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8000
ada.anon@arnoldporter.com
michael.sapiro@arnoldporter.com
matthew.wilk@arnoldporter.com
sam.sullivan@arnoldporter.com
eliza.buergenthal@arnoldporter.com

Michael F. Brockmeyer (*pro hac vice*)
**HAUG PARTNERS LLP**
1667 K Street, NW
Washington, DC 20006
Telephone: (202) 292-1530
mbrockmeyer@haugpartners.com

Ralph E. Labaton (*pro hac vice*)
**HAUG PARTNERS LLP**
745 5th Avenue
New York, NY 10151
Telephone: (212) 588-0800
rlabaton@haugpartners.com

*Attorneys for Defendant Takeda*

30

**CERTIFICATE OF SERVICE**

I, Joshua S. Barlow, hereby certify that on March 26, 2026, I caused a true and accurate copy of the above document, filed with the Court, to be served upon counsel of record for each party via the Court's ECF filing system or, for sealed versions of the filing, via electronic mail.

/s/ *Joshua S. Barlow*

31

US 256161429v26