# Exhibit B

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

_____

IN RE AMITIZA ANTITRUST
LITIGATION                              Docket No. 21-CV-11057-MJJ
                                        April 27, 2026

_____

JURY TRIAL DAY 10

BEFORE THE HONORABLE MYONG J. JOUN

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA  02210

JAMIE K. HALPIN, CRR, RMR, RPR
&
KRISTIN KELLEY, RPR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 7-204
Boston, MA  02210
jkhhalpin@gmail.com

APPEARANCES:


FOR THE PLAINTIFFS:

Thomas M. Sobol
Kristen Anne Johnson
Daniel Polonsky
Jessica Rose MacAuley
Erin C. Burns
Rebekah Glickman-Simon
Hagens Berman Sobol Shapiro
One Faneuil Hall Square
5th Floor
Boston, MA 02109
617-482-3700
Fax: 617-482-3300
Email: Tom@hbsslaw.com

Courtney Elizabeth Finerty-Stelzner
Getnick & Getnick LLP
Rockefeller Center
630 Fifth Avenue
Ste 20th Floor
New York, NY 10111
212-376-5666
Email: Cfinertystelzner@getnicklaw.com

Lauren C. Ravkind
Jonathan Douglas Stratton
William Campbell Haynes
Sperling Kenny Nachwalter, LLC
Four Seasons Tower
1441 Brickell Avenue
Suite 1100
Miami, FL 33131
305-373-1000
Fax: 305-372-1861
Email: Lcr@sperlingkenny.com

Uriel Rabinovitz
Thomas K. Griffith
Lowey Dannenberg, P.C.
44 South Broadway
Suite 1100
White Plains, NY 10601
914-997-0500
Fax: 914-997-0035
Email:  Urabinovitz@lowey.com

Barry L. Refsin
Hangley, Aronghick, Segal, Pudlin & Schiller
One Logan Square
27th Floor
Philadelphia, PA 19103-6933
215-496-7031
Fax: 215-568-0300
Email: Brefsin@hangley.com

John D. Radice
A. Luke Smith
Radice Law Firm, PC
475 Wall Street
Princeton, NJ 08540
646-245-8502
Fax: 609-385-0745
Email: Jradice@radicelawfirm.com


FOR THE DEFENDANTS:


Joshua S. Barlow
Fred A. Kelly, Jr.
Andre M. Geverola
Laura Scott Shores
Ada V. Anon
Wallace Wu
Bee Nagle
Matthew Wilk
Thomas Carr
Sam Sullivan
Assad Rajani
Ali Nayfeh
Drew Needham
Elizabeth Trentacost
Michael Sapiro
Arnold & Porter Kaye Scholer LLP
200 Clarendon Street, 53rd Floor
Boston, MA 02116
617-351-8052
Email: Joshua.barlow@arnoldporter.com

4

**P-R-O-C-E-E-D-I-N-G-S**

THE CLERK:  Today is April 27, 2026.  We're on the record in the matter of *FWK Holdings, LLC v. Takeda Pharmaceutical Company Limited, et al.*  Case Number is 21-CV-11057.

Will counsel please identify themselves for the record.

MR. SOBOL:  Good morning, your Honor.  Good morning to the court staff.  I hope everybody had a good weekend.  I see we have less people.  That's probably because of the patents we are going to put on today.

Tom Sobol, Hagens Berman Sobol Shapiro, for the direct purchasers.

THE COURT:  Good morning.

MS. JOHNSON:  Good morning, everyone.  Kristen Johnson, Hagens Berman Sobol Shapiro, for the direct purchaser class.

THE COURT:  Good morning.

MS. MACAULEY:  Good morning, your Honor.  Jessica MacAuley, Hagens Berman Sobol Shapiro, for direct purchaser class.

THE COURT:  Good morning.

MR. RABINOVITZ:  Good morning, everyone.  Uriel Rabinovitz, Lowey Dannenberg, for the EPP class.

THE COURT:  Good morning.

MR. TAUS:  Good morning, your Honor.  Barry Taus of Taus, Cebulash & Landau for the purchasers.

THE COURT:  Good morning.

MR. STRATTON:  Good morning, your Honor.  Jonathan Stratton for the retailers.

THE COURT:  Good morning.

MR. BARLOW:  Good morning, your Honor.  Joshua Barlow on behalf of Takeda.

THE COURT:  Good morning.

MR. KELLY:  Good morning, your Honor.  Fred Kelly on behalf of Takeda.  Good morning, everyone.

THE COURT:  Good morning.

MS. SHORES:  Good morning, your Honor.  Laura Shores on behalf of Takeda.

THE COURT:  Good morning.

MR. WU:  Good morning, your Honor.  Wallace Wu for Takeda.

THE COURT:  Good morning.

MR. RAJANI:  Good morning.  Assad Rajani on behalf of Takeda.

THE COURT:  Good morning.

MR. SAPIRO:  Good morning, your Honor.  Michael Sapiro for Takeda.

THE COURT:  Good morning.

Where is Mr. Geverola?

All right.  So where do we want to start today?  There was a lot.

MS. JOHNSON:  One I think is easy, but a logistical matter to address for Dr. Davitz.

The Court had previously indicated that Dr. Davitz will be permitted to take a break after one hour of testimony and then each hour.  Logistically, I wasn't sure how the Court wanted us to handle that.  Do you prefer that I keep an eye on the clock and say we will take the break, or did the Court want to say something about that?

THE COURT:  Yeah.  So before he starts his testimony, I'll tell the jury, let him know, that we're going to take more frequent breaks today, and I'll try to remember.  But if it looks like I'm not paying attention, just sort of, like, get my attention.

MS. JOHNSON:  Will do, your Honor.  Thank you.

MR. SOBOL:  By way of an agenda, Ms. Marchetti might testify later today.  There is an issue there, so I suggest we deal with that first.

THE COURT:  Okay.

MR. SOBOL:  And then the motion that we filed yesterday, the defendants haven't had an opportunity to respond to it in writing.  That gentleman doesn't testify until tomorrow, so the issues that are implicated by that, we can

either try to address today or, given the gravity of it, it's probably better to deal with it tomorrow morning.

THE COURT: Sure. Is that Mr. Broxson?

MR. SOBOL: Yes. Yes. There are some non- -- there are some documents of Broxson that are not implicated by that motion, so if we have time in this, we might deal with that. And then I understand that there is some issues regarding a witness by the name of Kumar.

THE COURT: Kumar. But that's not until Thursday or Friday.

MR. SOBOL: Correct. And so -- of course, you know, counsel for Takeda might have other issues. But my suggestion is we deal with Marchetti first since she might testify today.

THE COURT: Sure.

MS. SHORES: And, your Honor, just one additional issue. Dr. Ruhm, I believe, is going to testify sometime today, and there is just one exhibit at issue with respect to his testimony.

THE COURT: Got it.

MR. BARLOW: Yeah. It may be best to start with Marchetti and Ruhm. We will be filing an opposition to the motion. We're trying to do that as early as we can today.

I can agree with counsel there are, separate and apart from that, a lot of documents that are disclosed for use with Mr. Broxson that we have objections to. So we will sort

through those.

THE COURT:  Let's go through the Marchetti exhibits.

MR. BARLOW:  There are TX-1192 disclosed for use or to be entered into evidence with Ms. Marchetti.

Do you have that, your Honor?

THE COURT:  I do.

MR. BARLOW:  Okay.  And this is -- you know, we have objected to it on hearsay grounds.  This is very similar to, if the Court recalls, a deck from a company called Rising that was proposed to be entered into evidence through Mr. Johnson.  It's the same type of issue here.  It's a hearsay deck created by a third party, in this instance, Par, back in 2010.  So our point is it's hearsay without an exception.  Certainly Ms. Marchetti can't lay a foundation for it.  It shouldn't come into evidence.

MR. TAUS:  Good morning, your Honor.  This document is -- well, let me set the context a little bit.

Ms. Marchetti is going to testify that Par had the capabilities of manufacturing sufficient generic lubiprostone by the dates that we say are relevant.  They've come -- Takeda has come back and said that she's just presuming that they have the capabilities.  And so part of what Ms. Marchetti is saying in response is, I'm not just presuming, it's my experience, SEC filings, but there's also documents that I reviewed and this is one of them.

It's a presentation made by Par to Takeda about their capabilities, about the exact issue we're talking about here, and so it is clearly an authentic document.  I don't think there's any dispute about that.

THE COURT:  So just looking at the Bates number here, it looks like it was produced by Takeda?

MR. TAUS:  Yes, produced by Takeda.

THE COURT:  In discovery?

MR. TAUS:  Yes.

THE COURT:  So assuming, given the date of this document, it's about Takeda's position and it's Par's --

MR. TAUS:  Yes.

MR. BARLOW:  Yeah, I presume so.  It was generated by Par.  So there's testimony, but --

THE COURT:  Right.  But it might have been generated by Par but if Takeda had considered this and kept it as part of their business records, why won't it come in as business record exception?

MR. BARLOW:  I don't see how it's a Takeda business record.  It's prepared by Par.

And I think, just to Mr. Taus' point, we're not saying Ms. Marchetti can't discuss that she relied on it and in broad terms what it is, but I don't think it's appropriate to show or enter it into evidence.  That's the issue.

MR. TAUS:  Your Honor, there's the document itself and

then there is a slide about one page from the document.  So we think clearly at the very least the slide should be able to come in.  We also think the document should come in.

THE COURT:  Which slide is that?

MR. TAUS:  That's PX-0016.4.

THE COURT:  I am looking at the TX-1192 exhibit.

MR. BARLOW:  Yeah.  Well, Mr. Taus is referring to a slide in her presentation which is a picture of a page of the deck we're talking about.

And the only thing I'd add is, again, there is no adoptive foundation.  This issue came up very early in the case with Mr. Scott where he was shown an e-mail generated by a third party and I believe it was kept out of evidence on the grounds that there was no foundation.  He or KPH adopted it.  It's the same issue here.

THE COURT:  So how do you want to use this?

MR. TAUS:  Well, we think the document should come into evidence, and also that this screenshot from one page of the document would be on a slide deck that would be shown during Ms. Marchetti's testimony.

THE COURT:  Right.  But what are you trying to use it for?

MR. TAUS:  To establish that Par does, in fact, have the capabilities to manufacture -- it's a sophisticated company with significant manufacturing capabilities and Ms. Marchetti

is not just presuming that, that there is evidence to support it.

THE COURT:  So she can testify on direct.  I've reviewed documents and it is my opinion that Par had these capabilities.

MR. TAUS:  Yes.

THE COURT:  You don't need the document for it.

MR. TAUS:  I wouldn't say it's necessary, but I think it's helpful to build her credibility and show the jury that she's not just making this up.  This is an evident document she looked at.

THE COURT:  Yeah.  And even without the foundation issue, I mean, it wouldn't come in like that on direct anyway.  So she can testify to her opinion that Par had this capability and then let's see what Takeda does on cross.  And then depending on what they do, I might allow it in.

MR. BARLOW:  Understood.  So that applies to the document and the screenshot as well?

THE COURT:  Uh-huh.

MR. BARLOW:  The only other issue was 1195 which is a big segment of Par's ANDA filing.  And I understand, secondhand, that there is an intention to admit into evidence a page or two of it.

THE COURT:  This is the ANDA packet?

MR. BARLOW:  Yeah, it's part of the ANDA packet which

in and of itself --

MR. TAUS:  I'm sorry, I didn't mean to interrupt, Josh, but I think we can short circuit this by saying we don't intend to put that document in.  We intend for Ms. Marchetti to testify about it but not put the document in.

MR. BARLOW:  Okay.  That does short circuit that. Thank you, Mr. Taus.

MR. TAUS:  Sorry to take away your argument.

MR. BARLOW:  I think next up is --

MS. MACAULEY:  Actually, can I add one thing on Ms. Marchetti?  I think we discussed earlier, she is legally blind.  I discussed with counsel, I think she should be able to see things on that screen but in case she can't, we discussed if maybe providing her some assistance or reading aloud to her things that are on the screen if the Court would permit that.

THE COURT:  Yeah.

MS. MACAULEY:  Thank you.

MR. BARLOW:  Happy to do whatever works.  Dr. Ruhm?

MR. SULLIVAN:  Yes.  Hi, your Honor.  Sam Sullivan on behalf of Takeda.

Our only remaining objection here is as to Slides 25 and 26 of Dr. Ruhm's demonstrative.  The objection being that these slides artificially double Dr. Ruhm's estimates on reverse payment.  This is important besides the payments not just in an economic calculation, it's an element of liability.

The plaintiffs have the burden to prove that the reverse payment was, in fact, large.

The case law is clear that the value of the payment was in excess of the settlement.  So, for example, *In Re:  HIV Antitrust Litigation*, that is 700 F.Supp.3d 879.  In that case the Court looks at what the expected value was at the time of the settlement agreement.  That's what makes sense because the question here is comparison to litigation expenses and business context at the time of settlement.  That's when you have to assess the size of reverse payment, and that's why Dr. Ruhm, in his reports, every time he calculates the size of the reverse payment, he uses its value at the time of settlement in 2014 dollars.

If you look to Paragraphs 142, 143 of his opening report, he does it there.  He does it again in Paragraph 69 of his rebuttal.  And, in fact, in that paragraph he actually explains why he does it.  It's exactly the same reason I just gave, because you have to compare it to the litigation expenses in the context at the time of settlement.

One final point I'd make on this.  If you look at plaintiffs' submission, it's carefully worded.  It does not say Dr. Ruhm valued the payment at 150- to $200 million as they say in the slides.  It says that those demonstratives show the brand's lost profits, right.  So Dr. Ruhm can talk about the lost profits, but when he values the payment, he values it at

that lower 70- to $80 million range.

MS. FINERTY-STELZNER:  Your Honor, Dr. Ruhm clearly, in his report, talks about the nominal value of the profit sacrifice Takeda made during this time.  He also makes clear on rebuttal that this value can be viewed in 2025 dollars.  And, in fact, the jury is hearing this case in 2025.  We took a middle ground approach of, what is the profit sacrifice being made at the time, you know, Takeda would have been launching its second generic but didn't.

You can see this in Paragraph 142, which counsel just cited, as well as the corresponding backup materials.  Nominal value versus net present value is really the same thing.  It's just accounting for the time value of money.  So if Takeda wants to cross Dr. Ruhm on the fact that in other areas of his report he also does speak to net present value as of 2014, they're welcome to do that.  Dr. Ruhm can respond.  I presume Dr. Ruhm will also make clear that yes, you can also value it in that present value in terms of 2025 dollars and you can, you know, adjust the litigation cost accordingly.

So, you know, I think it's plaintiffs' right to present the aspects of Dr. Ruhm's report as they see fit and Takeda can cross as it sees fit.

THE COURT:  All right.  The objection is overruled.  You can cross.

MS. FINERTY-STELZNER:  Oh, Courtney Finerty-Stelzner.

I forgot my name.

MR. SOBOL:  You didn't forget your name.

MS. FINERTY-STELZNER:  Well, no, I forgot to say it. That's right.

THE COURT:  We've got about eight minutes.

MR. SOBOL:  I have a very important issue to raise, your Honor.  Can you tell the jury that the length of the deposition designations that were played during the plaintiffs' case were made by selections made by all parties so that they know that, even though they went in in our case, because they obviously were long.

THE COURT:  Yeah.

MR. SOBOL:  I think it's fair for them to get some kind of instruction to that effect.

THE COURT:  I did give that instruction at the very beginning, but I am happy to do it again.

MR. SOBOL:  Thank you.

MR. BARLOW:  No objection to that.

THE COURT:  Okay.

MR. SOBOL:  Do you want to start going into the Broxson documents that are not implicated by indemnification or take a short break before the jury comes in?

THE COURT:  I am happy to take it up now, if it's only going to take about six minutes.

MR. SOBOL:  Probably going to take longer than that.

MR. BARLOW:  I think it's 20, 25 documents in dispute.

THE COURT:  We will deal with it afterwards.

MR. SOBOL:  Let's hold off on it then.

(Recess.)

(Jury entered the courtroom.)

THE COURT:  Please be seated.

So good morning, everyone.  I hope you had a nice weekend.  Thank you all for being on time again.  I really appreciate that.

So let me start with asking you my morning questions. Have you been able to follow my instructions about not conducting any independent research?

THE JURY:  Yes.

THE COURT:  About not discussing this case with anyone?

THE JURY:  Yes.

THE COURT:  About continuing to keep an open mind?

THE JURY:  Yes.

THE COURT:  All right.  So before we start, I want to just remind you of something that I had said at the beginning of this case, and it's about video deposition testimony.  And you may recall that I said when a -- normally when a witness is called live, the party that calls that witness gets to question that witness first on direct examination, as you have seen that's what happened, and then the other side gets to question

the witness during their cross-examination, and it just goes back and forth.

But in a video deposition, the parties have designated portions, different portions of that video, but it was all played together.  Even though the plaintiff has been calling these witnesses, they've all been played together.  I just wanted to remind you all of that fact.

But, again, treat the video testimony as you would any other testimony, treat it as if that testimony was given here in court.  Okay.  All right.

MS. JOHNSON:  Purchasers call Dr. Michael Davitz to the stand.

DR. MICHAEL DAVITZ, having been duly sworn by the Clerk, was examined and testified as follows:

THE CLERK:  Please state your full name for the record and spell your last name.

THE WITNESS:  Yes.  My name is Michael Andrew Davitz.  My last name is spelled D-A-V-I-T-Z.

THE CLERK:  Thank you.  You may be seated.

DIRECT EXAMINATION

BY MS. JOHNSON:

Q.   Good morning, Dr. Davitz.

A.   Good morning.

Q.   How are you this morning?

A.   Good.

Q.   Please tell the jury a little about yourself.

A.   Yes, hi.  My name is a Michael Davitz.  I'm a patent attorney.  Been married for 46 years, have two wonderful children, both married.  I have a grandson who is about two.  And on the side, I actually work cattle, like Yellowstone.

Q.   Where do you live, sir?

A.   I live in New York.

Q.   Please describe your educational background.

A.   I received my Bachelor's degree at Yale University, I received my medical degree at Columbia University, and I received my law degree at New York University.

Q.   Now, you mentioned that you're a patent attorney.  What's a patent attorney?

A.   A patent attorney is an attorney that specializes in an area of the law called patent law.

Q.   Now, we're going to go through more about your experience and your particular conclusions in this case in just a minute, but first, how do you understand your testimony today to fit into this antitrust case?

A.   As I understand it, the dispute is about the settlement in this case between the two parties, Sucampo/Takeda and Par.  My role in this case is I was asked to look at the underlying patent litigation that occurred between Sucampo and Takeda and Par.

Q.   And for clarity, are you offering any opinions today about

the settlement that resolved, that patent litigation between Takeda and Sucampo on the one hand and Par on the other?

A.   No, I'm not.

Q.   How does one become a patent lawyer?

A.   You become a patent attorney or patent lawyer by having some type of scientific or technical education.  It could be an engineering education.  And then you go to law school.  And then in order to become a registered patent attorney, in addition to the bar exam, you take another exam called the patent bar.

Q.   Did you take the patent bar?

A.   Yes, I did.

Q.   Did you pass the patent bar?

A.   I did pass the patent bar.

Q.   And what is your scientific or technical background that qualified you to sit for the patent bar exam?

A.   I have a scientific background in several ways.  The first is I have extensive training in biology as an undergraduate.  I then went to medical school, which there is significant scientific training in medical school, and then after medical school, I did what's called a postdoctoral fellowship.  It's a postgraduate education, really, in molecular immunology.  And then I was an assistant profession in molecular immunology for a number of years at New York School of Medicine.

Q.   Now, you mentioned medical.  Were you ever a practicing

physician?

A.   I really practiced for a very limited period of time, but only as an intern and resident at NYU.

Q.   What is your current job, Dr. Davitz?

A.   I am a partner at a law firm called Leason Ellis, which is an intellectual property law firm in New York.

Q.   What does intellectual property mean?

A.   What intellectual property deals with is it deals with the protection of patents and trademarks, copyrights and trade secrets.

Q.   What's a patent?

A.   A patent protects an invention.  And when you get a patent, it prevents others from selling or making or using the -- what's protected by the patent.

Q.   In your current job as an attorney at a law firm, who hires you?

A.   I'm hired by a number of different types of clients.  I'm hired by universities that do research; that's one of my clients.  I'm hired by biotechnology companies that do biotechnology.  I'm hired by pharmaceutical companies, and I'm also hired by medical device companies that make devices.

Q.   When you say pharmaceutical company, is that the same thing as a drug company?

A.   Yes, it is.

Q.   Do companies that sell branded drugs hire you?

A.    Yes, they do.

Q.    Do companies that sell generic drugs hire you?

A.    Yes, they do.

Q.    In your experience, how common is it for a patent attorney to represent both branded drug companies and generic drug companies?

A.    In my experience, most typically, attorneys typically represent one or the other.  I, over the course of my career, have been fortunate to represent both.

Q.    Does the legal advice that you provide to drug companies change based on who hires you?

A.    No, it does not.

Q.    Why not?

A.    Because what I do is I make my decision or make -- I provide my advice based on the facts and the law.

Q.    What do brand and generic drug companies hire you to do for them?

A.    They hire me for a number of different reasons.  They hire me to help them build or establish their patents that protect their products.  I call them patent portfolios.  They hire me to evaluate the strengths and weaknesses of the company's patents as well as competitors' patents.  They hire me to look at and evaluate patents for doing various deals, either licensing in or licensing out, and they hire me to manage and direct all of their dispute work, their arguments that they

have with other companies, both within the United States and worldwide.

Q. You mentioned a patent portfolio. What is a patent portfolio?

A. A patent portfolio protects a group or claims -- a product, and you have a number of patents that may protect a particular product and they all cover the same product but they cover it in -- they claim it in different ways.

Q. Have you heard the term "follow-on patent"?

A. Yes, I have.

Q. What is a follow-on patent?

A. More typically what a follow-on patent means are those patents that typically are filed later on in what we call the life cycle of a drug. So they give -- initially you have a patent that's filed just when the drug is discovered. And then later on, you have patents that are filed later on in that as the -- during what we call the life cycle of a drug.

Q. And you mentioned, I think, managing patent disputes. What did you mean by patent disputes in that context?

A. Well, there are a number of things that can occur. You can have patent litigation that could be involved in how one company sues another company for infringing a patent. You can have disputes in various administrative offices, and that can occur both within the United States and worldwide, and I'm involved -- I've been involved in all of those.

Q.   Now, you mentioned infringing a patent.  We're going to come back to that concept in a minute, but I want to understand a little more about your experience first, sir.

You mentioned drug companies hiring you to evaluate the strengths and weaknesses of patents.  What does that mean?

A.   Well, just because you get a patent doesn't mean you can keep it.

Q.   What do you mean?

A.   Well, what it means is that just because you have a patent, you can challenge it.  And patents are challenged all the time.

Q.   Do you ever advise drug companies about the strengths and weaknesses of their patents in the context of a patent litigation?

A.   All the time.

Q.   Have you ever been an employee of a drug company?

A.   I have been.

Q.   Which company?

A.   I was an employee at a company called Taro, T-A-R-O, Pharmaceuticals.

Q.   How long did you work at Taro?

A.   A little less than six years.

Q.   What kind of drugs did Taro sell?

A.   Taro sold primarily generic drugs, but they also had a growing -- when I was there at least, they had a growing

branded division as well.

Q.   What were your job responsibilities at Taro?

A.   My job responsibilities were the same as what I mentioned just slightly earlier:  Helped them build their patent portfolio that protected their products, I evaluated the strengths and weaknesses of all of the various drugs that -- and the patents that protected those drugs.  I was involved in all of the deals that Taro was involved in.  And also I was involved in managing and directing all of the various litigations that Taro was involved in with respect to intellectual properties.

Q.   At Taro, in what context would you have analyzed the strength and weaknesses of competitors' patents?

A.   Really, two areas.  The two areas that I was involved in is that when you have a generic drug, and Taro was a generic pharmaceutical company, you would -- they would want to put that drug out on the market and the brand company would have a number of patents that would protect that drug.  And so the question that I was asked is, you know, how strong or weak are those patents.

Q.   Would you also provide advice about that in the context of ongoing patent infringement litigation?

A.   Yes, all the time.

Q.   You also said that you -- I believe your word was "managed patent litigation" at Taro.  What do you mean by that?

A.    Well, when I say "managed the litigation," I was involved in all aspects of the patent litigation at Taro Pharmaceuticals, from selecting outside counsel to drafting and preparing the various documents that are prepared in the course of the litigation, which can be quite numerous, doing something called discovery, which is a fairly unique concept in the United States, and was involved in selecting experts who would be willing to testify and work with Taro Pharmaceuticals, as well as budgeting issues, all of the various budgeting and cost issues.

Q.    I'm going to break that down a little bit because I think you used some lawyer words and I want to make sure that we get that down to plain English.

So you mentioned outside counsel.  What is outside counsel in that context?

A.    Typically, a company, like many companies, most companies, they'll hire an individual, more typically a law firm, to represent them in a particular matter.  And so it's a law firm that's usually a group of attorneys who may have specific expertise in some specific area, and that's outside counsel. So that's the outside lawyers, and so we call them in lawyer's speak "outside counsel."

Q.    And so do I understand that you were responsible for selecting which outside lawyers Taro would hire to litigate patent infringement cases?

A.    Yes, I was.

Q.    And to whom did those outside counsel litigating patent infringement cases for Taro, to whom did they report?

A.    They reported directly to me.

Q.    Are outside lawyers kind of like the lawyers in this courtroom representing Takeda here?

A.    They can be.

Q.    At any point in your career have you been a lawyer who stood up in a courtroom and argued on behalf of a client?

A.    No, I have not.

Q.    And while we're talking about it, sir, have you ever testified in a courtroom as a witness before?

A.    No, I've not.

Q.    You mentioned that you were involved in selecting experts as part of your job at Taro.  I just want to give some context for that.  What's your understanding of what is an expert report?

A.    What an expert report is is that it is a document, typically, frequently a long document, that deals with a specific issue that the litigation may be concerned with.  And so it's a document that counsel will ask a person who has some specific knowledge about some specific area to write a report on about some particular -- usually it's a technical area.

Q.    While you were at Taro, was part of your job providing advice about who was likely to win patent infringement

lawsuits?

A.    Yes.

Q.    To whom at Taro did you give advice about who was likely to win patent infringement lawsuits?

A.    I provided advice directly to the chief executive officer, the CEO, but I also reported them to the chief financial officer, the vice-chairman, the general counsel, and so I really provided advice to those senior management group of individuals.

Q.    What questions, if any, did that group of individuals ask you about pending patent infringement litigation?

A.    They would basically ask me three questions, and they would say:  How likely is it we're going to win this lawsuit, how long is this lawsuit going to last, and how much is this lawsuit going to cost us.

Q.    How often, if ever, did the CEO and other senior management at Taro ask you to express your view in numerical terms?

A.    I was asked all the time to express my views in bottom-line numerical terms.

Q.    In a percentage?

A.    Yes.

Q.    A percentage of what?

A.    I was asked, you know, what's the likelihood of our winning, and they wanted to know a percentage, and they would

say all the time, give us a percentage.

Q.   So now we've talked about your time at Taro, I want to go back now to since you left Taro.

So since you left Taro -- oh, first, what was your title at Taro?

A.   I was vice president of intellectual property at Taro Pharmaceuticals.

Q.   Thank you.

Okay.   Now, since you left Taro, what experience, if any, do you have providing advice to CEOs and senior businesspeople about who is likely to win patent infringement litigation?

A.   I've continued that type of practice since I left Taro almost 20 years ago.  So that is exactly the type of advice that I provide to senior executives of my clients all the time.

Q.   So in your career in total, at Taro and otherwise, what's your best estimate as to how many times you have provided CEOs or senior businesspeople with advice about who was likely to win a patent infringement lawsuit?

A.   Difficult to estimate, but I would say certainly several hundred times over the course of the last 30 years.

Q.   What's your understanding, if any, as to why drug companies hire you to give them advice on that topic?

A.   Well, why they hire me is, I think, for a number of reasons.  I think that I've seen the full life cycle of the

entire history, we call it the history of patents, from getting it to maintaining it to challenging it and that's one reason.

The other reason is that I have significant technical training. So I understand or I can speak to the scientists who are involved in the development of the drug and understand what they're saying.

And I think the other reason is is that, you know, I've spent time in the business and have direct -- have a direct appreciation of some of the issues that are involved in the business.

Q. How often, in total, in your career, sir, would you estimate that you've provided advice about how long litigation would take and how much litigation would cost?

A. Well, that's going back to the three questions, and those are the three questions that, in my experience, and this is my experience, that I've been asked by every single businessperson all the time. And so I've been asked that question several hundred times by -- as a part of the three questions.

Q. And have you answered that question several hundred times?

A. I have.

Q. What do you understand CEOs and senior businesspeople to do with the advice that you give them about patent litigation?

A. What they do is they take that advice and they use that advice as part of their overall business, you know, strategy and development. And so the litigation or the licensing or the

legal advice forms part of how the CEO and the senior business leaders think about the entire issues before the company.

Q.    What's your understanding, if any, as to why, let's say, the CEO of Taro doesn't only go to the outside counsel litigating that case to get advice about how it's likely to pan out?

A.    I think for several reasons.  One, that I have a somewhat more global view of the issues, not just the issue of the particular litigation, and I'm looking at both the facts and the law not just from the standpoint of, you know, the particular litigation but also in the context of the business, the overall business as well.

Q.    Okay.  Let's turn to this case, Doctor.  Who hired you here?

A.    I was hired by a number of law firms, including your law firm, who represent the purchasers of the lubiprostone product. And so it was a number of different law firms; Berman, as well as a number of other different law firms.

Q.    Are you being paid?

A.    I'm being compensated on an hourly basis for my time.

Q.    What is the hourly rate, sir?

A.    My hourly rate is $800 per hour.

Q.    Do you make more money if the purchasers win?

A.    No, I do not.

Q.    Okay.  How many hours in total have been spent on your

reports and opinions here?

A.    Approximately myself, and some junior people who assisted me on this report, probably spent approximately 2,000 hours, roughly.

Q.    Now, did you work with me and some other folks to provide some slides to aid your testimony here today?

A.    Yes, I did.

Q.    Okay.

MS. JOHNSON:  If we could pull up the slides, please, and turn to Slide 2.

Q.    What were you asked to do here?

A.    I was asked, how would a reasonable and competent patent counsel advise a company in Par or Takeda's position who was likely to win, when the litigation was likely to end and how much would it cost Takeda or Sucampo and Par to have kept on litigating.

Q.    Now, I want to be very clear about the following because I'm afraid this slide is not, so let me be clear about this.

When this says "the litigation," are you offering opinions about this antitrust case in this Boston courtroom before Judge Joun?

A.    No, I am not.

Q.    So which litigation are you talking about?

A.    What I'm offering my opinion on is the underlying litigation, the underlying, what we call the Hatch-Waxman and

ANDA litigation, was the patent litigation involving lubiprostone between Sucampo, Takeda and Par.

Q.   You mentioned on the slide in your articulation a "reasonable and competent patent counsel."  What do you mean by that?

A.   What I mean by that is a patent attorney who has a certain degree of experience advising companies or advising clients on these particular type of issues.

Q.   And how do these three questions that you were asked to look at here relate to your experience?

A.   They relate directly to the experience that I've had over the last 30 or so years.

Q.   Please describe -- were you able to reach a conclusion held to a reasonable degree of professional certainty in the area of patent law on these three questions?

A.   Yes, I was.

Q.   Please describe to the jury the work you did to reach these conclusions.

And if I may, sir, I'll pass up a bottle of water. Apologies.  I forgot to put that up there.

A.   Thank you.

Q.   Let me put the question to you again, sir.  Please describe to the jury the work you did to reach conclusions on these three topics.

A.   So I did a number of different things.  I reviewed the

patents themselves that were involved in this underlying patent litigation, this underlying Hatch-Waxman litigation.  Part of that review I reviewed something we called technically the file history, and what that means is that there is an argument back and forth between the patent office or a discussion and so I reviewed those documents.

I also reviewed the litigation record; again, of that underlying litigation.  And that included a large number of different documents, some of which you will hear about which are called notice letter and other types of, you know, documents or invalidity contentions that are put forth by the various parties.

I also -- as well as a variety of expert reports.

I also reviewed the law at the time.  And that is just very important to note because the law changes over time. And I reviewed the law that was relevant at that particular time.

Q.    Was one of the things that you considered as part of the record of the litigation some expert reports submitted by Par and some expert reports submitted by Takeda and Sucampo?

A.    Yes, I reviewed a number of expert reports submitted by both parties.

Q.    So we're going to turn to what happened in the Par litigation very shortly, I promise, but first let's clear up two things.

With respect to the patents in the Par litigation, are you a person of ordinary skill in the art?

A.    No, I am not a person of ordinary skill in the art.

Q.    What is, in your understanding, a person of ordinary skill in the art?

A.    A person of ordinary skill in the art, as we use that term in patent law, means a person, it's a theoretical person, that has specific knowledge about a specific field.  So we call that shorthand a person of ordinary skill in the art.

Q.    And in the several hundred times that you estimate you've provided advice to CEOs and businesspeople about the likely outcome of patent information, were you a person of ordinary skill in the art then?

A.    No, I've never acted as a person of ordinary skill in the art.

Q.    So how, in your view, does the fact that you're not a person of ordinary skill in the art here impact your ability to tell this jury about what's going on in the Par litigation?

A.    It doesn't impact it.

Q.    Second thing I want to clear up, what role, if any, did statistics play in your analysis of who was likely to win the Par litigation?

A.    They didn't play any role, per se, in my evaluation of that issue.

Q.    Now, you said "per se."  I don't know what that's doing

here so let me put the question to you again, sir.

What role, if any, did statistics play in your analysis of who was likely to win the Par litigation?

A.   They did not play any role.

Q.   Why, then, did you refer to some statistics about how often generic litigants are likely to win patent infringement suits?

A.   One of the questions that in my experience everybody asks is, okay, you said we're going to win or we're not going to win or this is the percentage chance, what typically happens in the industry.  And so everybody likes to know or wants to know, all right, what happens -- what typically happens with other people or other companies.

MS. JOHNSON:  Your Honor, the purchasers tender Dr. Michael Davitz as an expert in pharmaceutical patent law.

MR. WU:  No objection.

THE COURT:  Thank you.

Q.   Now, you said you reached a conclusion as to your first assignment.

If we can turn to Slide 3.

What was your conclusion, sir?

A.   My conclusion was that Par was substantially more likely than not to have prevailed, to have won in the underlying Hatch-Waxman ANDA litigation.

Q.   I think you said this, but I want to make sure.  What do

you mean by "prevailed"?

A.    What I mean by prevailed is, again, it's a technical term that we sometimes use that Par would have won.

Q.    Does this conclusion take into account the possibility of an appeal?

A.    Yes, it does.

Q.    What do you mean by Par was substantially more likely than not to have won?

A.    Translating that out, as I've been asked to do by, at least in my experience, every single businessperson, at least 60 percent likelihood of success.

Q.    Does that mean that Par had at least a 60 percent chance of winning the litigation?

A.    Yes, it does.

Q.    Okay.  So let's turn to that litigation.  When Par wanted to sell generic Amitiza, how did patents come into play?

A.    The patents came into play because Sucampo/Takeda had or listed a number of patents in what we call the Orange Book. And Par, wanting to sell a generic version of the product, had to challenge those patents.

Q.    What is the Orange Book?

A.    The Orange Book is a book that is produced by the U.S. Food and Drug Administration, and it lists, among other things, patents that claim the drug itself or a method of using the drug.

Q.   How do patents get into the Orange Book?

A.   Patents get into the Orange Book by when the brand company files what's called a new drug application or, again, sorry for all the abbreviations, an NDA.  As part of that application, the drug company can submit the -- the brand company can submit a form where they say these patents claim the drug or method of using the drug.

Q.   What did Par do here to address the patents that the brand had listed in the Orange Book?

A.   What Par did is Par filed or submitted what's called a notice letter, we call it a Paragraph IV notice letter that challenged the patents that were listed in the Orange Book.

Q.   Now, did Par challenge all of the patents that were listed in the Orange Book as claiming Amitiza or a method of using Amitiza?

A.   No, it did not.

Q.   What did Par do with that other patent or patents?

A.   Par -- one of the patents that had been listed in the Orange Book by the time that the lawsuit was initiated, had expired, was finished, Par agreed -- and we call this, again, the technical term is the Paragraph III, they basically agreed not to challenge one of the patents and then they challenged the remaining of the patents that were listed in the Orange Book in that thing that I call the Paragraph IV notice letter.

Q.   Is there a convention for how you refer to or name

patents?

A.    Yes, there is.

Q.    What is that convention?

A.    The convention is we typically refer to patents by the last three digits of the patents.  So patents have a -- they could be six or ten -- well, there can be seven or ten digits or, you know, eight at this point, and so we refer to it by the last three numbers.

Q.    So what are the last three numbers of the patents that you mentioned that had been listed but had expired by the time the Par litigation came up?

A.    It's the '032 and the '878 patent that had been -- yes, the '032 patent had expired and the '878, they agreed that they would not challenge it, basically filing this thing that we call a Paragraph III, agreed not to challenge.

Q.    What was the expiration date of the patents that Par elected not to challenge?

A.    The expiration date of the patent that Par agreed not to challenge was July 14, 2014.

Q.    Thank you, sir.

      Okay.  So we've got Par sending a -- what's the mechanism by which Par challenged the listed Amitiza patents?

A.    The mechanism by which it's challenged is they file what's called -- or they send what's called a notice letter.  And the generic company sends a letter, it's an actual letter, to the

brand company in which they say, We're challenging these patents and these are the reasons we're challenging these patents.

MS. JOHNSON:  If you could go to Slide 5.

Q.   When you say Par challenged the patents, what do you mean?

A.   What I mean by challenged is the notice letter included or includes reasons why in this case Par said that the patents were invalid.  And so that's what, in this context, what I mean by challenged.

Q.   We're going to come back to invalid in just one second, but let's get the numbers right.

Did Par send some other additional Paragraph IV notice letters later on in time?

A.   Yes, they did.

Q.   So what happened after Par sends its Paragraph IV certification challenging some of -- all but one of the patents listed in the Orange Book for Amitiza?

A.   What happens at that point is that the brand company receives the letter and then has a certain period of time during which they make a decision:  Are we going to sue the generic company or not sue the generic company?  And so what happened in this case is that Takeda then sued Par.

Q.   By the way, I think you misspoke earlier, Dr. Davitz.  Was the number of the patent that Par did not challenge, that it said it would wait until July of 2014 to expire, was that the

'858?

A.    Excuse me, you're correct.  It was the '858 patent.

Q.    Thank you.

What's shown on is this slide, sir?

A.    What's shown on this slide is a copy of the complaint that Sucampo and Takeda filed against Par Pharmaceuticals in the District of Delaware.

Q.    And I'll just note for the jury that these are excerpts from the exhibit already admitted as JX-51.  That's the complaint in the litigation.

I see Takeda's name there in the complaint.

A.    Yes, I do.

Q.    Do you see Sucampo's name there as well?

A.    Yes, I do.

Q.    How many patents did Takeda and Sucampo try to defend in the Par litigation?

A.    Sucampo and Takeda elected to defend seven patents in the ANDA litigation.

Q.    And did those seven patents fall into any groups or buckets?

A.    Yes, they do.

Q.    How many?

A.    We've grouped them into four buckets.

Q.    Okay.  So let's take a minute to get some vocabulary down. I know everyone is excited to learn patent vocabulary.

What does it mean to infringe a patent?

A.   What it means to infringe a patent is basically without the permission of the inventor, the owner of the patent, some other party says, Okay, we're going to do what the patent owns, what the patent -- and the term we use in patent law is what the patent claims.

Q.   What is a patent claim?

A.   A patent claim is at the end of the patent, there is the single sentences.  We call them claims.  And think of them like a fence, and they're just -- they're a fence.  And it's the fence around which the inventor, she or he, says, This is what is ours, this is what we own, this is what we invented.

Q.   Now, a patent, generally speaking, protects an invention or inventions.  Fair to say?

A.   Yes.

Q.   How does the concept of claims relate to the concept of inventions?

A.   Well, the claims cover the invention, the claims.  And so when I talked about that fence analogy or that fence illustration, the invention that is described in the patent is protected by the claims and that, hence, the analogy of that fence.

Q.   Now, how many claims are in a single patent?

A.   Well, there has to be at least one, but it could be hundreds.

Q.    And in the Par litigation, did Takeda accuse Par of infringing all of the claims in the seven patents you mentioned?

A.    No, it did not, it did not.

Q.    How many claims did Takeda accuse Par of infringing?

A.    Takeda accused Par of infringing 58 claims in the seven asserted patents.

Q.    How did your analysis, which we're turning to shortly, address Par's positions and Takeda's positions on the 58 claims?

A.    I looked, as part of my task, at Par and Takeda's position with respect to all 58 claims.

Q.    Now, are you going to drag this jury through looking at 58 patent claims, sir?

A.    No, I'm not.

Q.    So what are you going to do for this jury?

A.    What I'm going to do is provide a summary, essentially a shortened summary of what the expert reports that I prepared looked at and analyzed the claims, and that's what -- of all the 58 claims.

Q.    For clarity, you did consider and bake into your analysis all of the claims and all of the arguments made by both sides in the Par litigation.  Fair to say?

A.    Yes, I did.

Q.    Okay.

MS. JOHNSON:  If we go to Slide 7.

Q.   Help orient the jury, please, to the four buckets that you said the patents at issue fell into.

A.   So looking at this slide, the four buckets break down into the constipation patents, the dosing patents, the IBS or irritable bowel syndrome patents, and the soft gel cap patents or capsule patents.

Q.   We're not going to go through every single claim, I promise, but could you read into the record for me the numbers of the patents by their last three digits for each group?

A.   Yes, I can.

So with respect to the constipation patents, using that three-digit shorthand that we use in patent law, it's the '016 and the '613.

With respect to the dosing patents, it's the '653 and the '542.

With respect to the IBS, or irritable bowel syndrome patents, it's the '312 patent.

And with respect to the soft gel cap or capsule patents, it's the '639 and the '393.

Q.   Now, we're going to look at each of these briefly in a minute, but as a starting point to help orient us to that discussion, please describe to the jury at a high level what you understand Par's position to be with respect to all seven of these patents in the litigation.

A.   What Par's position was is that all of these patents that you see on the slide here were invalid.

Q.   What was Par's position, as you understand it, as to whether Par's generic Amitiza would infringe these patents?

A.   Par's position with respect to that was that they would infringe a number of the claims of these patents.

Q.   Now, let's clarify.  How do you know what Par's positions were again?

A.   Well, as I said earlier on, what I did as part of my work for the expert report is I reviewed the various documents that are associated with this, and so -- and those documents are voluminous.  And so in those documents I would then see what Par's position was.

Q.   So help the jury to understand this concept, please.  If Par admitted that it infringed these patents, doesn't that mean that Takeda wins the lawsuit?

A.   No, it doesn't.

Q.   Why not?

A.   Because although they agree that they infringed a number of these claims, the defense against infringement is that -- Par asserted -- was that the claims themselves were invalid.

Q.   I'm going to try and get us to plain English on this, sir.

Does that mean that someone accused of infringement has the legal right to say those patents are invalid?

A.   Yes, they do.

Q.   Okay.  And what is the impact of a patent or patent claims being invalid?

A.   If the claims are invalid, then the owner of the patent basically can't stop others from crossing that fence that I talked about.  So they can't stop others from selling or making what's claimed by the patent.

Q.   So what happens if, in the Par litigation, Par proves that the patents are all invalid?

A.   In that case, Par wins.

Q.   And how, if at all, does that impact Par's ability to bring a generic version of Amitiza to market?

A.   In that particular scenario, Par would then be allowed after approval to sell the product.

Q.   One last thing on this topic, then we will go get into our buckets, sir.

     What, if anything, does the fact that the patent office issued a patent tell you about whether that patent is valid or invalid?

A.   Well, earlier on I said that just because a patent, to get a patent, doesn't mean that you're going to keep it.  And patents have been, continue to be and will be, successfully challenged all the time for a wide variety of different reasons and invalidated.

Q.   Okay.  So let's look at the constipation patents.

     MS. JOHNSON:  If we can go to Slide 8, please.

Q.    Please describe generally the method of treating constipation patents that were at issue in the Par litigation?

A.    Generally, those two patents, the '016 and '613 patents, claimed and described a method of treating constipation using lubiprostone.

Q.    And what is lubiprostone?

A.    Lubiprostone is Amitiza, and it's the active ingredient that -- essentially it's the drug that makes the drug product work.

Q.    Okay.  What was Par's position on the constipation patents here?

A.    Par's position was that these patents were invalid.

Q.    Why?

A.    Well, there were two reasons that Par said these patents were invalid.

Q.    What's the first one, please?

A.    The first one is that they said that this -- the constipation patents were anticipated.

Q.    What does "anticipated" mean?

A.    In patent law what anticipated means is -- again, it's a technical term we use.  It means it wasn't new.  And the bottom line is that what was claimed in that -- those patents was actually described in the earlier references or was already known.

Q.    Did you say -- I just didn't hear you, I apologize.  Did

you say that anticipated means that it was not new?

A.    Yes.

Q.    Thank you.

How do you evaluate, in patent law, whether something is new?

A.    Well, you look at the -- essentially the historical record, the references that are already out there, the, you know, what's publicly available.  And you say, okay, this is what's already out there.  And you say, okay, what's already out there, does that describe what's in the patent, and you do a comparison.

Q.    Does patent law sometimes use the term "disclose"?

A.    Yes, it does.

Q.    What does it mean, sir?

A.    What that means in patent law and patent speak is that if something in the references or something in the patent lays it out, basically spells out -- spells something out explicitly, and it could be implicitly as well, but basically explicitly that is what we take to mean disclose.

Q.    And why did Par say that the inventions and the method of treating constipation patents weren't new?

A.    What Par said is, Par maintained that what was actually claimed in these methods of treating constipation patent wasn't new, was anticipated, by this earlier patent, which we mentioned briefly, called the '032 patent.

Q.   What do you want the jury to know about the '032 patent that's relevant to Par's anticipation argument?

A.   Well, the '032 patent discloses methods of treating constipation using lubiprostone, and it discloses that in a group of, you know, number of compounds, but it discloses this information and that information is already in the public. Essentially -- it's not essentially, it is publicly available.

          MS. JOHNSON:  If we could go to the next slide.

Q.   What was Par's position in anticipation with respect to the '032 patent?

A.   What Par said is that the methods -- excuse me.  Could you repeat the question, please?

Q.   I'll put a better one to you because I misspoke.

          What was Takeda's position on this anticipation issue with respect to the '032 patent?

A.   Takeda's position was that the '032 patent didn't, did not, disclose lubiprostone and did not -- and, therefore, did not, as we say in patent law, anticipate or wasn't -- it did not anticipate, it did not disclose that and, therefore, what was in the later patents was new or not anticipated.

Q.   And were there expert reports presented in that Par litigation on both sides of this issue?

A.   Yes, there were.

          MS. JOHNSON:  Okay.  Your Honor, that's about an hour.

          THE COURT:  All right.  I should have mentioned to you

earlier that we're going to take more frequent breaks this morning.  I think it will help all of us.  So we're going to take a quick, what do you think, ten minutes?

MS. JOHNSON:  Five, ten, yeah.

THE COURT:  Ten minutes, thank you.

(Jury left the courtroom.)

(Recess.)

(Jury entered the courtroom.)

Q.   So we just talked about Par and Takeda's positions about whether the inventions in the method of constipation treatments were actually new.

Was there a second argument that Par had as to why the method of treating constipation patents were invalid?

A.   Yes, there was.

Q.   What was that?

A.   The second argument was that the method of treating constipation patents was obvious over what was already in the public record.

Q.   Okay.  I want to break that down a little bit.

So when you say "obvious," what do you mean?

A.   Well, in patent law, what we -- we use that term "obvious" and we say something is obvious to an invention is obvious to one of ordinary skill in the art at the time of the invention.  And that's the technical speak that we use in patent law.

Q.   So there is that phrase again, "person of ordinary skill

in the art."  Can you give us an example about what that means?

A.    Yes.

So think about obviousness in the following context, in the following way.  So if you have a wheel and the wheel has three spokes or four spokes and someone then -- so if you've got that wheel that, with three or four spokes and then someone comes and says, Look, I've got a wheel with five spokes, six spokes, seven spokes, ten spokes, and then the question becomes, are those wheels with different number of spokes obvious over that wheel with three or four spokes.

And so from the standpoint of a tire expert, someone -- or a wheel expert, someone who knows about wheels and spokes, that theoretical person would look at it and ask a number of questions.  Do the wheels with four or five, ten work differently?  Are they better?  Are they somehow different?  Or in that person's, that theoretical person's view, they're not, for any one of a number of reasons, then in patent law, patent speak, we'd say, Look, the invention of the wheels with more spokes is obvious in view of, or because what's already in the public domain is that wheel of three or four spokes.

Q.   Now, you used a phrase initially.  You said it would be obvious over.  What's that verb?

A.   Well -- and so thank you for pointing that out.  Again, we use a lot of technical speak in patent law, and so I have to break myself from it.

What it means is that it's obvious because or it's obvious in view.  In other words, what's already in the public domain, what's already publicly available is then fair game for that person of ordinary skill in the art to look at to say, Hey, is this new invention obvious.

Q.   So to stick with your spoke analogy for a minute, I am trying to do this in plain English, would you say that the three-spoke wheel is obvious given that the seven-spoke wheel is already out there?

A.   No.  The reverse.

Q.   I apologize.  I apologize.  Let me try it again.  Thank you.

Would you say that the "new," in quotes, seven-spoke wheel is obvious because the three-spoke wheel is already out there and known?

A.   Yes.  That's the way that I would look at it.

Q.   Can you give the jury an example of an older reference that Par pointed to when arguing that the constipation patents were obvious?

A.   Par pointed to a number of references that were already available, one of which was this patent that we talked about which was the '032 patent.

Q.   Can you give -- is there another example of an old reference that you would bring to the jury's attention as an example of a reference that Par pointed to on this obviousness

argument?

A.    Yes, there is.

Q.    And what is that, sir?

A.    That is the -- this other patent called the '588 patent.

Q.    And by the way, I should have done this earlier but for the '588 patent, who is the first inventor on that patent?

MS. JOHNSON:  Kaelan, could you blow that up, please.

A.    Thank you.

I'll spell it for the court reporter because just in terms of my pronunciation, R-Y-U-J-I, Ueno, U-E-N-O.

Q.    And what was the date that this '588 patent was issued?

A.    The date that this patent was issued was October 19, 1993.

Q.    And we already talked about the '032.  I don't want to make us go back to that, but do you remember, sir, what the date on which the '032 patent issued?

A.    Don't have immediate recollection.

Q.    Okay.  We'll come back to it.  Thank you.

What did Par point out about the '588 patent in relationship to this obviousness argument?

A.    Well, it disclosed both how to make what we call synthesize lubiprostone and disclose the actual active ingredient lubiprostone itself.

Q.    Now, I think you told us earlier when we were talking about anticipation in the '032 patent, I think you mentioned earlier that there was a dispute as between Takeda and Sucampo

on the one hand and Par on the other as to whether the '032 patent, in fact, described lubiprostone.

Do I have your testimony right about that?

A.   Yes, you do.

Q.   Is there any dispute in the Par litigation between Takeda and Sucampo on the one hand and Par on the other as to whether the '588 patent describes lubiprostone?

A.   To my knowledge, there was not a dispute.

Q.   So even if lubiprostone is not in the '032, it's in this '588 example?

A.   Yes.

Q.   What was Takeda's position on obviousness here?

A.   Takeda's position on obviousness with respect to these particular set of patents was, first, that the '032 does not disclose lubiprostone itself and that this patent, the '588 patent, although it does disclose lubiprostone, one of the things about obviousness that just is whether you can combine the two references together.

Q.   And what was --

A.   And Takeda's position was that you couldn't combine these two references together.

Q.   So as to the method of treating constipation patents that were at issue in the Par litigation, having considered Takeda's position and Par's position, were you able to reach a conclusion about who was more likely to win on the constipation

patents?

A.    Yes, I was.

Q.    And what was your conclusion, sir?

A.    My conclusion was, based on my review of everything, that Par was substantially more likely than not to win in terms of its invalidity position with respect to these methods of treating constipation patents.

Q.    Can you put that in plain English, please?

A.    Yes.

      That Par had at least about a 70 percent chance of winning, being able to show that either the patents were not -- that covered the method of treating constipation were not new or they were obvious.

Q.    Why did you reach that conclusion?

A.    Because after weighing and looking at the facts, looking at the law, looking at the various disclosures, I made a judgment as a patent attorney that Par had the argument that to me, as a patent attorney, I evaluated they had the winning position.

Q.    Now let's talk about the dosing patents -- oh, sorry.

      MS. JOHNSON:  Could we go to slide -- I missed something.  I apologize.

      Can we go to Slide 13, please.

Q.    So just to sum up, how many arguments did Par make on the constipation patents?

A.   Par made two arguments on the constipation patents; one, that it wasn't new, and the second one, that it was obvious.

Q.   Now, let's go to the dosing patents.  I'm going to try to move this one a little bit faster, sir.  I'm told it's not been a scintillating hour which no disrespect to you, but I'm going try and get a little energy in here.

Please describe to the jury generally what's claimed in the dosing patents.

A.   What's claimed in the dosing patents is basically a method of treating constipation using a certain amount what we call a dose of lubiprostone.

Q.   Did the dosing patents refer to a single dose given in one setting?

A.   No.  They referred to both a specific dosing as well as a range that would be within one day.

Q.   What was the specific dose referred to in the constipation -- in the dosing patents at issue in the Par litigation?

A.   What -- the patents basically say it's 24 and they use plus or minus micrograms, which is a measurement of the amount, very small amount, plus or minus 10 percent, and the total dose of the drug was -- could be 48 to 72 micrograms, so the two together.

Q.   So let me just -- so as to the specific dose, if I understand what you're saying, they described giving

24 micrograms of lubiprostone, plus or minus 10 percent, so a little bit more than that, a little bit less than that. Fair to say?

A. Yes, that's fair to say.

Q. And that's a single dose that they're describing?

A. Correct.

Q. And then if I understand what you're saying, they also disclosed a range or a total dose amount in a given day.

A. Yes, they did.

Q. What was Par's position in the litigation with respect to the dosing patents?

A. Par's position with respect to the dosing patents is they basically said it was obvious over what was already disclosed.

Q. And can you give the jury an example that Par pointed to of an old reference that Par said rendered this 24-microgram single dose obvious?

A. Yes, that there were really -- one was that they said, look, in the '032 patent, there was something called examples which sit typically more or less at the end of the patent. And these are specific examples of -- that the patentee says, hey, look, this is examples of what things that we've experimented with. One was test drug 2, and they said, look, a group of healthy male volunteers got 20 micrograms of something called test drug 2 and in coconut oil and they administered it and it had this cathartic effect on these volunteers.

Q.   And now what's the number of the patent -- sorry.

What's the name of the patent that refers to 20 micrograms of test drug 2?

A.   It's the '032.

Q.   The same '032 we've talked about for the constipation patents?

A.   Yes, it was.

Q.   The same '032 we talked about that was in the Orange Book but it already expired by now?

A.   Yes, it was.

Q.   How, if at all, does the fact that the 20-microgram dose referred to -- sorry, is test drug 2 lubiprostone?

A.   No, it's not.

Q.   How, if at all, does that inform your opinions on this topic?

A.   It forms part of my overall analysis of my -- in terms of the -- how I analyze obviousness.  So it's just one factor of many.

Q.   Did Par also refer to the '588 patent that we've already discussed in this obviousness argument as to the dosing patents?

A.   It did.

MS. JOHNSON:  I think that's Slide 15.

Q.   What was Takeda's position with respect to the dosing patents?

A.    Well, Takeda had two arguments, or a variety of arguments. One argument we talked about earlier, saying, look, the '032 doesn't disclose lubiprostone;

Two, that test drug 2 is not lubiprostone;

And three, that the -- what was disclosed in another reference, which was put up on the screen for everyone to see, the '588, was so broad that it was just too broad.

That was at least at a high level what their arguments were.

Q.    Now, having considered Takeda's position, Takeda and Sucampo's position on the one hand and Par's position on the other, did you reach a conclusion about who was more likely to win on the dosing patents?

A.    Yes, I did.

Q.    What was your conclusion?

A.    My conclusion, based on the facts and the law, was that Par was, again, substantially more likely than not to have won on their invalidity arguments with respect to dosing patents.

Q.    And can you give that to me in English?

A.    That based on my review of the facts and all the various documents, they had at least a 70 percent chance of winning on that argument, on the arguments that they put forth.

Q.    That Par had at least a 70 percent chance of winning on this issue?

A.    Yes.

Q.   Okay.  Let's talk about IBS.

Please describe to the jury generally what was claimed in the single IBS patent.

A.   In the single IBS patent that basically was claimed by the patent was a method of treating irritable bowel syndrome using lubiprostone and a method of treating abdominal discomfort using lubiprostone.

Q.   So what was Par's position in the litigation as to the IBS patent -- sorry, I should -- IBS means what?

A.   Irritable bowel syndrome.

Q.   Thank you.

What was Par's position in the litigation as to the irritable bowel syndrome patent?

A.   Par's position was that these patents were -- that this patent, excuse me, this patent was invalid, again, as obvious over what was disclosed in the historical record, what was publicly available.

Q.   And can you give the jury an example or two of old references that Par pointed to in saying that the IBS patent was obvious and invalid?

A.   Par pointed to the '032 patent, which we've discussed, and it pointed to the '588 patent we've discussed, and it also pointed to a number of what we call "medical references." These were references -- these were publicly available documents that had been published by medical scientists that

were, again, publicly available.

Q.   I see this slide refers to Martin and Horwitz.  What is that a reference to?

A.   Those are two references that talk about, essentially, the irritable bowel syndrome and the method of treating it.

Q.   What did Par point to those references for?

A.   Par pointed to those references, to my recollection, that constipation or abdominal discomfort was a key symptom or major symptom of the irritable bowel syndrome and that treating those would ultimately end up treating irritable bowel syndrome.

Q.   And were you in the courtroom when Dr. Warfield, the medical doctor, testified earlier in this case?

A.   No, I wasn't.

Q.   Okay.  I'll move on then.

     MS. JOHNSON:  I offer TX-1188, that's Horwitz, and TX-1190, that's Martin.  I understand there is no objections.

     MR. WU:  No objections.

     MS. JOHNSON:  Thank you.

Q.   What was Takeda's position as to the IBS -- I apologize.

     MS. JOHNSON:  Are the slides being published to the jury?  Okay.  Thank you.

Q.   What was Takeda's position as to the IBS patent?

A.   Takeda's position was, as we've discussed, that to my recollection, is that one, the '032 patent, did not disclose lubiprostone; the '588 patent disclosed other types of uses of

lubiprostone; and that these medical references, the Martin and Horwitz, that constipation and abdominal discomfort were really separate diseases as I understood it from reading the various expert reports and that you couldn't combine -- I understood their argument, you couldn't really combine that together to say that the method of treating irritable bowel syndrome patents were obvious.

Q.   Were you able to form an opinion about who had the better of the arguments here?

A.   Yes, I was.

Q.   And what was that opinion?

A.   My opinion was that it was substantially more likely than not that Par would have won or would have been able to show that those patents were invalid.  That patent was invalid, excuse me.

Q.   And why?

A.   Based on my review of, again, the facts and the expert reports and the law, that the legal position -- and, again, I look at it as from a legal position as a patent attorney -- that combining those references for treating irritable bowel syndrome would have been obvious over the prior art based on what the disclosures were and based on what the experts -- based on what the expert said those disclosures were.  Let me just correct that.

Q.   Thank you, sir.

Now, I notice in this chart that's been populating as we go, I noticed that the '032 patents is referenced in every line, and the '588 patent is referenced in every line.  What observations, if any, did you make about that fact?

A.    I noted it as one part of my overall analysis that the same references, the same documents, were used -- excuse me -- throughout all of the various invalidity arguments.

MS. JOHNSON:  If we could go to Slide 18.

Q.    And what are you showing with this visual, sir?

A.    What we're showing with this visual is that at a very high level, the same references, in this case they're patents, the same references were used to invalidate, were used to -- against the constipation patents, the irritable bowel syndrome patents and the dosing patents.

Q.    Now, Dr. Davitz, respectfully, you and I have used a lot of patent geek speak in laying out your opinions today.  Fair to say?

A.    Yes, it is.

Q.    So now I want you to look at the jury and I want you to talk to them like you would talk to a CEO about what the real issue is in the Par litigation with respect to the constipation patents, the IBS patents, and the dosing patents.

A.    What I would have said to the CEO, and what I've said in the past, is I would have said, look, you have a method of treating constipation and you have a method of treating

irritable bowel syndrome and that information is already out there and it's out there in numerous different ways.  And although it's legally not binding, the inventor who invented the patents we're trying to deal with, namely, the method of treating constipation, the irritable bowel syndrome and the dosing patents, is the same inventor who, you know -- that same inventor who invented at least two of the earlier pieces so -- and, again, that's not a legally binding issue, but I would have pointed that out in my discussion with the CEO and I would have said, look, there's a, you know, depending on if we're challenging it, I would say there's a good chance we're going to win.  And if those were on the other side, if those were our patents, I would say there's a good chance they're going to fall.

And that's the message that I would deliver to the CEO or the vice chair.

Q.   And when you just answered that question -- which thank you -- you said there's a good chance we're going to win, is that what you have told the CEO?

A.   No, I would have said, look, it's -- I wouldn't have -- would I use the words substantially more likely than not with the CEOs I've worked with?  I would have said, look, overall, you have about a 60 percent chance of either winning or, if you're on the other side, you have a significant chance of losing.  So I would have said that, you know, you're really at

risk here.

Q. Now, would you have said, because language matters here, Doctor, would you have said about a 60 percent chance or would you have stated the conclusion that you gave earlier which was Par had at least a 60 percent chance of winning?

A. I would have said at least a 60 percent chance of winning.

Q. Okay. Thank you.

Okay. Let's talk about the gel cap patents.

MS. JOHNSON: You can take that down, please.

Q. Please describe to the jury generally what was claimed in the soft gel patents.

A. What was claimed in the soft gel cap patents was lubiprostone, the active ingredient that we're all talking about here, in a soft gelatin capsule. And the soft gelatin capsule contained a sugar called sorbitol which they said was a plasticizer. It made it a little softer.

Q. When you say the capsule contained sorbitol, was sorbitol, and forgive me because I'm not a scientist, was sorbitol inside, like the liquid on the inside of the capsule, or was sorbitol on the shell on the outside?

A. To my understanding, you know, reading the experts and reading the patent, it was on the outside.

Q. What was Par's position on the soft gel cap patents?

A. Par's position on the soft gel capsule patents was that it was obvious in view of or because of what was already

disclosed.

Q. Were you in court when Dr. Christians testified earlier?

A. No, I wasn't.

Q. What was Takeda's position to Par's argument?

A. Takeda's response to the argument was that -- several things, but among them is that there were a lot of different sugars disclosed and, therefore, you really can't pick one or the other. And because what was already -- if you think about it, if there is a lot of things disclosed, they basically said, look, you can't pick it out because there is just a lot of different sugars that are already disclosed and that the actual patent itself taught that when you did this type of mixture, namely sorbitol in the capsule, something unexpected happened.

Q. Is an unexpected result something that can be used to overcome a finding of obviousness?

A. Yes, it is.

Q. So Takeda said that something unexpected happened when you used sorbitol in the outside of the gel cap?

A. Yes.

Q. Did Par have a response to that?

A. Par did.

Q. What was Par's response to that?

A. Well, Par argued that the experiment, and this was what was described in the patent, that was actually pointed out, really didn't reflect what really happened in real life in the

capsule because, essentially it was what the experts say; that the sugar, sorbitol, and the drug were all dissolved together. And they said that's not really what happens in the capsule circumstance.

And so Par's position was, Par's expert's position was, is look, the sugar is not dissolved and all mixed up together. It's really sitting on the capsule and, therefore, that unexpected result, at least they said, was not -- would not have been un- -- was not unexpected.

Q. So I want to unpack that into a little couple of bite-sized pieces.

As I understand your testimony, you referred to some information in a patent, and I think you said it suggested that if you put sorbitol and what, lubiprostone dissolve together?

A. Uh-huh, yes.

Q. So what happens if you put -- what did the patent say about what happens if you put sorbitol and lubiprostone dissolved together in a liquid?

A. You put the two together, what the patents said is it said, look, lubiprostone itself fell apart. The technical term is "degraded," but basically it fell apart.

Q. How does the notion that sorbitol and lubiprostone mixed together in a liquid causes lubiprostone to fall apart relate to the use of sorbitol in the outside shell?

A. Again, looking at what the expert said and what the expert

said is the expert said, hey, that is something completely different, it's apples and oranges.  It's not a fair comparison, basically, at the end of the day.  That's what the expert -- that's what Par's expert said.

Q.   That's what Par's expert said.

And were you able to form an opinion --

A.   I was.

Q.   -- about this.  And what was your opinion?

A.   It was substantially more likely than not that Par would have been able to show that those patents covering the dosing form were invalid, is obvious.

Q.   Having now looked at each of the four groups of the patents at issue in the Par litigation, please remind the jury what your overall conclusion is as to how a reasonable and competent patent counsel would have advised a company in Par or Takeda's position about who was likely to win the Par litigation?

A.   My position, my opinion was, is that Par was substantially more likely than not to have prevailed.  In other words, at least a 60 percent likelihood of success.  In other words --

Q.   I apologize.

Does that mean, if I understand your earlier testimony, that there was at least a 60 percent likelihood that Par would succeed in proving all 58 claims of the seven patents we've discussed were invalid?

A.   Yes, it does.

Q.   Okay.  Now, I want you to talk to the jury like a CEO again, please.  How confident are you in that opinion?

A.   I'm very confident based on, you know, based on my experience.

Q.   And what's your experience, again, that you would point to here?

A.   I've been doing this for the last 30 years.  I've advised a lot of different clients in numerous different circumstances on both the brand side and the generic side and asked to do exactly this, you know, give them my opinion who was likely to win or who was likely to lose.

Q.   Now, let's turn to litigation timing.

        MS. JOHNSON:  If we could go to Slide 19, please.

Q.   You mentioned earlier that you were asked to provide your conclusion as to how a reasonable and competent patent counsel would have advised a company in Par or Takeda's position about litigation timing.  What was your conclusion there?

A.   My conclusion was that the litigation would have likely concluded by September or October 2016.

Q.   What do you mean by "concluded"?

A.   What that means is that from the District Court -- underlying District Court level to appeal at this court that reviews patents, it would be an appellate court called the Federal Circuit through appeal.

MS. JOHNSON:  And if you go to the next slide, please.

Q.   Who would decide -- at the trial court level, who would decide whether Takeda or Par would win?

A.   To my recollection it was a bench trial and, therefore, the judge would have decided.

Q.   And who was the judge in that trial, if you remember?

A.   Judge Sleet.

Q.   And was there a trial date set at the time that the parties settled?

A.   Yes, there was.

Q.   What was that date?

A.   To my recollection, it was December of 2014.

Q.   And what was your opinion as to when Judge Sleet would have entered a final decision deciding who won that trial?

A.   My opinion was it was July to August of 2015 but no later than September of 2015.

Q.   So by -- as I understand your conclusion, by September of 2015, there would have been a decision from Judge Sleet as to whether the challenged claims of the challenged patents were invalid?

A.   Yes.

Q.   Okay.  And, again, how does that impact Par's ability to come to market?

Sorry I withdraw the question.  I missed a step.  Let me pull that back.

You mentioned an appeal?

A.    Uh-huh.

Q.    Okay.  To whom do appeals from decisions like that go?  What court hears those appeals?

A.    The court that heals -- sorry, that hears patent appeals is the Federal Circuit, it's a specialized court in Washington, D.C., that will hear patent cases from all the District Courts around in the United States.

Q.    And so if there had been an appeal from a final trial court decision, do I understand you to say it would have been resolved by the Federal Circuit?

A.    Yes, it would have been.

Q.    Okay.  And by when do you conclude the Federal Circuit would have issued its final issue on appeal?

A.    By September or October of 2016.

Q.    Now, let's turn to litigation -- so sorry, let me just put that in context.

So is it your conclusion that if the parties had not settled in the fall of 2014 but had, instead, decided to litigate and see the patent challenge through to decision, that case would be resolved, including any appeal, by October of 2016?

A.    Yes.

Q.    Okay.  And that's a date the jury should remember, then, I take it.

A.    Yes.

Q.    Okay.  Let's turn to litigation costs.

MS. JOHNSON:  If you go to Slide 21, please.

Q.    What was your conclusion as to what reasonable and competent -- oh, let me back up.  I should just ask you.

Is there anything else you'd like to say about how you formed your opinion on timing?

A.    Not at this time.

Q.    Okay.  On costs, then, what was your conclusion as to how a reasonable and competent patent counsel would have advised a company in Par or Takeda's position about the cost of continuing to litigate?

A.    I estimated that Takeda/Sucampo and Par each would have saved about three and a quarter to $4.5 million each by settling.

Q.    What informed your conclusion on that issue?

A.    What informed my opinion is a number of things.  Both what are accepted costs in the industry, and those are benchmarked and published by a number of different groups; my own experience with costing out trials for numerous clients, down to how much it costs per day; and then projecting out those costs based on all of those factors to arrive at this range.

Q.    And this morning when we started this, you did mention that you had a lot of experience budgeting patent litigation, and I should have asked you that.  What do you mean by

"budgeting patent litigation"?

A.    Patent litigation costs a lot of money, and there is a whole bunch of reasons it costs a lot of money.  The hourly time that attorneys charge, what we call discovery costs, which are a rather unique U.S. concept, and so there's a whole bunch of costs that you have to budget in.  And so that's what I -- you know, that's what I mean in terms of the budgeting issues.

Q.    So is one way -- I suspect the jurors have not had to do a budget for a patent infringement case, so forgive me if I'm belaboring this point.  But is one way to understand this conclusion is that if Sucampo and Takeda on the one hand and Par had not settled but, instead, had continued through to that scheduled December 14 trial, and an ultimate decision from the Federal Circuit in October of 2016, that they would each have spent an additional three and a quarter to four and a half million dollars on litigation costs?

          MR. WU:  Objection.  Leading.

          THE COURT:  Overruled.

A.    Yes.

Q.    Thank you.

          We have spent a lot of time, sir, talking about the lawsuit between Takeda/Sucampo on the one hand and Par on the other and the patents at issue in that lawsuit.  Fair to say?

A.    Yes, we have.

Q.    Now we're going to talk about something else entirely, and

I want to be very clear about that.  Are you with me?

A.    I'm with you.

Q.    Separate and apart from the patents in the Par litigation, did you look at two patents that were not part of the Par litigation?

A.    Yes, I did.

Q.    Which patents were those?

A.    They were two additional patents.  They were -- we use, again, those three-digit shorthand, the '187 and the '481 patents.

Q.    And just to confirm, these two patents were not part of the Par litigation, right?

A.    No, they were not.

Q.    Okay.  What is the one -- just generally, what is the '187 patent claiming?

A.    The '187 patent is a gel cap patent.  It was, again, using patent speak, it's what's called a continuation of an earlier patent, basically, patent speak it's a child of that patent. It's a child of one of the earlier patents.

Q.    What observations did you make, if any, about how the '187 gel cap patent related to the other gel cap patents that were at issue in the Par litigation?

MR. WU:  Objection.  Scope.

THE COURT:  Overruled.

MR. WU:  Can I have a sidebar, your Honor?

(Sidebar begins.)

MR. WU:  Your Honor, Dr. Davitz never opined on the substantive aspects of these two patents.

THE COURT:  It's not included in his report?

MS. JOHNSON:  It's Paragraph 651 of his report.  I'm happy to show you the excerpts, your Honor.  And we're not going to go beyond that.  Your Honor, the summary judgment order addresses.

MR. WU:  This order said the '187 patent is related to -- counsel is about to get into a deeper area that he's never opined on in that Paragraph 651.  He already answered this question, '187 patent being -- continuing on --

THE COURT:  In my opinion.  Yeah, but he goes on to give a further opinion.

MS. JOHNSON:  Correct.

MR. WU:  I'm just very concerned that they're going to introduce new opinions.

THE COURT:  We just heard she's not going to go beyond what's here.

MR. WU:  Just want to be sure.

(Sidebar concluded.)

THE COURT:  You can ask the question again.

Q.   What observations did you make, if any, about how the '187 gel cap patent related to the other gel cap patents that were at issue in the Par litigation?

A.   In my report, I stated that it was likely that the '187 was susceptible to the same type of invalidity challenges that the other gel cap patents were vulnerable to.

Q.   And this is just a plain English question, okay.  What do you mean by "susceptible to"?

A.   What I mean is that it was -- they could be attacked in the same way.

Q.   What did the '481 patent claim, generally?

A.   Generally, it claimed a method of treating long-term constipation with lubiprostone.

Q.   What observation did you make, if any, about how the '481 patent related to other constipation patents that were at issue in the Par litigation?

        MR. WU:  Objection.  Scope.

        MS. JOHNSON:  Paragraph 652.

        THE COURT:  Sidebar again?

        MR. WU:  Yes.

        (Sidebar begins.)

        MR. WU:  So in Paragraph 652, he only talks about '481 patent claims directed to long-term treatment of chronic constipation for lubiprostone.  That's it.  He never said anything about the '481 patent.  The same type of prior challenge as '187 patent.

        MS. JOHNSON:  It's implicit.

        MR. WU:  It's not implicit.

MS. JOHNSON:  He's saying it is.

MR. WU:  Absolutely not implicit.  It's an issue raised in the summary judgment.

THE COURT:  So if you read in combination all of these three together, it is implicit.  Right?  Because it says it explicitly here that it's acceptable, and then it talks about how it's similarly directed to long-term treatment of chronic constipation using lubiprostone.  And then the conclusion, that in combination, the existence of these two asserted claims doesn't affect his analysis.

MR. WU:  Affect his analysis of the seven asserted patents in the Par patent case, not the validity issue of the '481 patent.

THE COURT:  But if it did, then it would affect his ultimate conclusion.

MR. WU:  No.  This '481 patent is not in the same family of the seven asserted patents.

THE COURT:  I understand that.  But this opinion here, as a group, is saying these two additional patents does not alter his original analysis about whether Par would have succeeded in the underlying litigation.

MR. WU:  Correct.  I agree with that.  But she's about to elicit testimony about the validity of the '481 patent, not whether the existence of the '481 --

THE COURT:  Right, and the argument is, and I accept

the argument, that implicit in what he's saying in Paragraph 652 is what he said in 651. Otherwise, it would affect his analysis.

MR. WU: The opinion he expressed in the expert report is only that the existence of '187 and '481 patents would not affect his analysis of the seven asserted patents.

THE COURT: It's overruled and you can cross him on it if you'd like.

(Sidebar concluded.)

Q. What observation did you make, if any, about how the '481 patent related to the other constipation patents that were at issue in the Par litigation?

A. The observation that I made in the report was that they were likely -- it was likely vulnerable to the same type of invalidity challenges that had been raised earlier.

Q. As a general matter, are patents self-executing?

A. If you mean by self-executing that just because you have a patent it automatically stops other people from using your invention, the short answer is no. You have to assert, you have to say, you have to stop others from using it. You have to actually assert it. So they are not self-executing in that definition.

Q. And in the context that we've been discussing, how does a patent holder tell the generic company to stop infringing?

A. They sue them.

Q.   To your knowledge, did Takeda or Sucampo ever sue Par for infringing the '187 or '481 patents?

A.   Not to my knowledge.

Q.   To your knowledge, did Takeda or Sucampo ever threaten to sue Par for infringing the '187 or the '481 patents?

MR. WU:  Objection.  Scope.

THE COURT:  Overruled.

A.   Not to my knowledge.

Q.   What's your understanding as to whether the '187 and '481 patents are addressed in the settlement agreement even though they were not part of the Par litigation?

MR. WU:  Objection.  Scope.

THE COURT:  Overruled.

A.   I believe, again, that they were part of the settlement agreement, but I believe that's what I stated in my expert report.

Q.   What was Takeda and Sucampo's position in the settlement agreement, as you understand it, with respect to the '187 and the '481 patent?

MR. WU:  Objection.  Scope.

THE COURT:  Overruled.

A.   That they agreed not to sue Par on those two patents.

Q.   What's your understanding, if any, as to whether Takeda promised not to sue other generics from infringing those two patents?

A.    Again, to my recollection, that they agreed not to sue on those other -- the other generics, to my recollection.

Q.    Thank you, sir.  Now, homestretch.

You understand that Takeda had some experts that responded to your opinions?

A.    Yes, I do.

Q.    Is one of those experts in the courtroom today?

A.    Yes, they are.

Q.    And who is that?

A.    Dr. Josephine Liu.

Q.    Have you ever worked with Dr. Liu?

A.    Yes, I have.

Q.    Where did you work together?

A.    When I was a senior partner at Axinn Veltrop & Harkrider, which is a firm in New York City, Dr. Liu was -- I don't remember the exact position at that point, either senior associate or counsel at Axinn and to my recollection, although it's a number of years ago, she worked on at least one project for me and then there was one article that we published together.

Q.    The jury may not be familiar with titles like senior partner and senior associates.  So can you describe the hierarchical position of yourself relative to Dr. Liu?

A.    When I was in Axinn, I was a partner -- I was one of the core partners at that firm and that's an equity partner at

Axinn, and Dr. Liu, again, I don't remember the exact -- don't remember exact title, but was at that point either an associate or counsel at Axinn when she was working there.

Q.   So fair to say that Dr. Liu worked for you on at least those couple projects?

A.   She did work for me on at least one project and there was one article.  I don't recollect anything else at this point.

Q.   Okay.  And, Dr. Davitz, what should the jury remember about your conclusion as to Par's likelihood of winning the patent infringement litigation?

A.   I think the take-home message for me was that the -- basically, the -- they had a method of treating -- they were claiming a method of treating constipation, and they claimed it in a variety of different ways in the patent.  And what was already known was a method of treating constipation using the same drug.

And as a side note, it was the same inventor, although that isn't legally controlling, but that's the, for me, was the take-home message; that if you had to remember one thing, that was the take-home message for me.

MS. JOHNSON:  Thank you, sir.  I pass the witness.

THE COURT:  Why don't we take a ten-minute break now.

(Jury left the courtroom.)

(Recess.)

(Jury entered the courtroom.)

MR. WU:  May I proceed, your Honor?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. WU:

Q.   Good morning, Dr. Davitz.

A.   Good morning, sir.

Q.   My Name is Wallace Wu.  I represent Takeda.  We met during your deposition.

A.   Yes, we did.

Q.   I have a few questions for you, but I want to make sure that we're clear on your overall opinion in this case.

Now, it's your belief that Par had at least 60 percent of chance of winning the underlying Par patent case, correct?

A.   Yes, it's my opinion that Par had at least a 60 percent chance of winning in this case.

Q.   And the underlying Par patent case is a case called Hatch-Waxman case, correct?

A.   Yes, it is.

Q.   And you have never put on a witness in a Hatch-Waxman case, correct?

A.   No, I have never put on a witness in a Hatch-Waxman case.

Q.   And you have never cross-examined a witness in a Hatch-Waxman case, correct?

A.   That is correct.

Q.   And, in fact, you have never presented any witness in a case of any kind, correct?

A.   No, I have never presented a witness in a courtroom case.

Q.   And never cross-examined any witness, right?

A.   No, I have not.

Q.   And you mentioned on direct that Judge Sleet was the judge presiding over the Par patent case, right?

A.   Yes, I did.

Q.   And the Par patent case was not a jury trial like this, it was a bench trial; meaning that Judge Sleet would be the one who would decide who wins, correct?

A.   At the District Court level, that is correct.

Q.   And you have never appeared in front of Judge Sleet in a Hatch-Waxman case, correct?

A.   Correct.  I have never appeared in front of Judge Sleet.

Q.   And you have never even attended a Hatch-Waxman trial before Judge Sleet, correct?

A.   Not to my knowledge.

Q.   Now, your opinion of likelihood of success by Par includes the appeal, right?

A.   Yes, it does.

Q.   And you mentioned a court called the United States Court of Appeals for the Federal Circuit, correct?

A.   I did.

Q.   And you have never argued anything before the Federal

Circuit in a Hatch-Waxman case, right?

A.    No, I have not.

Q.    And you have never argued anything before the Federal Circuit in any case, correct?

A.    No, I have not.

Q.    So I want to start with the big picture here.

MR. WU:    Can we bring up Dr. Davitz' direct, Slide Number 7.

Q.    So, Dr. Davitz, you told the jury that there are seven Amitiza patents asserted in the Par patent case, right?

A.    Yes, I did.

Q.    And they fall into four general subject matter categories, right?

A.    Yes.

Q.    And the top two are constipation patents, and top right are the dosing patents, right?

A.    They are.

Q.    And bottom left is the IBS patent, correct?  And bottom right are the two soft gelatin capsule patents, right?

A.    Correct.

MR. WU:    So can we bring up TX-5072.11.  We don't need to publish it to the jury.  Can you see --

MS. JOHNSON:    Excuse me.  I don't believe I have that. Do I have that?

MR. WU:    That's his expert report.

MS. JOHNSON:  No objection to showing it to the expert.

THE COURT:  Thank you.

Q.   There is a table in your expert report listing the expiration dates of the seven Amitiza patents.

Do you see that?

A.   Yes, I do.

Q.   Can you tell the jury the expiration date for the two constipation patents?

A.   Yes, I can.

For the '016 and '613 patents, the expiration date is September 5, 2020.

Q.   And can you tell the jury the expiration date for the two dosing patents?

A.   Yes, I can.

For the dosage unit of prostaglandin patent or the dosing patents, the expiration date is November 14, 2022.

Q.   And how about the expiration date for the IBS patent?

A.   September 17, 2024.

Q.   And how about the expiration dates for the two soft gelatin capsule patents?

A.   For the '639 patent, it's January 23, 2027.  And for the '393 patent, it's October 25, 2027.

Q.   Thank you.

MR. WU:  Can we bring up JX-47.

Q.   You talked on direct a little bit about what a patent claim is, so I want to spend some time explaining to the jury what a patent claim is.

So this is JX-47.  And this is the '653 patent, right?

A.   That's correct.

Q.   And this is one of the dosing patents, correct?

A.   That's correct.

Q.   So at the end of each patent, there are these numbered paragraphs that patent attorneys call "claim" or a "patent claim"; is that right?

A.   That's correct.

Q.   And, for example, as shown in the screen, claim 1 of the '653 patent is directed to a method of relieving constipation in a human patient in need of constipation, and it goes on to describe other requirements of this patent claim, right?

A.   That's correct.

Q.   And a patent claim is just a concise, single paragraph aligning the subject matter of the invention, correct?

A.   It's a single sentence that defines what the inventor considers to be their invention.

Q.   Right.  So you mentioned on direct that there were a total of 58 patent claims asserted against Par in the Par patent case, right?

A.   I did.

Q.   Okay.  Now, each and every one of the 58 patent claims is presumed valid, correct?

A.   That's correct.  By statute they're presumed valid.

Q.   And that presumption of validity applies to any issued U.S. patent, right?

A.   It does.

Q.   And that presumption of validity also applies to what you call "follow-on patents," correct?

A.   It does.

Q.   There is nothing wrong with a company securing multiple patents on a drug, correct?

A.   There is not.

Q.   There is nothing wrong with getting follow-on patents, correct?

A.   No, there is not.

Q.   So a patent holder never has the burden to prove that any patent claim is valid, correct?

A.   That's correct.

Q.   And you mentioned on direct that Sucampo and Par elected to defend seven Amitiza patents.

          Remember that?

A.   Yes, I do.

Q.   But a patent holder never has the burden to prove that its patents is valid, right?

A.   Yes.

Q.    They didn't have to defend the seven Amitiza patents, correct?  These patents are presumed valid?

A.    They're presumed valid.  Yes, I agree with that.

Q.    And because a patent is presumed valid, the party challenging the validity of a patent must prove by clear and convincing standard, correct?

A.    Yes, they must prove by clear and convincing standard if they want to prove invalidity.  That's correct.

Q.    And you are aware that clear and convincing evidence is a higher standard of proof than preponderance of evidence, correct?

A.    Yes, I am.

Q.    So to win the Par patent case, Par had the burden of proving each and every asserted claim is invalid by clear and convincing evidence, correct?

A.    That's correct.

Q.    In other words, Par had to defeat every single asserted claim to win the Par patent case, right?

A.    To win the case on the basis of invalidity, yes, they would have had to show by clear and convincing evidence each of the 58 claims.

Q.    Now, sitting here today, not a single one of the 58 claims asserted against Par has been invalidated; is that right?

A.    To my knowledge, the patents have not been challenged outside of this litigation or the -- yes.

Q.   That's not my question.

Sitting here today, not a single one of the 58 claims asserted against Par has been invalidated, correct?

A.   Has not been shown by a court or by the USPTO to be invalid.

Q.   So no one has successfully challenged the validity of any one of the 58 claims asserted against Par, right?

A.   To my knowledge, no court or administrative body, such as the USPTO, has known the claims to be invalid.

Q.   Now, let's move to another topic.  In particular, I'd like to focus on the process of getting a patent.

Do you have that topic in mind?

A.   I do.  Is there an exhibit I should look at?

Q.   I'll get to it.

First of all, maybe you can take a look at TX-5072.38.

Dr. Davitz, this is your expert report in this case. At Paragraph 38, you say that "Patent prosecution is a highly technical process involving the drafting of an application for submission to the United States Patent and Trademark, USPTO, usually followed by several years of review, also referred to as 'examination' or 'prosecution' by the USPTO."

Do you see that?

A.   Yes, I do.

Q.   Is that an accurate statement?

Case 1:21-cv-11057-MJJ    Document 850-2    Filed 05/06/26    Page 90 of 231

89

A.   Yes, it is.

Q.   Okay.  So let's break down the different steps of this highly technical patent prosecution process.

First, to obtain a patent, an inventor must file a patent application with the PTO, right?

A.   That's correct.

Q.   And after the application is filed, it is assigned to a patent examiner whose role is to review the patent application, correct?

A.   With the only caveat it's assigned to an art unit and within the art unit, it's then subsequently assigned to an examiner.

Q.   And the patent examiners are government employees, right?

A.   They are.

Q.   And they don't work for Sucampo, correct?

Can I get a verbal answer?

A.   I apologize.  Sorry.  I was taking a sip of water. Apologies.

Yes, they don't work for Sucampo.

Q.   And they don't work for Takeda?

A.   They don't work for Takeda.

Q.   And they don't work for Par either, correct?

A.   That's correct.

Q.   And the patent examiner's review, which you call "old references" to see whether the patent claims are novel and not

obvious, correct?

A.    Among other things, yes.

Q.    And if the invention does not meet the requirements of novelty and not obviousness, the patent examiners are not allowed to issue the patents, correct?

A.    That is correct.

MR. WU:  So can we bring up Dr. Davitz's direct Slide Number 16.

Q.    So on direct, you spent a lot of time talking about the '032 patent, right?

A.    Yes, I did.

Q.    This is what you call one of the old references, right?

A.    That is correct.

Q.    Right.  And you testified that the constipation patents, the dosing patents, and the IBS patent, in your view, were likely to be found invalid over the '032 patent on its own or in combination with other old references.

Is that your testimony earlier?

A.    Yes, that's correct.

Q.    Dr. Davitz, I prepared some slides to help our discussion.

MR. WU:  Can we publish the slide for cross-examination?

MS. JOHNSON:  Your Honor, I object to these being shown to the jury.

MR. WU:  These are referring to admitted exhibits.

MS. JOHNSON:  They were not previously disclosed.

THE COURT:  Overruled.

Q.   So, Dr. Davitz, you see on this slide --

A.   Excuse me.  Sorry, sir.  May I just ask, are these the copies of the slides here, the physical slides?

Q.   Correct.

A.   Okay.  Thank you.

Q.   You can take a look at the physical copy or on the screen.

A.   Great, thank you.

Q.   Are you ready?

A.   Yes, I'm ready.

Q.   So on this slide, on the left is the old '032 patent you talked earlier today, right?

A.   That's correct.

Q.   And on the right is one of the two constipation patents you talked about earlier as well, correct?

A.   That's correct.

Q.   And everything you see under "Reference Cited" on the right is all the old references the patent examiners considered during the prosecution of the '016 patent, right?

A.   Yes, that's correct.

Q.   And as you can see, on the right during the prosecution of the '016 patent, the '032 patent, the old reference you talked about earlier was already considered by the patent office; isn't that right?

A.   It was cited by the applicants or referred to by the examiner during the course of prosecution.

Q.   That's a slightly different question you are answering.

I am asking you, as you see on the right, during the prosecution of the '016 patent, the patent office already considered the '032 patent, correct?

A.   Yes, it did.

Q.   And the patent office issued the '016 patent over the '032 patent, correct?

A.   It did.

Q.   And in other words, the patent office made a determination that the '016 patent is new and not obvious over the '032 patent, correct?

A.   Yes, it did.

Q.   Now, your opinion is that the patent office got it wrong, right?

A.   My opinion, based on the experts and based on my review of the documentation, is yes, the patent office did get it -- that it did get it wrong.

Q.   Okay.  So let's go to the next slide.

So same setup.  On the left is '032 patent, on the right is the second constipation patent.  One of the seven Amitiza patents, right?

A.   Yes, I see that.

Q.   And if you look on the right again, under "References

Cited," the old '032 patent was already considered by the patent office during the prosecution of '613 patent, correct?

A.    That's correct.

Q.    So the patent office issued all the asserted claims of the '613 patent over the '032 patent, correct?

A.    It did.

Q.    And the patent office already made a determination that the '613 patent is new and not obvious over the '032 patent, right?

A.    The patent office did.

Q.    So let's go to the next slide.  So, again, on the left is the '032 patent that you testified about earlier, and on the right is the '653 patent, one of the dosing patents, correct?

A.    That's correct.

Q.    Again, during the prosecution of the '653 patent, the '032 patent was already considered by the patent office, correct?

A.    That's correct.

Q.    And, again, the patent office issued the '653 patent over the '032 patent, correct?

A.    That's correct.

Q.    And the patent office already made a determination that the '653 patent is new and not obvious over the '032 patent, right?

A.    Yes, that's correct.

        MR. WU:  And next slide.

Q.   So, again, during the prosecution of the '542 patent, the second dosing patent, the patent office already considered the '032 patent, right?

A.   They did.

Q.   And the patent office issued the '542 patent over the '032 patent, right?

A.   They did.

Q.   Again, the patent office made a determination that the '542 patent is new and not obvious over the '032 patent, right?

A.   They did.

Q.   All right.

     MR. WU:   Next one.   This is the IBS patent we talked about earlier.

Q.   Again, the patent office already considered the '032 patent during the prosecution of the '312 IBS patent, right?

A.   That's correct.

Q.   And the patent office issued the IBS patent over the '032 patent, right?

A.   That's correct.

Q.   Sorry to interrupt you.

     And the patent office already made a determination that the IBS patent is new and not obvious over the '032 patent, right?

A.   That's correct.

Q.   So your opinion is that the patent office got it wrong

five out of five times?

A.   My opinion is for each of the patents at issue here that yes, the patent office got it wrong.

Q.   So let's -- I am going to switch gears and talk about what actually happened in the Par patent case.

MR. WU:  So can we bring up JX-51.

So, Dr. Davitz, you've talked earlier about the filing of the Par patent case, and this is the initial complaint in the Par patent case, right?

A.   Yes, it is.

Q.   And you did not talk about what actually happened in that case, so I am going to go through some of the orders issued by Judge Sleet.

MR. WU:  Can we now go to JX- --

Q.   Before I move to another exhibit, I want to make sure. This Par patent case was filed by Sucampo and Takeda and a company called R-Tech, right?

A.   To my knowledge, yes, that is correct.

Q.   This case was not filed just by Takeda, right?

A.   No, it was not.

MR. WU:  Now, let's go to JX-58.

Q.   Dr. Davitz, are you familiar with this document shown on the screen?

A.   Are you referring to JX-58.3?

Q.   No.  JX-58 that's on the screen, on the computer screen.

A.    Okay.  I don't have a copy of that.

MS. JOHNSON:  I believe he has hard copies.

Q.    You actually have a hard copy in one of the binders.

MR. RAJANI:  Your Honor, may we approach?

THE COURT:  Yes, thank you.

A.    Yes, I'm here.

Q.    So this is an order that Judge Sleet issued during the course of the Par patent case, right?

A.    That's correct.

Q.    And this is what's known as a "claim construction" order, right?

A.    That's correct.

Q.    Okay.  So just look at the top of the stamp here.  This order was available on the court's docket as of May 7, 2014, right?

A.    Yes, that appears to be right.

Q.    And if you can go to the last page of this order, and the order actually was signed on May 5, 2014, right?

A.    That's correct.

Q.    And that was signed by the chief judge for the District Court of Delaware.

Do you see that?

A.    I do.

Q.    And the chief judge at the time was Judge Sleet we talked about earlier, right?

A.    That's correct.

Q.    And a claim construction order is often called a "Markman" order, correct?

A.    That's correct.

Q.    Now, I want to go through this Markman order in more detail.

MR. WU:    Can we go to cross Slide Number 7.

Q.    So, Dr. Davitz, this is the same order we just looked at, which is the Markman order.

A.    Yes, I have it.

Q.    So on Page 3 of this Markman order, you see that there is a callout for the term "medium chain fatty acid."

Do you see that?

A.    I do.

Q.    And a Markman order, just so that the jury can understand, a Markman or a claim construction order, is Judge Sleet's determination of the words of patent claims mean, right?

A.    Yes, it is.

Q.    And here, Judge Sleet determined the meaning of the term "medium chain fatty acid," right?

A.    Yes.  He construed the term "medium chain fatty acid."

Q.    And Judge Sleet adopted Sucampo and Takeda's position on the meaning of the term "medium chain fatty acid," correct?

A.    That's correct.

Q.    And it says on the screen that "The Court adopts the

plaintiffs'," in this case Sucampo and Takeda, "proposed construction because the Court finds that it comports with the context of the asserted claims and the specification," right?

A.    That's correct.

Q.    So during the course of the Par patent case, Sucampo and Takeda won the claim construction issue before Judge Sleet, correct?

A.    I wouldn't term it "won."  I would just term it the Court adopted the plaintiffs' construction of the term.

Q.    The Court sided with Sucampo and Takeda on the meaning of the term "medium chain fatty acid," correct?

A.    I would say the Court adopted the plaintiffs' claim construction with respect to that particular term.

Q.    And that was the only claim construction issue before Judge Sleet in the Par patent case, right?

A.    To my understanding, the other one, the parties had agreed on the meaning of that on the earlier page.  But yes, that's my understanding.

Q.    So I want to focus on the term "medium chain fatty acid," the judge ruled in Sucampo and Takeda's favor.

        MR. WU:  So can we go to the next slide.

Q.    So this is the '653 patent which is one of the dosing patents, correct?

A.    Yes.  Yes, it is.

Q.    And you can see that in claim 4 of the '653 patent, it has

the term "medium chain fatty acid" that the Court agreed with Sucampo and Takeda, right?

A.    That's correct.

MR. WU:  And can we go to the next slide.

Q.    Which is the '542 patent, the second dosing patent, right?

A.    Just one second, please.

Q.    Take your time.

A.    Yes, I see it.  That's correct.

Q.    And, again, claim 5 of the '542 patent, one of the two dosing patents, also has the term "medium chain fatty acid."

A.    That's correct.

Q.    And on that term, Judge Sleet agreed with Sucampo and Takeda on its meaning, right?

A.    As I said, the -- Judge Sleet construed the term and adopted the plaintiffs' proposed claim construction.

Q.    Right.

Now, Judge Sleet's claim construction of the term "medium chain fatty acid" favorable to Sucampo and Takeda could determine the outcome of the two dosing patents, right?

A.    In my opinion it did not, but the -- Judge Sleet adopted the plaintiffs' claim construction.

MR. WU:  Can you go to TX-5072.62.

Q.    This is your expert report.  Tell me when you're there.

A.    I'm sorry, where is the physical copy here?  TX what?

Q.    TX-5072.

A.   Yes, I'm here.

Q.   And if you look at Paragraph 160, it says "The validity of" --

A.   Please just hold on one second.  May I turn to the page, please.

Q.   Yes.  Paragraph 160.

A.   Yes, I see that.

Q.   And it says, "The validity of an asserted claim can also be impacted by the Markman decision," right?

A.   That's true.

Q.   Is that an accurate statement?

A.   It is an accurate statement.

Q.   And Judge Sleet's order we just looked at is a Markman decision, right?

A.   That is correct.

Q.   And the validity of an asserted claim can be impacted by Judge Sleet's Markman decision, correct?

A.   I said here, in a general statement, which is true, that a Markman decision can be -- that the validity of any asserted claim can be impacted by the Markman decision.

Q.   I now want to ask you a few questions about the two additional Amitiza patents you were asked about on direct.

So these two patents are the '481 patent, the '187 patent.  Do you remember testifying about these two patents earlier?

A.   I do remember.  I do recollect testifying.

Q.   And these two patents were listed in the Orange Book, right, for Amitiza?

A.   It's my understanding they were.

Q.   And no expert in the Par patent case offered any noninfringement opinion with respect to any claim of the '481 and '187 patent, correct?

A.   To my knowledge, no expert offered any opinion on either of those patents.

Q.   And no experts in the later-filed Hatch-Waxman cases you mentioned offered any noninfringement opinions with respect to any claim of the '481 and the '187 patents, correct?

A.   Again, I would have to review because there were quite a number of -- I would have to look at my expert report to see -- and look at materials considered in order to answer that.  I don't have a recollection sitting here of an answer to that question.

Q.   And no expert in the Par patent case offered any invalidity opinions with respect to any claim of the '481 and '187 patents, correct?

A.   In the Par --

Q.   Patent case.

A.   In the Par patent case.  To my knowledge, no, they did not.

Q.   And no expert in the later-filed Hatch-Waxman cases

offered any invalidity opinions with respect to any claim of the '481 and '187 patents, correct?

A.    Again, I would have to check the materials considered because I don't have a recollection of that particular point sitting here.

Q.    And you did not offer any opinions on the validity of any claim of the '481 and '187 patents, correct?

MS. JOHNSON:  Objection.

THE COURT:  Overruled.

A.    All I stated was, in my expert report, that they were likely susceptible to the same invalidity challenges that the earlier patents were susceptible to.

Q.    That's not my question.

So have you offered any opinion in this case that somehow the '481 patent or the '187 patent is invalid for any reason?

MS. JOHNSON:  Objection.

THE COURT:  Can I see both of you at sidebar.

(Sidebar begins.)

THE COURT:  So maybe I'm missing something.  These two patents, if they weren't part of the underlying Par patent litigation, why would anyone give an opinion on it?

MR. WU:  That's our point.  He did not offer any opinion in this case for counsel to elicit his opinion on these two additional patents on direct.  I thought your Honor --

THE COURT:  No, no.  That was as a result of the argument that I heard from the plaintiffs early on, that you were going to -- not you, but Takeda was going to make to the jury in this trial, that those two -- that Par would have had to deal with two additional patents regardless of what happened in the Par litigation.

MR. WU:  Yeah.

THE COURT:  There is no question these two have nothing to do with the Par patent litigation.

MR. WU:  But they were both listed in Orange Book and --

THE COURT:  But they weren't challenged.  They weren't sued on.

MR. WU:  But I'm -- I wasn't -- she opened the door on these two patents regard --

THE COURT:  Not in that context.  It was only brought up for the fact that in response to the anticipated argument later during this trial, that Takeda is going to make an argument to the jury that Par had to deal with these two other patents in addition to the seven in the underlying Par patent litigation.  They never made the argument that it was part of patent litigation.  So to pose these questions is not only misleading, but it's unfair.

MR. WU:  I disagree because she opened the door.  I wasn't going to ask any questions.

THE COURT:  She didn't open it in that fashion.  It's a different argument.

MS. JOHNSON:  Thank you, your Honor.

(Sidebar concluded.)

Q.   Dr. Davitz, you were asked on direct about whether Par agreed to wait to launch until July 14, 2014, correct?

A.   That's correct.

Q.   And just so we're clear, you're not an FDA regulatory expert, correct?

A.   No, I am not.

Q.   You have no idea when or if Par was ready to launch any product, correct?

A.   I have no opinion on that subject.

Q.   I also want to ask you a few questions about this concept of registration before the U.S. Patent Office.

Now, you understand that in order to try a patent case in a federal court, there is no requirement that a lawyer be admitted to the patent office, correct?

A.   That is correct.

Q.   Are you aware that the vast majority of the lawyers trying patent cases are not admitted to the patent office?

A.   I won't characterize it as the "vast majority."  I -- certainly at firms that I've worked at, the vast majority were registered.

Q.   Are you aware that the vast majority of Par's lawyers in

the underlying Par patent case were not admitted to the patent office?

A.   I did not look up or consider whether or not the Par attorneys were registered or not registered.

Q.   For example, you understand that Terrence Connolly, Par's lawyer, was not admitted to the patent office?

A.   I have no -- I did not consider that, did not look up that issue.

Q.   Again, just to make sure, there is no requirement to litigate a Hatch-Waxman case only with attorneys registered before the patent office?

A.   Yes, but every firm I've worked at, virtually every litigator is registered.

Q.   Let me ask you a few questions on that.

     You were at the firm Axinn for many years, right?

A.   Axinn?

Q.   Yeah, axin.

A.   Yes, I was a partner at Axinn, Veltrop & Harkrider.

Q.   And Axinn has many Hatch-Waxman trial lawyers who are not admitted to the patent office, correct?

A.   Actually, of the attorneys that I think are there, Jim Veltrop was registered before the USPTO.  Matt Becker was registered before the United States Patent and Trademark Office.  There were several other attorneys that were also registered.  The only attorney that I recollect who was doing

Hatch-Waxman litigation who was not registered was Chad Landmon.

Q.   Are you familiar with Ted Mathias?

A.   I am familiar with Ted Mathias.

        MS. JOHNSON:  Objection.

        THE COURT:  Sustained.

Q.   Dr. Davitz, I only have a few more questions for you.

        And this is not your first antitrust case, right?

A.   No, it is not.

Q.   And, in fact, you worked on three other antitrust cases before this one, right?

A.   Yes.  I just was going through the numbers.  Yes, I have. Yes.

Q.   And in those three other antitrust cases, you were an expert for the plaintiffs, correct?

A.   That is correct.

Q.   So this is the fourth antitrust case where you have been plaintiffs' expert, correct?

        MS. JOHNSON:  Objection, your Honor.  Could we have a sidebar?

        THE COURT:  Sure.

        (Sidebar begins.)

        MS. JOHNSON:  I believe what he's wrestling with, is my understanding, he has been retained on antitrust cases but he's prohibited from disclosing those retentions.  I'm just

mentioning it and trying to clear it up for you.  I understand you to be asking about public information where he was retained for courts.

THE COURT:  But the general question, this is the fourth time, without mentioning the other cases, I'll allow it.

MR. WU:  Yep.

(Sidebar concluded.)

Q.    Dr. Davitz, this is the fourth antitrust case where you have been plaintiffs' expert, correct?

A.    Again, this is the fourth case.  There are some other cases, but I am not permitted to discuss them at this time.

Q.    At least this is the -- this is at least the fourth case you've been plaintiffs' expert, right?

A.    Again, this is the fourth case.  There are other cases, but respectfully, I am simply not permitted under court order to discuss any of those other cases.

Q.    And about one-third of your income derives from being an expert witness, right?

A.    It varies year by year.  Sometimes it's zero.  Sometimes it's a third.  So there is no hard and fast rule of how much of my income comes from my expert work year by year.

Q.    Do you remember your deposition being taken in this case?

A.    I do.

Q.    And you told me that about a third of your income derives from expert work, correct?

A.    I do, but it does vary.

MR. WU:   No further questions.

REDIRECT EXAMINATION

BY MS. JOHNSON:

Q.    Hello, again.

How does the fact that you've never argued a patent case before Judge Sleet impact your ability to offer an opinion here?

A.    It doesn't impact it at all.

Q.    Why not?

A.    Because I base my opinion on what are the facts of the case and the law, and this is the type of counsel that I've provided for the last 30 years to numerous clients at the most senior levels.

Q.    Mr. Wu showed you a chart with some patent expiration dates.

Do you remember that?

A.    I do.

Q.    And those patents, which were patents that were actually at issue in the Par litigation, expired sometime between 2020 and 2027; is that fair?

A.    Yes, that's true.

Q.    When did the settlement in this case allow Par to enter?

A.    I believe it was 2021.

Q.    So what's the difference between 2027 and 2021?

A.    Six years.

Q.    In your experience, if Takeda believed so strongly that the patents at issue in the Par litigation were valid, why would it allow Par to enter the market six years before those patents expired?

MR. WU:  Objection.  Sidebar, your Honor.

(Sidebar begins.)

MR. WU:  He's never offered an opinion on this topic. He's only a patent law expert.

THE COURT:  His whole opinion is whether he can win or lose, and the question goes to what would you do because Takeda didn't feel 100 percent certain.

MR. BARLOW:  That's a subjective belief.

MS. JOHNSON:  I could rephrase to reasonable company, his decision.  I don't mind that.

MR. BARLOW:  At the very least.

MR. WU:  At the very least.  He never offered an opinion on this topic.

MS. JOHNSON:  You put up in front of him patent expiration dates.  You said there is a presumption of validity and you said 2027.  So I think it's appropriate --

THE COURT:  I think it's a fair question.

MS. JOHNSON:  Thank you.

MR. WU:  The expiration dates are facts.  I mean, he's never offered an opinion about what Par believed, anything like

that.

MS. JOHNSON:  I will ask it as a reasonable company. I -- Takeda, I should not have said Takeda.

THE COURT:  It's all the same ball of wax.  He gives an opinion that Par, in his opinion, had at least a 60 percent chance of winning.  The other shoe is Takeda wasn't confident or Sucampo wasn't confident.

MR. BARLOW:  That's not his opinion at all.  He's looking at the merits of the patent litigation in a vacuum, as I understand.

THE COURT:  I understand, but if she rephrases the question, a company in Takeda's position would not have felt that they would have won, I think that's the answer.

MR. BARLOW:  Would, I think the question was why.  To get in the minds --

THE COURT:  So she's going to rephrase it.

MR. BARLOW:  We still object to it.

THE COURT:  Right.

(Sidebar concluded.)

Q.   I'm looking at my screen here so I get it exactly right and hopefully not get another trip over there.

In your experience if a reasonable company in Takeda's position believed so strongly that the patents at issue there were valid, why would it agree that Par could enter the market six years before those patents expired?

MR. WU:  Objection.

THE COURT:  Noted.  Overruled.

A.   So they likely would, you know, not have agreed for an earlier entry.  They would -- the CEO, in my experience, would have played it out to the end.

Q.   Now, you were asked some questions earlier about the presumption of validity.

A.   I was.

Q.   That's a patent law concept, not an antitrust law concept, right?

A.   That's correct.

Q.   Is the presumption of validity rebuttable?

A.   Well, as I said -- the short answer is yes, because as I said earlier, it's one thing to get a patent, it's another thing to keep it.  And so that's the whole point of that statement.

Q.   And just to clarify, you're not an antitrust lawyer, right?

A.   No, I am not.

Q.   And are you offering an opinion about whether as a matter of antitrust law patents are presumed valid?

A.   No, I have no comment whatsoever on any antitrust matters.

Q.   And in the context of the Par patent infringement litigation, the validity of the patents is the dispute, right?

A.   Yes.  In the context of the Takeda, Par ANDA litigation,

the validity was the issue.

Q.   And the settlement between Takeda and Sucampo and Par avoided a decision on validity, right?

MR. WU:  Objection.  Leading.

THE COURT:  Overruled.

A.   So yes.  In the context of your question, yes.

Q.   Mr. Wu talked to you about the clear and convincing evidence standard.

Do you remember that?

A.   I do.

Q.   Now, you didn't mention that on direct, frankly because I forgot to ask it, but you didn't mention that on direct, did you?

A.   I did not.

Q.   How, if at all, did your analysis take into consideration the clear and convincing standard applicable to invalidity?

A.   Well, each claim that I looked at, my question was, did the parties meet that standard which, you know, is admittedly a higher standard than preponderance of the evidence that we talked about.  So the question is, I looked at that and said, did it meet that -- in my opinion, did the experts meet their burden.

Q.   And so is another way to say that, that your opinion that Par was substantially more likely to win the litigation baked into it the clear and convincing standard?

A.    The short answer is yes.  It bakes it in the context -- it bakes it in because the question is, did I say did it meet it.  So that's where the "baked in" concept would come in.

Q.    You were asked whether a single one of the claims asserted against Par has ever been invalidated.

Do you remember that?

A.    I do.

Q.    Has a single one of the claims against Par ever been adjudicated valid?

A.    Not to my knowledge.

Q.    Because the settlement avoided that issue, right?

A.    Yes, that's correct.

Q.    Now, Mr. Wu showed you in some slides that the '032 patent, which you talked about quite a bit, was actually in front of the patent office for a handful of patents.

Do you remember that?

A.    I do.

Q.    How does the fact that the '032 patent was before the patent office for some of the patents affect your opinion here?

A.    It doesn't, and let me just illustrate why, is that the patent -- getting a patent is really a one-sided process.  The person or persons or company who is applying for the patent get to argue for their patent.  There is no back and forth like there is in a courtroom.  Or there isn't an administrative body where people get to argue, this is invalid, this is valid, back

and forth.  It's a one-sided process.

No criticism of the examiners, but they have very limited time and they're on a very strict clock.  I know this for a fact.  I talk with a lot of examiners.  They're on a very strict time clock.  And the applicant has all the resources at their disposal to make the arguments to submit statements.  We call them "declarations."  You get to interview with the examiner, you get to bring your experts down.

So to some extent, or to a large extent, it's a very large one-sided process so that is why patents -- that's why I said patents are one thing to get, it's another thing to keep it.  And that's why patents are invalidated all the time, because it really is a one-sided process.

Q.    Did Par or any other generic company ever get to present its side of the validity arguments to the examiner at the patent office?

A.    You can't.  Legally you can't.  That's why I say it's one-sided.

Q.    And you said something just a minute ago about patents are invalidated all the time.  Is that true in the context of the kind of Hatch-Waxman case that we're talking about?

MR. WU:  Objection.  Scope.

MS. JOHNSON:  I'll withdraw.

Q.    You mentioned that it's the '016 constipation patent, that the patent office got it wrong?

A.    Yes, I did.

Q.    And is that also your opinion for the other patents that Mr. Wu showed you where the '032 patent was part of the record?

A.    Yes.   That framework, yes, they got it wrong.

Q.    And by the way, as to the '653 dosing patent, was Par relying only on the '032 patent to prove invalidity of that patent?

A.    No, they weren't.

Q.    Did Mr. Wu show you the other references on which Par was relying to show, for example, that the '652 dosing patent was invalid were also before the examiner?

A.    I'd have to go back and check my -- check his notes and check his slides.   I don't know the exact answer to that question.   I don't think so, but I'd have to check it.

Q.    We talked about a Markman decision.   This is another one I meant to ask you about but I forgot so I'm glad we're coming back to it.

         How many claims were disputed in the Markman decision?

A.    I don't remember the number of claims that were disputed. It was the term, that the term "medium chain" -- basically, what does that term mean.   That's what the Court answers.

Q.    Thank you.   I misspoke.   One moment.

         Did you consider the Judge Sleet's order on claim construction in conducting your analysis here?

A.   Yes, it was one factor -- absolutely.

Q.   How does the Markman decision impact your opinion about your conclusion as to who is likely to win?

A.   What Judge Sleet said when I looked at the facts, it didn't change my opinion with specific reference to this case.

Q.   Why not?

A.   Because medium chain fatty acid, the way Judge Sleet said what it meant, that was in the prior art.  It was coconut oil. And so basically -- so it didn't change my opinion with specific reference to just this case.

Q.   So even though the Court adopted Takeda and Sucampo's explanation of what a medium chain fatty acid was, that has no bearing on your opinion in this case?

A.   I wouldn't say no bearing, it's just that it didn't change my opinion.  I took it into consideration.  I thought about it.

Q.   And, in fact, wouldn't that claim construction issue, wouldn't that -- well, sorry.  I'll try to ask in a non-leading way.

Is the medium chain fatty acid issue relevant to invalidity?

A.   In this particular case, because of the way Judge Sleet thought about it, the way Judge Sleet said what he meant, it didn't change my position because what I read -- what the experts told me and what I read in the historical record, in the public record, we call it prior art, but in the public

record, it was there so it didn't change my opinion.

MS. JOHNSON:  If we could go to Plaintiffs' Slide 9. I fear we failed to cover this before so I just want to clean this up.

So this is plaintiffs' slide.  I think you're looking at defendants' slides.

THE WITNESS:  This is yours.  I'm sorry.

Q.   What was the date on which the '032 patent was issued?

A.   The '032 patent was issued May 31, 1994.

Q.   Thank you.

Did the '187 patent and the '481 patent change your opinion as to who would win the Par litigation in any way?

A.   From what I reviewed, no, it did not.

MS. JOHNSON:  Thank you.

THE COURT:  Mr. Wu.

RECROSS-EXAMINATION

BY MR. WU:

Q.   Do you need to take a break, Mr. Davitz?

A.   Just depends on how long.  If it's going to be an hour, I respectfully request a break.

Q.   No, definitely not.  A couple minutes.  Just for clarification.

There is no such thing as adjudicating a patent as valid, right?

A.   I'm sorry?

Q.    There is no such thing as adjudicating a patent as valid, right?

A.    Technically, yeah.  I would say adjudicating validity is not -- no, I would agree, adjudicating validity.

Q.    Okay.  Because every patent comes out of the patent office is presumed valid, right?

A.    Yes, they are.

Q.    And you talked about rebutting that presumption of validity.  Again, no one has successfully rebutted the presumption of validity, correct?

A.    To my knowledge, yes, you are correct.  No one has invalidated the patents that -- these particular set of patents, in any form.

Q.    Yeah, you also talked about USPTO being one-sided.

        Do you remember that?

A.    I did.

Q.    And the U.S. patent office proceeding is not always one-sided, right?

A.    There is a subset of proceedings that is not one-sided.

Q.    And if anyone believes that a patent is invalid, they could initiate a proceeding called inter partes review to challenge the invalidity of the patent, correct?

A.    That is -- that is correct.

Q.    And no one has challenged the validity of any of the asserted 58 claims at those patent office proceedings, right?

A.    To my knowledge, no one has challenged the validity of any of these patents in inter partes review to my knowledge.

Q.    And no one has challenged the validity of any of the 58 asserted procedures called ex parte reexamination, correct?

A.    To my knowledge, I have no knowledge that there been either an inter partes review or ex parte reexamination.

MR. WU:  Thank you, Dr. Davitz.

THE COURT:  Thank you very much.  You may step down.

MR. SOBOL:  Should we call the next witness, your Honor?

THE COURT:  Yes.

MR. SOBOL:  The purchasers call Dr. Christopher Ruhm.

DR. CHRISTOPHER RUHM, having been duly sworn by the Clerk, was examined and testified as follows:

THE CLERK:  Please state your full name for the record and spell your last name.

THE WITNESS:  Christopher John Ruhm.  R-U-H-M.

THE COURT:  Thank you.  You may be seated.

DIRECT EXAMINATION

BY MR. SOBOL:

Q.    You all squared away there?

A.    Yes.

MR. SOBOL:  May I inquire, your Honor?

THE COURT:  Yes.

Q.    Please state your name.

A.    Christopher Ruhm.

Q.    Good afternoon, how are you?

A.    I'm good.

Q.    Where do you live?

A.    I live in Charlottesville, Virginia.

Q.    What kind of place is that?

A.    It's a college town.  It's where the University of Virginia is located.

Q.    Do you have a family?

A.    I do.

Q.    Please describe your family to the jury.

A.    So I've been married for 37 years, I think, and have two children, both grown, in their 30s.

Q.    Can you put the microphone maybe just a little bit closer to you?

A.    Sure.

Q.    Or put you closer to the microphone?

A.    Can you hear me better now?

Q.    Yes, thank you.

        What's your profession?

A.    I'm professor of public policy in economics.

Q.    So you're an economist?

A.    Yes, that's my training.

Q.    And how do you fit into this case?

A.    Well, I'm providing sort of an analysis of the economic

incentives in this case.

Q.   Okay.  So describe your formal education, please.

A.   Sure.

     I got a Bachelor's degree in economics from the University of California, Davis, then a master's in Ph.D. in economics from the University of California, Berkeley.

Q.   And when did you get your Ph.D.?

A.   1984.

Q.   So you've been an economist for the past 42 years?

A.   It's hard to believe, but yes.

Q.   Well, let's keep it brief, but can you tell the jury the arc of your professional career as an economist?

A.   Sure.

     My first job was right here at Boston University where I met my wife, by the way.  And then I was at the University of North Carolina, Greensboro for almost 20 years, and been at the University of Virginia since 2011.

     I also spent a year serving on President Clinton's Council of Economic Advisers in the '90s.

Q.   Have you focused on a particular kind of economics?

A.   Yes.  Most of my work for the last probably 35 years has been in the area of health economics.

Q.   Health economics?

A.   Yes.

Q.   And what's that?

A.   It's the study of everything related to health.  So the medical system, it's also how individuals behave, you know, individual behaviors, but it's certainly relevant for the issues in this case.

Q.   I understand you also have experience in an area called applied microeconomics.

A.   That's right.

Q.   What's that?

A.   So if you think about theoretical economics, you use theory.  But what you're doing is you're looking at data to see what's really going on in the world, how it's responding to economic incentives and so forth.

Q.   Okay.  Have you published in the area of health economics and applied microeconomics?

A.   Yes, I have.

Q.   Please describe that to the jury.

A.   I have something over 170 peer-reviewed articles and then various other policy pieces and book chapters and so forth.

Q.   And I understand that there is some way to get a calculation of how many times other people have cited your work.  Please describe that.

A.   Yeah, the most common one is called Google Scholar citations, and I think the last count my work had been cited more than 31,000 times.

Q.   So you've been a professor at the University of Virginia,

at UVA, for about the past 15 years; is that right?

A.   Yes, that's right?

Q.   What do you teach?

A.   So I teach courses in economic methods, in economics itself.  I've taught health economics courses.  I teach courses -- sort of capstone courses for our students who are putting it all together, doing actual project work.

Q.   Okay.  And have you been involved in any area where there are awards for economists?

A.   Yes.

So I've received several awards, but also I was the chair and cochair, chair for three years and cochair for three years, of the Arrow award, and that is the award for the best economics article worldwide written in the last year.

Q.   Okay.  And so, of course, this antitrust case occurs in the context of the regulatory structure for pharmaceuticals in the United States.

Are you familiar with that?

A.   Yes, I am.

Q.   In what way?

A.   Well, you know, generally, it's been part of what I do as a health economist.  It's an important part of the system.  And then, of course, I'm more familiar with the work on this case as well.

Q.   And are you familiar with the Hatch-Waxman Act?

A.    Yes, I am.

Q.    How so?

A.    Well, you know, I had some general familiarity before this case and then have become more familiar as I have been working on the material in this case.

Q.    Do you consider the dynamics of brand and generic drugs to be a part of health economics?

A.    Yes, definitely.

Q.    Why is that?

A.    Well, you know, I mentioned that health economics is very broad.  It covers determinants of health and, obviously, pharmaceuticals are an important element of that.

Q.    Great.

        And on whose behalf are you testifying in this case, sir?

A.    I am testifying on the behalf of the end users and the -- sorry, of the payors -- I'm misspeaking here -- the payors in this case.

Q.    And how long have you been working on the case?

A.    I think I started in 2023.  I don't recall exactly, but I think it started in 2023.

Q.    Okay.  And have you been hired as a health economist in other litigation matters?

A.    Yes, I have.

Q.    Have you testified in court before?

A.    Yes, I have.

Q.    How many times?

A.    I think two or three.

Q.    And you're being compensated, obviously, in this case, right?

A.    Yes, I am.

Q.    And what's your rate?

A.    It's $1,400 an hour.

Q.    And what's your best estimate as the amount of time that you've spent working on this case?

A.    I think since the start of it, something a little over 200 hours.

Q.    Okay.  And did you do all the work that did you on your own?

A.    No, I had extensive staff support.

Q.    From whom?

A.    It's the company Greylock McKinnon Associates.

Q.    How does your research, your education, your experience have any application to the issues in this case?

A.    So in many ways, and I hope I can point this out, the issues, the economic issues are fairly basic.  There's incentive issues, and that's exactly what I study, what I comment on, what I do with my work.

        MR. SOBOL:  Your Honor, I tender Dr. Christopher Ruhm as an expert in the field of applied economics and health

economics.

MS. SHORES:  No objection, your Honor.

THE COURT:  Thank you.

Q.   Yeah, I should have said that.  If you ever need to take a sip of water, please do so.

A.   I get thirsty.

Q.   So please describe what your assignment was in this case.  And I think we have a slide that you can tick through on this.

A.   Yes.  There we go.  Thank you.

So we can break what I'm doing into four general baskets.  The first is, what would I expect the economic outcome of the settlement, what would a settlement look like in this case if there hadn't been a reverse payment.  And I'm not sure if you've heard that term before, but if not, we will certainly get into it.

And then the second is, was there a reverse payment; if so, how much was it.

Third, did that matter; in the sense that, did it inflict harm on the purchasers.

And then, was there a justification for the harm that occurred.

Q.   Okay.  So before we then start going through each of these four items, let's just give a little background about the dynamics of brand and generic drugs.

A.   Sure.

Q.   In the United States, how is it that drugs become affordable and accessible?

A.   Yeah.  The best way to think about this is you have brand-named drugs that almost always sell at high prices.  You have generic drugs that are actually the same product and they will sell at lower prices.  So that's one of the key elements.

          MR. SOBOL:  If you go to the next slide.

Q.   This is something that the jury has seen before.  What is a brand-name drug?

A.   A brand name, those are the drugs you've heard the name of.  They're usually -- they're the first time that chemical entity comes on the market.  And so when you talk to -- you know, are you taking Lipitor?  That's the brand drug, the one you've heard of.

Q.   By the way, I should have mentioned this.  We're talking about prescription drugs, correct?

A.   Yes, exactly.

Q.   Not the kind of drugs you go into -- it's at the pharmacy, not in the alleyway, right?

A.   Exactly right, yeah.

Q.   What is a generic drug?

A.   The generic drug is the same chemical entity, it's the same drug, but it will have a name you can't pronounce and probably never heard of.

Q.   And what do we mean by "competition" then?

A.   Competition in this sense occurs when the generic enters the market, or hopefully multiple generics enter the market, and prices of the drug start to come down.

Q.   So now let's talk about competition in the context of the Hatch-Waxman Act.

What is a first filer?

A.   So the first filer is the first generic that files an abbreviated new drug application, an ANDA, I don't know if you've heard that term, and so they're the first one to do that to make that filing.

Q.   Okay.  In addition to being the first one to file, what else does a generic company have to do in order to be treated as the first filer?

A.   Well, they have to get their ANDA approved or they can settle, but they either settle with the brand or they get their ANDA approved.

Q.   And what, if anything, did they have to do regarding any listed patents?

A.   So they're challenging those patents.  You know, I'm certainly not a patent expert, but they're challenging those patents as being either not valid or not applying in the case at hand.

Q.   And what's the 180-day exclusivity?

A.   Yeah.  So the key thing here is once that first filer generic comes on the market, no other nonbrand generic can come

on the market for a minimum of 180 days.

Q.   Okay.  So the generic first filer gets to be on the market as the only ANDA approved, the only --

A.   Exactly right.

Q.   And in addition to that, how many other -- what other kind of drug, if any, can come on the market during that 180-day exclusivity?

A.   Yeah.  So the key thing is the brand is always allowed to launch a generic.  It's sometimes called an authorized generic, but here, the key is during that first six months, the generic first filer can come on but the brand can also market a generic drug; again, same drug, but with the chemical name.

Q.   Okay.  So how often does one expect there to be two generics during this 180-day exclusivity?

A.   When it's a big market.  I expect that to occur most of the time.

Q.   Do we have a slide that can be able to show this dynamic to the jury?

A.   I think we do.

Q.   So please first describe -- we have time, obviously, going from left to right, correct?

A.   That's correct.

Q.   And price going up and down?

A.   Yes.

Q.   So what does the red line show?

A.    So the red line is the period where the brand is the only type of this drug on the market.  And I want you to notice here, there's the red line, the price is high.

Q.    Okay.  And the yellow?

A.    So the yellow is during that generic exclusivity period, and this is where -- in the case where we have two generics on the market.  So the ANDA that we've talked about and then the brand's authorized generic.  And what you notice there, the price plummets.  Typically it's going to be 50 to 60 percent lower when it was just the brand on the market.

Q.    And in that period, then, when there are two generics, is there a form of price competition that happens between two?

A.    I am not sure I'm understanding your question.

Q.    Well, the price goes down.  Does that price go down because there are two generics competing with one another?

A.    Oh, yes, exactly.  In these markets, once generics come in, remember they're the same drug so they're competing on price.  That's how they try to get business.

Q.    And the green section then?

A.    So the green is at some point after that exclusivity period ends, typically there are going to be other generics entering, and so you see this kind of step down.  Once you get past about five or so generics, you're down to essentially the cost of producing the drug.  So you see a very low price at that point.

Q.    Okay.  So we've talked about generic and we've talked about competition.  Now let's talk about begins.

What's the importance, if any, from the point of a view of a health economist, as to when the begins date is?

A.    So the begins date is when we go from this red line to the yellow line.  It's where prices start to come down dramatically.  So the later begins is the longer purchasers and everybody else has to pay high prices.  The earlier it is, the sooner prices begin to fall.

Q.    Okay.  So with respect to this begins in this lawsuit, there are some other approaches that the purchaser group, my group, we have to the begins date that you're not addressing today, correct?

A.    Well, I'm not sure exactly what other approaches you have, so I don't know the answer to that.

Q.    You're not a patent attorney, correct?

A.    No, absolutely not.

Q.    And you're not giving opinions to this jury as to whether and if so when Par would have won the litigation, correct?

A.    That's correct.

Q.    Instead, you're going to address a different scenario, which is, if there had not been this settlement, what other kind of settlement might there have been?

A.    Exactly right.

Q.    Okay.  So let's now turn to the first question that you

addressed.

MR. SOBOL:  If we go to Slide 5, please.

Q.   What would the economic outcome of a settlement without a reverse payment be?  Can you describe what this topic is in more detail to the jury, please?

A.   Yeah.

What I'm really looking at is in the case where we don't have a settlement with anticompetitive elements, what would we expect this market to look like, how many generics would be in the market, when would they go on the market and so forth.

Q.   And do economists have a way to be able to look at what economic outcome would have happened in a settlement that's just settling on the agreed entry date?

A.   So I'm not positive I am understanding your question, so I'll take a shot and you can tell me if I am not answering what you're asking.

Q.   Or you can tell me what I'm asking.

A.   Well, what I was going to say is, as I mentioned, I am focusing on economic incentives.  And the key assumption here is that drug companies are trying to maximize their profits. And so when I'm evaluating what we expect to happen, is the key element is, do they expect this to increase their profits or decrease their profits.

Q.   So if I understand it, then, the topic that we're about to

address is not talking about any aspect of legality or illegality in the agreement but rather what would happen if there was no payment?

A.    Exactly.

Q.    So in that situation, I take it, what are the parties negotiating over?

A.    Well, they're going to be negotiating over when the generic enters and what the terms are for when they enter.

Q.    Okay.  And did you have a methodology for how you approach this question as to what the economic outcome would be of a settlement without a reverse payment?

A.    Yes, I do.

Q.    And do we have a slide to show your methodology?

A.    Yes, we do.

Q.    Okay.  So let's go to the beginning, I think, of this.  That's right.

        Again, on this slide we have time going from left to right, correct?

A.    That's right.

Q.    And describe why you have over on the left, day of settlement agreement for trying to look at how a competitive entry date gets determined?

A.    Yeah.  The key issue for the date of the settlement agreement is the parties involved, so in this case the brand and generic, are making their best estimates at the time they

settle to say, are we better off or worse off with different entry dates or other provisions.

So that's kind of the key time for thinking about their decision process.

Q.   And, of course, entry couldn't happen any time before the settlement because they hadn't settled.

A.   No, exactly right.

Q.   And the challenged patents expire on the right, why do you have that there?

A.   Well, that's the last possible date.  You know, once the patents expire, anybody can enter freely.

Q.   Okay.  So in this setting then, what is the position of the brand, if we go to the next?

A.   Yeah.  So the brand -- so if you look at the yellow -- the orange, I'm not colorblind, if you look at the orange here, this is showing you the situation for the brand.  And basically they would like to have a later settlement.  They'd actually like as late a settlement as possible because the later it is, the longer they can keep those high brand prices and they make more profit.  So they want later.

Q.   And just to be clear, right now what we're describing to the jury is a general methodology.  You're not applying it yet to the facts in this case, correct?

A.   That's right, not yet.

Q.   And then what's this dotted line where it says, "brand

bottom line"?  What's that?

A.   So that's the earliest date at which the brand would agree to -- potentially agree to settle litigation.  They wouldn't go any earlier because if they went earlier, they'd actually be doing better off, they'd make more profit by just litigating to a conclusion.  So that's the earliest date they could possibly agree to.

We're not saying they will agree to that date, but it's the earliest it's possible.

Q.   And the earliest for what?

A.   Oh, the earliest for generic entry.

Q.   And what does the blue show us?

A.   The blue is showing the situation for the generic, which is the reverse of the brand.  The generic wants an earlier entry date and this generic bottom line, that dotted line, is the latest date that they would conceivably agree to a settlement because any later they'd say, we're better off just litigating this thing.

Q.   And a generics bottom line is just that, that's the --

A.   That's right.  That's the latest date that they might potentially would agree to.  We're not saying they're going to agree to that, but that's -- they would never want to go later because they'd lose money for sure.

Q.   Without going into the weeds of it right now, can you describe at a 30,000-foot level how these bottom lines get

determined by a health economist?

A.    Yeah.  What we do is we calculate the profit the brand would expect to make if there is a litigation, we look at the profit if they win the litigation and then the profit if they lose the litigation, and then we're taking what's called a weighted average of those.  We're weighting that by their probabilities of winning or losing the litigation.

Q.    And I take it you do a similar approach on the generics bottom line as well?

A.    Exactly.

Q.    So then if we go to the next slide, I take it that there ends up being a range.  What's that?

A.    That's right.  So this green range we see, we call it the bargaining range.  That's the range at which both the brand and the generic are potentially better off settling; that is, they could potentially both make more profit from -- expected profit from settling than if they litigate to conclusion.  So somewhere in that range, we expect to see entry.

Q.    And, again, just for this general methodology, are there some situations where you might not have any overlap?

A.    Yeah.  And if there is no overlap, there wouldn't be a settlement.  They will just litigate.

Q.    Okay.  Then you have something inside the green, "generic entry begins," what's that mean?

A.    Yeah.  So that is the most likely date where the generic

actually enters within that range.

Q.   Okay.  And -- well, how does that get calculated?  Again, at a very general level, we're not talking specific to this case?

A.   Right, right.

I apologize.  This gets a little nerdy, but basically what we do is we look at the actual settlement that occurred, and we look at of that extra profit over litigation, how is that split, what percentage is it split between the parties involved.  And then we figure out the date with this agreement that would give you that same split.

Q.   Is this methodology, this competitive setting of the begins date that you've just described, is this a methodology that's common in economics?

A.   Yes, it is.

Q.   Okay.  So you've described first to the jury your methodology of looking at an economic outcome when there is a settlement that doesn't have a payment.  Now let's turn to the data or facts that you need in order to be able to reach your opinion.

Please describe -- that is now specific to this case -- what facts and data do you need specific to this case?

A.   Sure.

So here what I'm looking at are forecasts of how big the market would be, of what the prices would be in different

situations, the prices for the drug, of what is the probability that the party, one party or the other, so, say, the generic will win the litigation versus losing the litigation, and what is the entry date that -- what's the earliest entry date they could have sort of legally or functionally.

Q.    Okay.  So what did you and some of the folks at Greylock McKinnon do in order to find forecasts?

A.    Oh, well, we went through -- this is data.  This is information that was provided as a part of this litigation, so in the discovery process.

Q.    And did you get forecasts from Takeda?

A.    Yes.

Q.    Sucampo?

A.    Yes.

Q.    Par?

A.    Yes.

Q.    Roughly, how many did you look at?

A.    I think it was on the order of 24, somewhere around 24, I believe.  I am not sure of the exact number, but I think it's something like this.

Q.    And is this the kind of facts and data health economists typically use in order to perform this kind of an analysis?

A.    Yes.

Q.    All right.  We've gone through methodology, we've gone through data and facts.  Now let's turn to your assumptions.

Do economists sometimes need to make assumptions in providing an opinion on an issue?

A.   Yes, pretty much always.

Q.   And so what are the assumptions that you needed to have in place in order for you to be able to have an estimate as to what an economic outcome would have been from a settlement without a payment?

A.   Yeah.  The key assumption is that all parties involved are trying to maximize the profit they expect to make.

Q.   And why do you make that assumption?

A.   That is a fundamental assumption in economics.  And when we think about the behavior firms, you know, in almost all situations, that's our starting point.  They're trying to make as much profit as they can.

Q.   Okay.  And what other assumptions did you make?

A.   Well, I think I mentioned about what the starting -- the earliest possible starting date might have been, and then about patent strength; so what the parties thought the probability of winning on the patents was.

I think those were the key assumptions.

Q.   Okay.  So, then, with respect to the starting date, what was the assumption that you had there?

A.   So this was the -- the earliest possible entry date was, I believe, was October of 2016.

Q.   And that's because that's when the litigation would have

ended?

A.    Yes.  And that information was provided to me as an assumption to make, yes.

Q.    And with respect to the patent merits, were you here when Dr. Davitz testified earlier today?

A.    I was here for part of his testimony.

Q.    Okay.  And what assumption did you make regarding the patent merits?

A.    So the assumption was that Par, the generic, would have at least a 60 percent chance of winning on all of the patents. And then on some of the later patents, it was at least 70 percent.

Q.    And did you also assume that reasonable parties in the position of Takeda and Sucampo, on the one hand and Par on the other, were negotiating only on a generic competition begins date?

A.    Well, I mean, practically they were also negotiating on terms of the settlement.  So I am not sure if I am answering your question.

Q.    But when you were trying to do your estimation, you were trying to estimate that date?

A.    Yes.

Q.    And doing so without a payment, correct?

A.    Oh, yes, yes, yes.

Q.    And before we go ahead, if -- looking at the slide that we

have before you, right, this was your general methodology for a competitive setting of the begins date, that's without a payment, correct?

A.    Exactly.

Q.    And then if we go to the next slide, what happens from the point of view of a health economist if instead of having just a negotiation over the entry date, you add into it a large reverse payment?

A.    Yeah.  So if you add in a reverse payment, what we expect to see happen is there is going to be a delay in the entry date.

Q.    And that's what this depicts, correct?

A.    Exactly.

Q.    But now, if we go backwards, what we're going to do now is go through your testimony about how, without that payment, how it is that rational parties, reasonable parties would have entered into or come to a reasonable economic outcome; is that right?

A.    Yes.

Q.    Now, in terms of winning the litigation, the percentage of winning the litigation, can you give the jury an example of how you simplify that for non-economists?

A.    Sure.

      Let's think about a case where you're going to get just -- I'll make up a number -- $100 million of profit if you

win and zero if you lose and there is a 50 percent chance of winning.  What you do -- 50 percent is the same as .5.  You're going to take zero times .5, that's if you lose, and then .5 times 100 million if you win, that's gives you $50 million.  So in that simple case you would be kind of splitting the difference.  Of course if it were 70/30 you're going to be weighting the zero and the 100 million differently, but it's the same process.

Q.   Okay.  So now we've gone through your methodology, your data, and your facts and you're assumptions.  Do you have a conclusion based upon your 40 years of health economics in the framework that you've identified to a reasonable degree of certainty in your profession as to what a reasonably predicted generic entry date would have been if Par and Takeda had a competitive settlement, a settlement agreement that just agreed on the generic competition begins date?

A.   Yes, I do.

Q.   What is your opinion?

A.   I believe it would have been around October of 2019.

Q.   And do we have a slide about this?

         MR. SOBOL:  We'll go to Slide 9.

Q.   So is this the conclusion that you reached, that a competitive entry date negotiated without a payment would be October 2019?

A.   Yes, it is.

Q.    Now, if we look at the brand bottom line, what does that show?

A.    Well, as I mentioned -- oh, so that shows you, again, the earliest date that's in there in their bargaining range, and you notice that's July of 2019.  So they would never agree to something earlier than that under these assumptions.

Q.    And how did you arrive -- how did you calculate that date?

A.    So that is the date at which their profit expected if they litigate is the same as the profit they expect if they settle on that date.

Q.    Okay.  And then there is a dotted blue line.  What's that?

A.    That's the same thing for the generic.  So their earliest date they would have considered is January of 2020.

       Did I say that backwards?  I might have said that backwards.  Let's see.

Q.    Why don't you say it forwards then.

A.    Yes, yes.  Okay.  So sorry, I'm having a brain freeze here.

Q.    No, that's okay.

       So you were describing how you determined the generic bottom line.

A.    Right.

Q.    And the generic bottom line is what?

A.    So the generic bottom line is the -- I'm apologizing, my brain freeze.  So the generic bottom line is the earliest date

they would agree.

Did I say that right?

Q.    No, you mean the latest date.

MS. SHORES:  Objection.

A.    Well, let me look here.  Yes, it was the latest date they would agree to.

Q.    And then you calculated the -- well, there is a range here then, right?  And what's that range?

A.    The range is between July 2019 and January of 2020.

THE COURT:  Why don't we take a lunch break now. Thank you.

(Jury left the courtroom.)

(Recess.)

MS. SHORES:  Can you instruct the witness he can't talk to the lawyers?

THE COURT:  So Dr. Ruhm, don't have any conversations with any of the lawyers during the break.

THE WITNESS:  Thank you.

MR. BARLOW:  Your Honor, what time should we return?

THE COURT:  I want to have the jury back in here at 2:00.  So maybe a few minutes before 2 o'clock.

MR. BARLOW:  Thank you.

(Recess).

THE CLERK:  All rise.  Back in session.  You may be seated.

(The Honorable Court entered.)

THE CLERK:  All rise for the jury.

(Jury enters.)

THE COURT:  You may be seated.

I hope you had a nice lunch.  I hope no one tried ordering a burger because that takes 20 minutes.

MR. SOBOL:  May I inquire, your Honor?

THE COURT:  Yes.

BY MR. SOBOL:

Q.    How are you doing?

A.    Good.

Q.    You didn't speak to anyone during the break?

A.    No.

Q.    Where we left off was on this slide, the competitive setting of the "Begins" date.  Just to remind the jury, your opinion after you did the analyses that you described was what about this date?

A.    So the most likely entry with a competitive settlement would have been October 2019.

Q.    And -- sorry.  So you reached a conclusion.

MR. SOBOL:  If we go to the next slide then.

Q.    And the conclusion was what?

A.    Yes.  So -- so if there had been a competitive settlement, the entry date would have been somewhere between July 2019 and January 2020.  And then the most likely entry date would have

been around October 2019.

Q.    Now, are there any other methodologies that you could have used, you could have employed, to determine a competitive generic competition date other than the one that you used?

A.    Not that I know of.  What I used was completely standard.

Q.    And how did the forecasts that you looked at factor into your analysis?

A.    So the forecasts provide the necessary information for the calculations, I think I mentioned before in terms of things like market size and price, and so those are used to calculate the profits under different scenarios.

Q.    Okay.  And you mentioned a term earlier in your testimony about profit maximizing.  That's, in this circumstance, profit maximizing but law abiding?

A.    Exactly.

Q.    Okay.  And then what is your estimate of the competitive entry date sensitive to?  What might change it so the jury understands how sensitive?

A.    Sure.  I mean, all the forecast information we were just discussing, but also the perceived patent strength would be quite important.

Q.    Okay.  If the assumption is that Par had a better chance to win the patent litigation, better than 60 percent, what would happen to your entry date?

A.    So it would become earlier.

Q.    And what would happen if the percentage was lower?

A.    The entry date would be later.

Q.    Okay.  So your model can be adjusted, correct?

A.    Yes.

Q.    And did you calculate what the entry date would be if the chances of Par prevailing was 70 percent?

A.    Yes, I did.

Q.    What was that?

A.    My recollection is February 2019.

Q.    Okay.  Now, if we go back one slide, the actual entry day for Par was -- do you recall that?

A.    Yes, January of 2021.

Q.    And so where would that appear relative to the payment free date that you determined?

A.    You see it's over a year later.

Q.    What does that tell you as a healthcare economist?

A.    It tells me something else was going on to induce the generic to delay their entry.

Q.    And you investigated that?

A.    Yes, I did.

Q.    So let's go now to slide 11.  This is your second assignment.  Can you describe to the jury what this was?

A.    Yes.  What I'm doing here is evaluating was there a reverse payment and, if there was, how much was it and what was the size of it.

Q.   So before you were testifying your first assignment was to look at what would likely have happened if there was no reverse payment, right?

A.   Exactly.

Q.   But now we're shifting and we're looking at was there a reverse payment here and, if so, how much?

A.   That's correct.

Q.   Okay.  Now, what do you mean by "payment"?

A.   Well, a payment, the way you should think about, is a transfer of value from one party to another.

Q.   And is that always like just cash?

A.   No.  It could be cash, but it doesn't have to be just cash.

Q.   So from your point of view as a healthcare economist, what do you look for when you're trying to determine whether there's been a transfer of value?

A.   Yes.  Specifically here, I'm looking did the brand give up something to get something more.  They're always going to do this if they can get something more, more profit, but did they give up something of value to get something out of it that increases their profit.

Q.   Okay.  And can you also look at it from the perspective of Par?

A.   Sure.

Q.   And what would that be?

A.    Well, it would be did they -- did they receive something of value in order to provide other value to, in this case, to the brand.

Q.    Okay.  So why is it important for a healthcare economist to be vigilant in trying to look for a payment that might not be just a cash payment?

A.    Yeah.  If I could give you an example, if that would be okay --

Q.    Sure.

A.    -- imagine that I have a Mercedes that I sell you and this Mercedes is worth $60,000 and I sell it to you for $10,000.  Well, the money flow has gone from you to me.  You've given me $10,000 but, actually, what's happened is you've gotten something that's worth $60,000 so the value transfer has been $50,000 worth to you.

Q.    Okay.  So then why is it important to a healthcare economist to look beyond the form and look for something else?

A.    Because, I mean, what's critical here is we're looking at would -- would something of value be provided to induce something else and, in this case, one of the things it induces is delayed entry by the generic.

Q.    What's your understanding of a reverse payment?

A.    So it's this transfer of value from, in this example, from the brand to the generic.  So it's from the party doing the suing to the party being sued.

Q.   Okay.  And do you look just for that formalistically or do you try to look behind the form to the substance?

A.   Yeah, no, we have to look at the substance.

Q.   And in the circumstance of a settlement where, in addition to having an agreed entry date, you see something of value moving from the brand to the generic, why is that important for you to look at?

A.   Well, because that's the reason the generic might agree to delay their entry date.  And, in this context, what it can do is increase the total pie, the total profits in a way -- let me stop there.

Q.   At the expense of who?

A.   At the expense of purchasers.

Q.   And so what effect, if any, would a reverse payment have on the agreed date for generic competition date begins?

A.   We would expect the competition to start later than it otherwise would.

Q.   And if we go to slide 12, again, you mentioned this briefly to the jury, what is this?

A.   Yeah.  This is showing you, when you have this kind of a reverse payment, how the entry date would be later than you would expect it to be with a competitive settlement that didn't have these characteristics.

Q.   So if we look to the actual dates in this case, if we go to the next slide, what does this tell us?

A.    Yeah.   So you see the best estimate with a competitive settlement would have been an entry date of October 2019, but what we actually see as an entry date is over a year later in January 2021.

Q.    Okay.  And so, in this circumstance, what's the brand paying for?

A.    Well, they're -- one of the things at least they're paying for is this delayed entry.

Q.    All right.  And this is a methodology that you used in order to determine whether there was a reverse payment in this case?

A.    Yes.

Q.    Okay.  So now let's turn from your methodology to what facts and data you looked at in this case in order for, first, just to determine whether there was a reverse payment, not how much yet, but just whether there was a reverse payment.  What facts or data did you look to?

A.    Okay.  So I'm going to look to the terms of the settlement and then the forecasts, type of forecast information we've already started to discuss.

Q.    And did you employ the same basic assumption that you described before about economists, that they assume they're trying to maximize their profits?

A.    Yes, exactly.

Q.    Now, based upon your review of the settlement agreement

and the forecasts that you mentioned and employed the methodology that you had, did you reach an opinion to a reasonable degree of certainty in the area of applied microeconomics and healthcare economics as to whether there was a reverse payment in connection with the 2014 settlement agreement?

A.    Yes, I did.

Q.    And what was your opinion?

A.    That there was a reverse payment.

Q.    Why did you reach that opinion?

A.    Well, I'm not sure I'm fully understanding your question. I'm looking at was there -- were there terms of the agreement that led to a transfer of value of the type that we discussed that led to the delayed entry date.

Q.    And what form did the transfer of value take here?

A.    So the key component here, we talked about how earlier there would be typically two generics upon entry, the ANDA, the first filers, generic, and then the brand's authorized generic, but the way this agreement would have been set up, it would have been economically irrational for the brand to launch their own generic.  So we went from two generics to one.

Q.    Okay.  And we'll talk about the consequences of that in a moment, but before we get there, was there a part of the Par settlement agreement that you saw that you could point to?

A.    Yes, and it has to do with the profit split, so how when

there was one generic on the market how -- when there were generics on the market, the profit would be split between the brand and the generic.

Q.   So if we can go to the next slide, I believe.  What is this?

A.   Yeah.  So this is showing you that when there was -- when Par was the only generic on the market, they would be paying 50 percent of their gross profits to the brand.

Q.   In this circumstance, it looks like Par is paying 50 percent to the brand side.  So why is this a profit split?

A.   Well, what's happening here is, by having these terms, the brand will not launch their own version of the generic.  It would have been economically irrational for them to do so because they would have had a lower total profit by doing so.  So, implicitly, there's virtually a guarantee that they won't launch their own generic.  So there would only be one on the market instead of two.

Q.   Okay.  Now, if there's an explicit no second generic provision in the Par settlement agreement --

A.   No.  There's not an explicit agreement, no.

Q.   So why are you describing then to the jury something that's not literally written out in the settlement agreement?

A.   So this is what we do as economists.  We look at what are the incentives, what's behind what's written down to what we expect to actually occur.

So even though there's nothing in the agreement that says the brand couldn't launch a generic, the way this agreement is set up, they won't.  It would be economically -- it wouldn't make sense for them to do so.  They'd reduce their profits.

Q.   Okay.  In addition to this Section 3.13(a) regarding the 50/50 profit split, was there another provision of the agreement that you looked into?

A.   Yes.  There's provisions about if there's more generics on the market, how does the profit split change.

Q.   Okay.  So let's go to the next slide.  So what is the declining royalty?

A.   So if there are two generics on the market, the profit split, that is the amount of Par's profits that they send to the brand ball from 50 percent to 15 percent.

Q.   And how does this -- what is the consequence of this in terms of the economic rationality of whether you'd see one or two generics on the marketplace?

A.   Yeah.  It actually makes it even less likely that you would see one generic than if you didn't have this provision in.

Q.   Even if this provision didn't apply in these circumstances, what would be the economic dynamics of this agreement anyway?

A.   Well, it influences -- I mean, it makes the conclusion

even stronger.  I guess that's the best way to say it.

Q.    Now, can you explain to the jury then why there is this difference between not having two but only having one generic on the market, the incentives that are created here?  Why does that result in Par and the brand making more money from the profit split than they would if there were two generics?

A.    Yeah.  It's a great question.  I think we have a slide coming up that will be helpful.

Q.    Yes.

A.    Okay.  So this is the world where we have two generics on the market.  This circle, sorry, that's split here, think about as the total profit from the generic sales, right?  When we have two generics on here, one of these is the brand and one is the generic.  You see they're splitting.  The way I have this set up, they're each capturing half of the market.  That's what the total profit is.

        But now let's think about the case --

Q.    Before you go ahead, when you've got these two in the marketplace but they're splitting this market, what else are they doing?  Are they competing?

A.    Yes.  They're competing.

Q.    And so what's happening with the size of this?

A.    So what's happening, prices are being bid down.  As prices go down, profits go down.

Q.    So continue then.  How would you compare this to being an

agreement that will incentivize or make it irrational to do anything other than one?

A.    Yeah.  So let's look at the case where there's only one generic on the market.  You see here the total pie.  That's the total profit is bigger.  The reason it's bigger is the reason we just discussed, because the prices are higher.

Q.    And so who's paying for that?

A.    The purchasers are.

Q.    But here there was a 50/50 profit split.  So I take it, what, that there's a 50/50 profit split of what here when there's one generic?

A.    Yeah.  So you can think of essentially splitting that big pie.  Split it down the middle and they each get their share, right?  But if you notice here, each of their shares are bigger than what they would get with the two generic case.

Q.    Now, there's an additional way that we can visualize this with one of your earlier charts.

        If we go to this slide 18, this is what we normally expect with two, right?

A.    That's right.

Q.    And just remind the jury what this is.

A.    Yeah.  So just to remind you, the red is where it's only the brand.  We see the very high price.  And really what I want you to focus in on here for now is this yellow area.  We get two generics on the market.  The price drops dramatically,

maybe 60, 50 percent.  And maybe it will drop further later.

Q.    When there are more generics on the marketplace?

A.    When there are more generics, yeah.

Q.    Now, looking at this two generic time period in here, what happens if there's one, if we transition to the next one?

A.    Right.  And you can see.  Maybe you can go back and forth a little from those.  I don't know if you're able to do it.

Q.    I don't do it.  He does.

A.    Somebody can do that.

We have the price with two with the very large drop.  When we have only one generic, there's still a drop in place but it's much smaller than it would be.

Q.    So how is this a source of a transfer of value then from Takeda Sucampo to Par?

A.    So what's happening is now by the size of the total pie available being bigger, Par can make a larger profit than they could have in the case where they didn't have this agreement of working together to kind of have a higher profit level.

Q.    So now in addition to this general way of looking at things, did you actually perform some calculations to determine the size of the transfer of the value?

A.    Yes, I did.

Q.    Okay.  And what was your methodology?

A.    You know, it's very similar to the things we've been talking about.  I'm looking at actual forecasts from the

parties involved on the size of the market, the prices, that sort of thing. So I'm using that, along with, in some cases, some industry information to calculate what their profits would be in the different cases.

Q.    Okay. So -- and I take it you looked at this both from the perspective -- from the brand's forecast and then separately for the Par, for the generics?

A.    That's right.

Q.    Okay. Now, turning to the information that you found available from Sucampo and Takeda when you and Greylock McKinnon were going through everything, did you find any comparisons where Sucampo or Takeda compared profits of one versus two generics being on the market after Par got on?

A.    Yes. I found some forecasts. They were actually slightly complicated in those cases and sometimes we'd bring in additional information, but yes, I did it.

Q.    And were those from Sucampo and Takeda or from Par?

A.    Well, I'm talking about Sucampo and Takeda right now.

Q.    All right. Now, I take it that -- one second. Okay.

So when you described then the calculations that you did for the Sucampo/Takeda estimate of the size of the -- excuse me -- of the incentive that there was for Takeda and Sucampo to not have a second generic on the market --

A.    Yeah.

Q.    -- describe what that process was.

A.   Oh, I'm sorry.  Could you repeat the question?

Q.   Sure.  Describe the process of doing the calculations to estimate the incentives of the brand side to not launch a second generic into the market.

A.   Right, right.  So what I'm doing is I'm going to use the forecast information and other information to forecast what their profits would have been, what the generic profits would have been in the case where they did go on the market versus in the case where they didn't go on the market.  And, in all cases, I'm taking into account the profit split of the -- of Par's profits.  So I'm looking at their total profit, generic profits, versus if they do or they don't go on the market.

Q.   If we go to slide 20, does this show the observations, the calculations that you did to show the incentives to not launch a second generic --

A.   Yes, it does.

Q.   -- from the brand perspective?

     So describe to the jury what this is.

A.   Sure.  What I'm looking at here is 2021 and 2022.  So if you see this -- well, first, the basis for the profit calculation, that's coming from Sucampo's forecast and then the top row and then the bottom one is Takeda's forecast.  You can keep going.

Q.   Okay.  So you have two sets of forecasts?

A.   Right.

Q.   Right?  And then the middle column is telling us then what?

A.   So this is the case where they don't launch a generic.  So that "no" is no generic coming from the brand and showing you that a court buys Sucampo's forecast, their generic profits they would receive are about 336 million.  Takeda's are about 256 million.

Q.   And then the "yes" column?

A.   And the "yes" is if they do, if the brand does launch, there would be two generics.  There would be two on the market, and you see these numbers are smaller.  They would do worse if they launched a generic than if they didn't.

Q.   So how did this -- so regardless of the kind of forecasts, you're making less if you have two on the market?

A.   Yes.  The brand would do worse, so you would not want to do this.

Q.   Okay.  Now, did you also look at this from the perspective of Par, meaning Par's incentives -- whether or not Par ends up better off?

A.   Yes, I did.

Q.   What did you do there?

A.   So I'm doing the same kind of process.  I'm looking at forecasts.  In this case, these are Par's forecasts.  I should say all these forecasts are right around the time of the agreement.  So it's what they thought at the time of the

agreement.  And I'm going to do the same exercise to see would Par have been better off if the brand had launched a second generic or would they be worse off.

Q.   Okay.  So let's go then to the next slide.  And we're going to spend just a little bit of time on this.

Tell the jury first.  Other than the two yellow boxes at the top, what is this slide from?

A.   So this is -- this is from Par's actual forecasts.  And this is kind of their, some of their summary information.  Forecasts are more complicated.  It's like an Excel workbook with lots of tabs, but this is sort of the first tab that provides some summary information.

Q.   Okay.  And in the bottom right-hand corner, we'll see that this is dated -- it says the forecast is dated November 2014, right?

A.   That's correct.

Q.   And why did you look at Par analyses shortly after the settlement?

A.   Yeah, because this would provide us a good sense of what are they thinking at the time they're making the decision, when they're deciding whether or not to settle, and what the terms were.  It's that point of time we want to think about what did they understand.  So we don't want to go way in the past or way in the future from that point in time.

Q.   Okay.  So I take it then, again, that other than the two

yellow banners and the red circles, this was an actual part of the spreadsheet, right?

A.   Yes, it was.

Q.   And they were side by side in the spreadsheet?

A.   Yes, they were.

Q.   Okay.  So, on the left-hand side, what do you want to draw the jury's attention to?

A.   Right.  So you see where it's circled "Par" alone.  That's the case where there was no generic entry by the brand.

Q.   And in that situation, how much does Par get by way of its margin?

A.   Are you talking about the profit split?  Is that what you're asking about?

Q.   No.  Stay on the left-hand side first.  Excuse me.  Yes. The profit split without the generic on the left-hand side.

A.   Right.  They're going to get 50 percent.

Q.   Okay.  If there's only one generic on the market?

A.   Right, which is their generic.

Q.   Okay.  And how much money then in net sales is there available?

A.   So it actually is not shown on -- oh, the net sales.  I'm sorry.  Those are shown.  So over -- in the first year, it's about 136 million.  In the second year, it's about 70 million.

Q.   Okay.  And then if you look over on the right-hand side, what is compared -- I take it that's a comparison of what?

A.    So this is the case where Par -- sorry -- where the brand enters with its AG at the same time Par enters the market.

Q.    Okay.  So this would be with two generics on the marketplace?

A.    Exactly.

Q.    And how does Par end up there in terms of net sales?

A.    Well, you see the net sales are lower, so 55 and 42 million.

Q.    So based upon this kind of information, what do your calculations show by way of the value -- did you do a valuation of the benefit to Par?

A.    Yes, I did.  I think it's in the next slide because it's more complicated than what I've just shown you.  This is --

          Do you want me to?

Q.    Yeah.

A.    This is showing you in the first case that first scenario with one generic of their own on the market where they get about 108 million on the market.  And then the competition, that's where the brand's generic is also on the market and you see that smaller amount of 65 million.

Q.    And so the difference then of 42.6 million, is that the value of the payment from the perspective of Par?

A.    Yes, it is.

Q.    Okay.  So now let's wrap this up in terms of your second opinion.  How confident are you, sir, that this settlement

agreement has a reverse payment in it?

A.    I'm quite confident.

Q.    Why?

A.    Well, because value is going from the brand to the generic.

Q.    Okay.  And what was your estimate of the size of that payment?

A.    Well, this is -- this is one aspect of it.  So this is looking to value to Par but, actually, my main estimates are related to the value that the brand gave up by not launching their own generic.

Q.    Now, I want to go back to the terms of the Par agreement for a moment.  Let me show you another term that's in there, if we go to the next slide, please.

Describe to the jury what else you saw in the agreement.

A.    Well, this is saying that Par, as part of this agreement, could sell their generic as an authorized generic.  So that is under the brand's NDA.

Q.    Okay.  So under the settlement, did Par have the right to sell an authorized generic?

A.    Yes, they did.

Q.    And what impact, if any, did this have on your analyses?

A.    It -- for me, it's a feature of the settlement.  So it doesn't change the numbers.

Q.   And there's another part of the agreement that I want to show you that you observed, if we go to the next slide.

A.   Right.

Q.   So describe for us what you first saw in the agreement here.

A.   This is saying that, technically, there's nothing that stops the brand from launching an AG.

Q.   Okay.  And so what impact, if any, does this have on your analyses?

A.   Very little.  So, as I mentioned, in economics, we're looking at the incentives, and often what we're looking at is what's really going on, but beyond what's written down, what does it really mean, what is it going to do.

        In this case, because of the terms of the agreement, the brand technically could launch a generic, but it would be economically irrational for them to do so.

Q.   Okay.  So the bottom line was you concluded what with respect to the 50/50 profit split?

A.   Well, it's what we'll sometimes call an implicit no second generic.  So the brand will not launch a second generic.

Q.   Okay.  So let's break that down just a little bit.

        Implicit versus explicit, what do you mean?  Explain that to the jury.

A.   Implicit would be if there's something in the agreement that says, contractually, the brand will not launch a second

generic.  Implicit means they don't put that in.  In fact, they can put in what they put in, a statement that they actually could but they wouldn't, but the way this is set up, they won't do it.

Q.   And how do you know that from the point of view of being a healthcare economist and working in the area of applied microeconomics?

A.   I know that because pharmaceutical companies want to maximize their profits, and so they're not going to do something that's going to lower their profits.

Q.   Now, was the size of the reverse -- what was the size of the reverse payment that you calculated here?

A.   So I'm calculating that as the amount that the brand gave up, the amount of profit they give up by not launching their second generic.  And I think we have a slide for that.

Q.   Yeah.  We'll get there.

        But what was your methodology used for this?

A.   You know, very similar to everything we've been talking to up until now.  Actually, what I showed you before, look at the profits in the case where they do have a second generic.  Look at where they don't.

        But, in this case, what I'm going to do is look at for that generic itself, what are the sales, what are the costs and so forth to calculate the direct profits from that piece of it.

Q.   And did you reach an opinion to a reasonable degree of professional certainty as to the size of the reverse payment in this case?

A.   Yes, I did.

Q.   Let's go to the next slide.  Please describe to the jury what the basis was of the lost profit calculation first.

A.   Right.  So, again, as I've just said, it's like this is going to be what the profit that the brand gave up directly, gave up from their sales of the generic, their own generic, that didn't occur.

Q.   So from the basis of Sucampo's forecast, what was the estimate you made from the point of view of the brand in terms of the size of the reverse payment here?

A.   It was $206 million.

Q.   And from Takeda's forecasts, what did you calculate by way of the size of the reverse payment to Par here?

A.   About $152 million.

Q.   Now, these -- okay.  So in the end then, what was your -- if we go to your next slide.

     What did you conclude overall with respect to whether there was a reverse payment and, if so, what its size was?

A.   Yeah.  So I concluded there was a reverse payment.  It was on the order of magnitude of 150 to $200 million or so.

Q.   Okay.  And how confident are you of this opinion?

A.   I'm very confident.

Q.   What was your methodology of reaching this conclusion between 150 million to $200 million?

A.   Well, I think I just described it.  That was the lost profit from not selling their own second generic.  So it's the direct loss of profit from not selling their own second generic.

Q.   Now, in your opinion, is 150 to $200 million large?

A.   Yes, it is.

Q.   Why do you think 150 million to $200 million is large?

A.   Well, I mean, there's a couple ways I could answer that.  One is it's a lot of money.  That's just a lot of money.  But I could also do things like compare it to the litigation costs.

So the litigation costs, I was told to assume they were around $400 million for the brand.  So if you think about, say, a rate of return, the rate of return I would need to take $400 million and get $150 million would be astronomical.  That would be huge.  So, by that or other metrics, this just seems like a very large payment.

Q.   Is the size of the payment here large enough in your view to have induced Par to settle with a later agreed entry date?

A.   Yes, it is.

Q.   Why?

A.   Well, this is also the -- when we looked at the earlier slide showing the situation from Par, that 40 million or so extra dollars they got, that was very large relative to their

total generic profits.

Q.    Okay.  One thing that I jumped over too quickly, Dr. Ruhm.
If we go back to the slide that has the size of the payment,
slide 25.

A.    Okay.

Q.    The numbers that you've identified here by way of the size
of the payment from the perspective of the brand, what kind of
numbers are these?

A.    So I think what you're asking, these are nominal dollars.
So these are payments in the years they were received.

Q.    Okay.  And are there other ways that you could also look
at a way to express this value?

A.    Yeah.  I mean, one thing I could have done is I could have
expressed this in the value in 2014.  So this is called
discounting the net present value.  I know that's a big term
but, basically, that would have given us a smaller number.

Or another way could do it is look at it in today's
dollars, so 2026, and I'd get a larger number.

Q.    Okay.  In your report, you did a couple of different
calculations, both present value and you also had the nominal
dollars available?

A.    Yes, I did.

Q.    Why did you choose to use the nominal here in terms of
describing this to the jury?

A.    I think it's probably the most straightforward.

Q.    Okay.  Does it make a difference how you express --

A.    It won't change the conclusion at all.

Q.    And why not?

A.    Well, if I'm -- if I'm looking at everything in, say, in 2014 dollars, I'm going to be expressing everything in those, but I could look at them in later years' dollars -- I mean, the conc -- the magnitude might be different but the overall conclusion is there a reverse payment, is it large in relative terms, is still going to be true.

Q.    Okay.  What would you want the jury to walk away with in this chapter of the direct examination about the 50/50 profit split?

A.    Well, I want you to understand that it gave an implicit no second generic by the brand.  That led to a large reverse payment sufficient certainly to induce a delay in entry.

Q.    Okay.  Now let's go to the third question that you were asked.  And what was the third question you were asked?

A.    Yeah.  So that's did this settlement, did the reverse payment lead to anticompetitive harm to the purchasers and then how big was that.

Q.    And it says here "a potential to inflict anticompetitive harm", is that right?

A.    Yes.

Q.    So here you're not calculating the damages, the overcharges.  What are you doing here?

A.    It's my understanding other experts are going to do those calculations, but I'm giving you a sense of how high the expenditures were.

Q.    Okay.  So, again, methodology, what's your methodology here?

A.    So my methodology is going to look -- what I just said. It's how much more did the purchasers end up spending as a result of the -- of this agreement than they would have with an agreement that did not contain these anticompetitive characteristics.

Q.    Facts and data, what did you need?

A.    Again, very similar information before, forecast information.  One thing that I am doing now is I'm -- I'm also going to look at actual sales data in one case.  So that's something that's new.  I'm also looking at a slightly longer period here because I'm including both -- before I'd be looking at 2021, '22, because that was the period of the actual delay, but now I'm also going to look at the period where there was less generic competition even than there would have been before.  You can explain better than me.

Q.    Okay.  So this is a two-part question.  To the issue of whether it had the potential to inflict anticompetitive harm, what opinion did you reach?

A.    That it did.

Q.    In what ways did it inflict potential harm?  Here we have

a slide 16, I think.

A.    Yeah.  This is important.  So we talked about the longer period of time where there was only one seller on the market and so there was a high price during that.  So that was the before competition begins period.

It turns out the second piece of this, which I don't think we've talked about as much, is even once generic entry occurred, prices were still higher, again, because we had only one generic on the market instead of two.

So there's both the longer period and then, even once competition began, it was sort of incomplete competition because there was one generic instead of two on the market.

Q.    Now, you've identified that it did harm.  You measured the extent of the harm generally, a general estimate; is that fair to say?

A.    Yes.

Q.    What methodology data and assumptions did you use for that?

A.    So I think, again, as I mentioned, I'm looking at -- I'm looking at expenditures that actually occurred and that were forecasted to occur, and then I looked at the expenditures that would have been expected in a situation where there had been a competitive settlement.

Q.    Okay.  If I understand it, sir, with respect to these forecasts, different companies had different time periods

during which they were forecasted?

A.    That's right.

Q.    And they were pretty wide ranges?

A.    They were.

Q.    So what did you do in order to be able to make certain, to make more certain, to make narrower, if you will, your opinion on this subject so you knew you were being on solid ground?

A.    Right.  So what I'm going to do is focus on the period 2020 to '22.  The forecasts, some of the forecasts went as far out as 2027.  If I had given you that whole period, I'd be giving you much larger numbers than what I gave you.

Q.    So did you end up with a calculation of what the range of the potential harm was within this three-year period that you identified?

A.    Yes, I did.

Q.    Okay.  Let's go to the next slide.

        Here, in the banner, it has at the top "(Conservative) Harm to U.S. Purchasers".  Describe what you mean by that to the jury.

A.    It's conservative in two ways.  One we just discussed. I'm cutting this off at 2022 even though some of the forecasts went out much further.  I'm also not starting this until 2020. You'll recall that the entry date under a competitive settlement was most likely around October 2019.  I'm not including any of that period there.  So I'm really just doing a

much narrower period.

Q.   Okay.  And it looks like you do the "Basis" three different ways.  So why don't you take us through, first, the Sucampo way of doing the estimate to the harm to U.S. purchasers for this three-year time period.

A.   Yeah.  So what I'm computing is in a world where, the world we actually saw where there was the 50/50 profit split implicit, no second generic.  The U.S. purchasers we would expect to pay about 1.4 billion dollars.

In the world where there was more competition, so this would have been the earlier entry date and having two generics on the market immediately, they would have paid about 859 million.  So it's the difference.  They paid an extra 549 million.

Q.   Walk us through the Takeda estimate basis you estimated.

A.   It's exactly the same framework.  So the first column is showing you kind of the actual world we saw with the anticompetitive settlement.  The second is showing you what we would have seen in the difference.  417 million is the extra expenditure.

Q.   Okay.  And, finally, what's the last row?

A.   This is using actual sales data.

Q.   And what did you find here?

A.   So here the difference was around 264 million.

Q.   Now, is there -- and just to be clear, these are not the

overcharge numbers.  This is just what?

A.    Yeah.  This is just a measure, mostly before the fact of what we expect the extra expenditure to be.

Q.    Okay.  Now, is there another way to help visualize this difference for the jury, this extent of the harm?

A.    Yes, I think there is.

Q.    So why don't we go to this.  First, let's look at the section above the line with all of the years.  Of course, it's time going from the left to right, correct?

A.    Yes.

Q.    And then over on the left going up and down, that's price, is that right?

A.    That's right.

Q.    And price of what, a capsule?

A.    This is price of the drug, of Amitiza.

Q.    So what does the black line show here by way of price over time for Amitiza?

A.    This is showing you the actual price of Amitiza from the period it went on the market until the date I estimated competition would have began with a competitive settlement.

Q.    And so the top line as we're talking about then, this is what, what you estimated would have been the economic outcome without a payment?

A.    Well, so far you only asked me about the black line.

Q.    Sure, sure.  Okay.  Fair enough.  That's the actual.  Fair

enough.

A.    Yeah.

Q.    So you stopped the black line at a point in 2019?

A.    Right.

Q.    October 2019 what?

A.    Well, that's when generic competition begins.

Q.    Or should have begun?

A.    Or would have begun.  That's when I projected it would have begun.

Q.    And what's the dotted green line show?

A.    This is my showing you what would have happened, again, with a competitive settlement.  So you notice that very large reduction in price in October 2019.  That's because two generics come on the market.  And then, as additional generics come on in the future, there's additional drops in prices.

Q.    Okay.  So now let's compare that to what's down below. What does this show?

A.    So I think you might be able to -- well, this is showing the case that we actually see with the 50/50 profit split.

Q.    Okay.  So with the 50/50 profit split, the red line is showing you what happened with the price of Amitiza?

A.    Yes.  Well, it's showing you -- yes.

Q.    Okay.  And then why does the line start, the red line start going down in the beginning of 2021?

A.    Because that's when Par finally comes on the market.

Q.   With one generic?

A.   Just Par.

Q.   And how long does that exist where it's just one on the market?

A.   Yeah.  It's not six months as we talked about before. It's two years until the beginning of 2023.

Q.   And what happens in January of 2023?

A.   Then there's some additional generic entry that starts.

Q.   Now, what happens if we overlay these two?

A.   Right.

Q.   What does this show to the jury?

A.   So what you want to look at -- of course, that black line, that's just what happened.  Nothing's changed there.  But the red line is showing you what we actually see.  The dotted green line is showing what we would have seen.  And you notice that red line's much higher, showing you higher prices because of this anticompetitive settlement.

Q.   How does this graph show the harm to U.S. purchasers with respect to the 50/50 profit split?

A.   Essentially, you can look at that gap.  That's the harm we've been talking about due to the higher prices, later entry of generic competition and so forth.

Q.   So you reached a conclusion.  If we go to slide 31.

A.   Yes.

Q.   And what was your conclusion?

A.   My conclusion is that, because of the nature of the agreement, it did cause harm to U.S. purchasers and that harm ranged in the hundreds of millions of dollars, up to potentially $550 million or even more.

Q.   Okay.  Now, can you explain to the jury the importance of these numbers?

A.   Well, my understanding is this is -- this case is about did the nature of this agreement, the anticompetitive nature of the agreement, cause harm.  So this is showing you that, yes, it did.

Q.   Let's go to your final conclusion, sir, the final question.  What was the question that was posed to you?

A.   Was there justification for the harm, in the sense, was there a procompetitive aspect of these features of the agreement we've been discussing.

Q.   And did you investigate that?

A.   Yes, I did.

Q.   And what did you find?

A.   I found that I did not see any evidence of procompetitive benefits.  Even if there was an argument that there was from an agreement per se, there was nothing until the anticompetitive nature of this agreement through the 50/50 profit split that led to any procompetitive benefits.

Q.   Now, from the perspective of an economist, when you're trying to look for procompetitive benefits in this settlement,

what do you try to focus on from the point of view of a healthcare economist?

A.   Well, here I want to know did the specific aspects of the agreement that we've been discussing, so did the fact that there was this profit split that led to no second generic that led to delay of entry, were there procompetitive benefits of those features.  It's not a question of in some hypothetical case would -- could there be an agreement that has some benefits but were these features relevant, did they lead to procompetitive benefits.

MS. SHORES:  Objection, your Honor.  Move to strike. Can we have a sidebar, please?

THE COURT:  Give me one second.  Yes.  You can start coming up.

*** Beginning of sidebar ***

MS. SHORES:  So he's testifying about the lack of procompetitive benefit from the challenged terms themselves. That's inconsistent on what you ruled on summary judgment and what you ordered pretrial, which is that the testimony has to be whether the agreement as a whole has procompetitive benefits or not.

MR. SOBOL:  Two things, your Honor.  First, the witness was asked from the perspective of a healthcare economist why would he look at certain particular features rather than the settlement as a whole.  So he's answering the

question as from the point of view as a healthcare economist.

Second, your rule was not procompetitive benefits must only be from the settlement as a whole.  It did not include the notion that one could also have the specific of a 50/50 profit split.

So you did not rule that way.  You didn't rule this out.  You just said you were allowing defendants to argue that the settlement as a whole did.

MR. SULLIVAN:  So I think the problem here is if we look at that highlighted passage that Mr. Sobol has -- if you don't mind.

MR. SOBOL:  No.

MR. SULLIVAN:  It says procompetitive benefits need not to be limited, which is to the specific terms.  So he's testifying as an economist, but he's testifying based on economics, but it's contrary to the standard which the Court says right here.  And this Court found procompetitive benefits means need not be limited to the challenged terms.  He's now testifying as an economist that they are limited to the challenged terms.  That's the issue we're pointing out here.

MR. SOBOL:  Your Honor --

THE COURT:  Go ahead.

MR. SOBOL:  I would point out obviously, your Honor, if the jury is to weigh whether certain kinds of procompetitive benefits are better than others, they're entitled to be

educated by the economist as to why we might focus on one instead of the other, which is exactly what he's trying to do.

THE COURT:  By the way, you're being double teamed here.

MR. SOBOL:  Yeah, I am.

MR. POLONSKY:  I can step in.

MR. SOBOL:  No.  I don't need you.

THE COURT:  Hold on one second.

I'm just trying to remember accurately what I had said earlier in my summary judgment.

MR. SOBOL:  Here.

THE COURT:  Okay.  Overruled.

MS. SHORES:  Thanks.

*** End of sidebar ***

MR. SOBOL:  May I proceed, your Honor?

THE COURT:  Yes.

BY MR. SOBOL:

Q.   Now, from the perspective of an economist, when you're trying to look for procompetitive benefits in the settlement, what do you try to find to focus on from the point of view of a healthcare economist?

A.   Well, I would look to see are there benefits to the parties involved in this.  I might look for some kind of broader benefits.

Q.   And would you also look for benefits to the profit split

itself?

MS. SHORES:  Objection, your Honor.  Leading.

THE COURT:  Overruled.

A.   So, in economics, we look at what's referred to as welfare.  So I'm -- we're looking at -- and by welfare here, we mean that the well-being.  So we're looking at a broad measure, but we're not looking for a benefit to the specific parties involved here.

I'm not sure -- did I answer your question?

Q.   I think you answered the question that you understood you were asked.  Okay?

So, in connection with your review of looking for procompetitive benefits in this settlement, okay, what parts of the agreement were you trying to figure out were procompetitive benefits or not?

A.   Well, I mean, I'm looking at the agreement as a whole but here I was looking in the case of the agreement as it was versus an agreement that did not contain the anticompetitive elements.

Q.   And the anticompetitive element was what?

A.   It's the -- it's the profit split which leads to the implicit no second generic and the delay in competition and so forth.

Q.   And what procompetitive benefits, if any, did you see that had?

A.    I saw no evidence of any procompetitive benefits.

Q.    Why?

A.    Well, I just -- there was no evidence of any type that I saw.

Q.    Well, now, if I understand it correctly, Takeda has argued that the settlement, as a whole, provided for a date for entry that was earlier than the expiration of the last expired patent.  Did you think that was a benefit from the 50/50 profit split?

          MS. SHORES:  Objection.  Same objection for the record, your Honor.

          THE COURT:  I'll allow it.

Q.    He's letting you answer.  Yes.

A.    No.  Could you ask the question again?

Q.    Sure.  Takeda has argued, gee, look at the settlement as a whole.  The agreement allows Par to enter before the expiration of the last patent.  Did you consider that to be a procompetitive benefit to the 50/50 profit split?

A.    No, I did not.

Q.    Why not?

A.    Well, there could have been an entry date at any point, even an earlier entry date than we discussed, without the 50/50 profit split.

Q.    And if I understand it correctly, Takeda has argued that while this allowed Par to enter as an AG, did you see that as

being a benefit to the 50/50 profit split?

A.    No.

Q.    Why?

A.    Well, Takeda could have allowed Par to enter as an AG in a competitive agreement.  They could have just allowed it.

Q.    There's a whereas clause in the agreement that says this is a procompetitive agreement.  What effect, if any, does that have on your opinions as a healthcare economist?

A.    Well, we have a name for this in economics.  We call it cheap talk.  And that is, you can say anything you want, but we look at what's actually going on.  So the answer is it had no effect on my evaluation or calculations.

Q.    Now, on the basis of your analysis and your experience and study in this case and of the terms, did you reach an opinion to a reasonable degree of professional certainty in health economics as to whether Takeda's argued procompetitive benefits could be achieved through a less anticompetitive way?

A.    Yes, I did.

Q.    So all of the benefits you saw Takeda argue about, how else could they have been achieved?

A.    And to be clear, I didn't see any evidence presented of procompetitive benefits, but even if they were, they could have been achieved with a simple agreement which allowed entry without the 50/50 profit split.

Q.    Now, you know that Takeda has hired another economist in

this case, correct?

A.   Yes, I do.

Q.   And did you see in any other report, any of that report, whether or not there was an estimate of the value of any purported procompetitive benefits?

A.   No.  I saw no estimate whatsoever.

Q.   And what significance, if any, did that have for you?

A.   Well, I mean, I guess if I'd seen an estimate of procompetitive benefits it would have given, it seems to me something to evaluate, but given there was no estimate, I see no indication that there were any.

Q.   Now, my understanding also is that Takeda has a purported procompetitive benefit that the more dollars that it made by this deal, it could spend on R&D.  What observations, if any, did you make with regard to that?

A.   First, there was no evidence provided of that.  So the notion that if a drug company could have a higher profit or a more stable profit, again, I don't know that there's any evidence that's true, but even if it were, it again could have easily been achieved in an agreement without any of these anticompetitive elements.

Q.   So if we go back to slide 30 then.  What would you have the jury take away in terms of what occurred here regarding harm to the U.S. purchasers in terms of the 50/50 profit split?

A.   I would tell the jury to look at these two lines, and that

tells there was harm.  There was significant harm to purchasers.

MR. SOBOL:  I have nothing further.

THE COURT:  Cross-examination.

MS. SHORES:  May I proceed, your Honor?

THE COURT:  Yes.

CROSS-EXAMINATION BY MS. SHORES:

Q.   Good afternoon, Dr. Ruhm.  Good to see you again.

A.   Yes.

Q.   I believe you've been handed a binder.  It's the binder apocalypse in here, but ours has tab numbers, so I can refer you to tab numbers.

A.   Okay.

Q.   You'll also see the exhibit on the screen before you.

A.   All right.

Q.   Okay?  Now, you've never served as an expert economist in any cases involving so-called reverse payment settlements before this one, correct?

A.   That's correct.

Q.   Actually, you've never served as an expert economist in an antitrust case before this one, right?

A.   Not a case that was primarily about antitrust, correct.

Q.   And I think you said you had personally worked about 200 hours in this market, is that right?

A.   Yes.

Q.    How much have you been paid to date for your work in this case?

A.    I can't tell you the exact amount, but it would probably be on the order of about $200,000.

Q.    $200,000?

A.    Yes.

Q.    What's your hourly rate?

A.    Now it's 1,400 an hour.

Q.    Did you recently take a big price increase or?

A.    Well, when I started this case, it was lower.  It was two years ago.

Q.    And what was it two years ago?

A.    I believe it was 1,200 an hour.

Q.    Now, you mentioned that you've written an impressive number of articles and book chapters, right?

A.    I didn't characterize it as impressive.

Q.    I was impressed personally by the number of them.  So that's my addition.

A.    Okay.

Q.    Did any of those articles or book chapters concern patent litigation between branded pharmaceutical companies and generic pharmaceutical companies?

A.    Certainly not as a primary focus.

Q.    Well, have you ever written any articles about so-called reverse payment settlements and Hatch-Waxman patent litigation?

A.    No.

Q.    And you've not personally reviewed any other Hatch-Waxman settlement agreements aside from the one at issue in this case, right?

A.    Well, I have now reviewed some.

Q.    Excuse me?

A.    I have now reviewed some.

Q.    Okay.  But the time I took your deposition, a year or so ago, you had not, correct?

A.    I had not at that point, that's correct.

Q.    Okay.  But you're generally familiar with patent litigation settlements outside the Hatch-Waxman context, correct?

A.    I guess that would be correct.

Q.    And in most of those traditional patent settlements, the accused infringer pays the patent holder a royalty, right?

A.    That would be common.

Q.    And in the Par patent litigation at issue here, Par was the accused infringer, correct?

A.    Yes.

Q.    And Sucampo was the patent holder, right?

A.    That's correct.

Q.    And in the settlement agreement, Par, the accused infringer, agreed to pay a royalty to Sucampo, the patent holder, correct?

A.    Yes.  They were paying a split of the profits.

Q.    Okay.  Well, it was in the form of a royalty.  They agreed to pay royalties.  That's what the settlement says, correct?

A.    I think the settlement refers to both royalties and shares of profits.  So I think both of those are included in the order.

Q.    Okay.  Now -- but as I understood your testimony just now, even though in the settlement agreement Par is the one who agreed to pay a royalty to Sucampo, it's your opinion that the settlement agreement contains a payment in the other direction, right?

A.    That's right.

Q.    Okay.  And in your opinion, you referred to this a couple times in your testimony, you call it a no second generic provision, right?

A.    Yes.

Q.    And by no second generic provision, you essentially mean a no authorized generic, in other words, a provision in which, the effect of which if there's not going to be an authorized generic on the market at the same time Par enters, correct?

A.    Well, I'm trying to not use the term "authorized generic" because, for example, when Par came in, they came in as an authorized generic.  So I think that term's a little confusing so I'm trying to avoid it here.

Q.    Since we lawyers are used to talking about all these kinds

of cases as no AG commitments, I may slip and not be able to get out of my mouth the no second generic, but you'll understand what I mean?

A.   If I don't, I'll let you know.

Q.   Thank you.

Now, as you pointed out, there's no explicit provision in the settlement agreement saying that Takeda or Sucampo won't launch an authorized generic, correct?

A.   That's correct.

Q.   And, in fact, as you testified earlier, the settlement agreement explicitly provides that nothing in the agreement would prevent Sucampo and Takeda from launching an authorized generic, right?

A.   That's correct.

Q.   Now, you've talked a lot in your testimony about incentives, correct?

A.   Yes.

Q.   And you would agree that during the course of the settlement negotiations between Sucampo and Par that Sucampo, on the one hand, and Takeda, on the other, might have had different incentives with respect to the terms under negotiation, right?

A.   Are you asking me hypothetically during the negotiations? Is there a hypothetical possibility they could have had different incentives?

Q.   I'm asking you, as I did in your deposition, would you agree during the course of negotiations between Sucampo and Par that Takeda and Sucampo might have had different incentives with respect to the terms in the Par settlement agreement?

A.   I think it's hypothetically possible at the time of negotiations.

Q.   Now, turning back to the terms, the explicit terms of the agreement, there are explicit terms in the agreement that contemplate the possibility that tab -- Sucampo or Takeda might market an authorized generic, correct?

A.   Could you repeat your question?

Q.   Yes.  The settlement agreement also explicitly contemplates the possibility that Sucampo or Takeda might market an authorized generic, right?

A.   Well, what I would say is the settlement agreement certainly permits it in principle.  So if that's what you're asking, I think that's right.

Q.   You're aware there are provisions in the agreement providing what will happen if Sucampo or Takeda launches an authorized generic?  You recall that?

A.   Yes.

Q.   Okay.  Now, I think you describe some terms in the settlement agreement that you said were the equivalent of an implicit -- you said implicitly there's virtually a guarantee that there would be no authorized generic.  Do you recall that?

A.   Yes.

Q.   And so I take it it's your opinion that by agreeing -- and you talk there about the royalty provisions, right?  That's what you're talking about that creates this incentive?

A.   Yes.

Q.   Okay.  So whatever implicit agreement you find in the settlement agreement about an authorized generic, they're to be found in the royalty provisions, correct?

A.   Yes.

Q.   And so, in your opinion, by agreeing to accept royalties from Par that Sucampo was somehow promising not to market an authorized generic, is that right?

A.   Yeah.  I mean, let me be clear because I fear sometimes I may not speak as technically carefully as I should be.

So what I'm saying is, in terms of the agreement, it would have been economically irrational for the brand to launch a second generic.

Q.   I see.  So you're saying that, given the royalty provisions in the agreement, it would be economically irrational for Takeda or Sucampo to decide independently whether or not to launch an authorized generic?  Is that what you're saying?

A.   Are you asking me independently of each other?

Q.   No, not necessarily.

A.   Yeah.  I'm saying -- yes.  It would have been economically

irrational for them to do so.

Q.   Okay.  Now, you're aware that in the settlement negotiations, that Par was the one that first offered to pay royalties to Sucampo?  You're aware of that, correct?

A.   I don't recall that, but I believe it may be true.

Q.   Well, if -- let's look at Tab 1 in your binder as your opening report.  And if you could turn to page 42, paragraph 87.

A.   Okay.  What was your question?

Q.   My question was, you're aware that, in the settlement negotiations, Par was the one that first offered to pay royalties to Sucampo, correct?

A.   This -- let me make sure I'm reading this correctly.  This said Par offered.  I don't think there's anything in here that says necessarily they were the first to offer.  I don't think it -- unless I'm missing something, I don't see where it says that.

Q.   Okay.  Fair enough.  Are you aware of any earlier offers by Par or Sucampo with respect to royalties than the one that you mentioned in your opening report?

A.   I'm not aware of any.

Q.   So if I'm right that this was the first offer of any sort, you would agree with me that Par offered to pay a royalty of 50 percent to Sucampo in exchange for an October 1, 2020 entry date, right?

A.    I'd have to go back to check.  Let me go back and check again.

Q.    It's page 42.

A.    Yes.  That's correct.

Q.    Now, you didn't find any evidence of this, but you agree that it's theoretically possible that Par was offering a 50 percent royalty to Sucampo to get Sucampo to agree to an earlier entry date, right?

A.    Can you repeat your question?  I just want to make sure.

Q.    I said you didn't find any evidence of this, but you agree that it's theoretically impossible that when Par was offering a 50 percent royalty to Sucampo, it was doing that to get Sucampo to agree to an earlier entry date than it might otherwise would have?

A.    An earlier entry date than what?

Q.    Than -- well, you talked about -- let's try this.

       So you talked about situations where there's value transfer from the brand to the generic, right?

A.    Sure.

Q.    And you said that because of that value transfer, that's why a generic might accept a later date, right?

A.    Yes.

Q.    Okay.  So now I'm asking you the inverse of that.  If there is a value transfer offered from the generic to the brand, isn't it possible that the brand, looking at that value,

might be induced to agree to an earlier date?

A.   Well, if you're asking me if theoretically that's possible in some situations, I'd say yes, but I would also say that Par's sophisticated and would recognize by offering this there would not be a brand second generic going on the market.

Q.   Well, you didn't see any testimony or emails in this case indicating that Par's purpose in offering the 50 percent royalty was to disincentivize Sucampo and Takeda from launching an authorized generic, correct?

A.   Right, but you're asking hypothetical questions and raising possibilities and I'm trying to respond to that.

Q.   Well, can you answer the question I just asked?  You didn't see any testimony or emails in the record in this case indicating that Par's purpose in proposing the 50 percent royalty was to prevent or disincentivize Takeda and Sucampo from launching an authorized generic?

A.   I didn't see any evidence what their motivations were in making that offer.

Q.   And you also didn't see any evidence, any testimony or emails, indicating that Par and Sucampo understood that by agreeing to the royalty terms, Sucampo and Takeda would not launch an authorized generic, right?

A.   Right.  I didn't see any written evidence that they were aware of.

Q.   Okay.  You would agree, when the agreement was signed, the

parties might not have known with certainty what Sucampo and Takeda would eventually decide to do, correct?

A.   Yes.  I'll agree it's very hard to know the future with certainty.  You make your best estimates.

Q.   Okay.  So given that there was no certainty, you would agree with me that Par didn't walk away from the settlement with a guarantee that Sucampo and Takeda would not launch an authorized generic, right?

A.   That's right.  There was no guarantee, but there were strong incentives.

Q.   Okay.  So Sucampo and Takeda might launch an authorized generic, but they might not, right?

A.   If you're asking me is it possible that a sophisticated company could do something that's economically irrational, it is possible.  It seems very unlikely.

Q.   Okay.  Now, you talked a lot about the forecast models that you looked at, correct?

A.   Yes.

Q.   And, in your opinion, the forecast models of the parties are the best evidence to determine what they thought about the settlement terms at the time they were negotiated, right?

A.   Yes.

Q.   And so let's look at the one you looked at.  Can we -- you discussed this.  Let's pull up JX26.

          Now, we saw -- this is a forecast from Par

November 24, 2014. We saw part of this one in one of your slides, right?

A. Yes. I should say I can't tell for sure. I haven't memorized the numbers, but if you're representing this came from November 2014, I'll believe.

Q. Fair enough. Let's compare.

MS. SHORES: Can we compare this side by side with Dr. Ruhm's slide No. 21?

Q. So this is the actual exhibit on the left and your slide on the right. Maybe you can check the numbers to confirm.

A. Yes. They appear to be the same.

Q. They're the same, right?

And Mr. Sobol, when he was questioning you, he just showed you scenario one in the green box and scenario two in the blue box, right?

A. That's correct.

Q. And he pointed out that those two boxes were side by side?

A. Yes.

Q. You recall that?

A. Yes.

Q. And I think we also saw this in the opening presentation, but this doesn't -- this is actually not the whole page of the first page of this forecast, right? That appears on the left?

A. That's correct.

Q. So let's just focus on the actual exhibit and take down

the slide.

Now, I think you testified earlier that what Par might have been doing in looking at the two on the top that were shown to you was comparing the profits that they would make in a world in which they were alone on the market and a world in which they were on the market with an authorized generic at the same time, right?

A.   Yes.

Q.   But this -- this forecast was done after the settlement, right?

A.   Yes, very shortly after.

Q.   Okay.  So you're not suggesting that when Par was negotiating the settlement, it was comparing the profits that it would make in a world with an authorized generic or a world without the authorized generic, right?

A.   I mean, I have no way of knowing exactly -- this is -- this did come out shortly after the settlement.

Q.   Right.  And you didn't -- when I asked you -- do you recall me asking about this exact forecast in your deposition?

A.   You better remind me.

Q.   Okay.  Well, we can get out your deposition and I'll direct you to where it is in the binder if you want to look at it on paper, but you testified when I asked you about these forecasts at your deposition that, well, a responsible company would look at all possible scenarios, some of which might be

quite likely, some which might be quite unlikely, right?  Do you recall that?

A.    That sounds familiar.

Q.    Okay.  You didn't say anything when I asked you about this at the time about Par comparing the profits it would make in a world with an authorized generic and the profits it would make in a world without it, right?

A.    I'm sorry.  What was your question?  Did I comment on that in the deposition?

Q.    Yeah.  When I asked you about this in your deposition, you didn't say that that's what Par was doing here, that they were comparing profits from a world with an authorized generic and profits from a world without it?

          MR. SOBOL:  Objection, your Honor.  Can we have a page and line?

          MS. SHORES:  Oh, sure.  If you'd like to -- let's pull up page 241, lines 8 through 18, of his deposition.

Q.    Your deposition is in your binder at Tab 9.

A.    You said -- what did you say the page line was?

Q.    Yeah, page 241.

A.    Okay.

Q.    If you see there, page 241, the question is, quote, Okay. And some of the forecasts Par prepared shortly after the settlement agreement was signed assumed that Sucampo would launch an authorized generic, correct?

A.    Okay.  I see that.

Q.    And your answer was, quote, well, that's not how I would frame it.  What I would say is a responsible company would look at all or at least most possible scenarios, some of which might be quite likely, some of which might be quite unlikely.

Do you recall that now?

A.    Yes.

Q.    So let's go back to the exhibit, please.

So, in the actual forecast, Par is looking at three possible scenarios, right?

A.    That's correct.

Q.    And scenario one is Par alone +1 month 7.  Do you see that?

A.    Yes.

Q.    So, in that scenario, Par is assuming it will be the only generic in the market for the first six months, right?

A.    That's right.

Q.    And another generic will enter in month seven, right?

A.    That's right.

Q.    And scenario two, just two months after the settlement, Par is assuming that it will be on the market when it enters with an authorized generic, right?

A.    That's correct.

Q.    That's what Par +AG means in the first part of that scenario, right?

A.    That's right.  It means Par plus the brand's generic.

Q.    Okay.  And in scenario three, now it's assuming that Par would be alone on the market and that two other generics would enter in month seven, right?

A.    That's right.

Q.    So you'd agree with me, in November 2014, shortly after the settlement, Par was modeling multiple different scenarios with authorized generic entry from a brand at different times, right?

A.    That's correct.

        MS. SHORES:  We can take that down.

Q.    You said you looked at something like 24 forecasts?

A.    I believe that was the number.

Q.    I'm not going to show you, but there are other forecasts after the settlement containing scenarios in which Par assumed that the brand would launch an authorized generic when Par entered, right?

A.    Yes.

Q.    So let's look at a few of them.  Let's pull up JX27.  This appears at Tab 5, but you'll see it on the screen here.

        Now, this one is from April 7, 2015.  That's about six months after the settlement agreement, right?

A.    Yes.

Q.    And this one, like scenario two of the last one, Par's assuming that it will be in the market with an authorized

generic when it enters, correct?

A.    Yes, it is.

Q.    Okay.  And this one doesn't have any other scenario in which they are comparing, right?  That's what they're assuming in April of 2015, right?

A.    This actually seems to be some kind of vestigal forecast, because if you notice, it has some elements that don't fit the case at all.

Q.    Well, it is a forecast, right?

A.    Right, and I never claimed that all forecasts are equally useful.

Q.    Okay.  But you'd agree that here you don't seem to be comparing a market with an AG and a market without an AG, right?

A.    You'll notice this one also has no royalty payments, so it does not reflect what went on after the agreement was signed.

Q.    Okay.  Well, so let's look at another one then.  Let's look at -- this is also in April of 2015.  Let's pull up JX28.

Now, this one has a format similar to the first one we looked at, right?

A.    Yes, it does.

Q.    This one also has three scenarios, right?

A.    Yes.

Q.    And scenario two again says Par AG, correct?

A.    Yes.  So can you tell me what date this forecast is from?

Q.    Yes.  I will represent to you that is April 13, 2015.

A.    Okay.

Q.    Let's look at another one, JX29.

This one is dated October 21, 2015.  Now that's a year after the settlement agreement, right?

A.    Yes.

Q.    And scenario two there once again says Par +AG.  Do you see that?

A.    I do.

Q.    And, finally, let's look at JX30.  This is from May 2016, same thing.  Scenario two says Par +AG, correct?

A.    Yes.

Q.    So, for years after the settlement agreement, Par models different scenarios, sometimes with competition from a Sucampo AG and sometimes without, is that correct?

A.    That's right.

Q.    So it's pretty clear from Par's perspective Sucampo and Takeda might authorize an authorized generic and they might not, right?

A.    That's not the conclusion I draw.

Q.    You think they were just making these up for no reason?

A.    No.

Q.    Well, they were assuming over and over and over again scenarios in which they would face competition from an authorized generic, right?

A.    Well, would you like me to explain what I'm saying?

Q.    I'd like you to answer the question.  Mr. Sobol can ask you a question.

A.    I don't agree with your conclusion.

Q.    Okay.  So you don't agree that's what Par was assuming in all of these forecasts?

A.    That's right.

Q.    Okay.

        MS. SHORES:  Now, can we just pull up Exhibit 20 from Dr. Ruhm's slide dec.

Q.    You testified about this slide.  And I just want to make the record clear.  You're not saying that you found forecasts right around the time of the settlement where either Sucampo or Takeda were comparing the profits that it might make in a market where there's one generic or two?

A.    You're saying did they put that in the forecast?  No.

Q.    Well, I'm asking you then a more general question.  Do you see any forecast in which either Sucampo or Takeda was comparing what they would make in a market with an authorized generic versus what they would make in a market without one?

A.    No.  I did not see that.

Q.    Okay.  At least some of the numbers on this slide, you came up with them by putting additional inputs of your own, is that right?

A.    That's correct.

MS. SHORES:  All right.  We can take that down.

Q.   Now, you testified that you found that Sucampo would earn more from receiving royalties on the sales of Par's generic than it would have from launching its own authorized generic, right?

A.   I testified they would make more profit from not launching than from launching.

Q.   Okay.  I think we're saying the same thing, so thank you.

And you would agree -- I think what you said was a rational brand company under those circumstances would have an incentive in that circumstance not to launch an authorized generic, right?

A.   Yes.

Q.   And that incentive, therefore, an economist would look at that and say, they would predict that the brand company would decide not to launch on authorized generic, right?

A.   Yes.

Q.   So making an independent decision, they would look at the math and say, you know, it's not worth it, we're not going to launch an authorized generic; is that right?

A.   That's right.  I'm assuming these companies would not do something that reduces their profits.

Q.   Okay.  Now, you testified earlier that brand companies typically do launch their own authorized generics when an ANDA filer, a first to file, first filer enters the market with a

generic version of its product, right?

A.   I think what I testified is that I would expect to see that in this case.

Q.   I think you said something broader, that that's typically what you would expect to see.  When an ANDA filer enters the market, you would see a brand company launch an authorized generic at the same time.

A.   I don't recall if I used the word "typically".

Q.   I think you said you would expect to see that most of the time and later I think you said "typically".

Would you agree that's what you would expect to see most of the time or do you know?

A.   Well, I would expect to see it in a market of this size.

Q.   But you would agree with me that brand companies don't always launch authorized generics even in markets of this size, right?

A.   No.  They don't always launch authorized generics in markets of this size.

Q.   Now, when brand manufacturers do launch authorized generics, they typically do so by distributing the authorized generic through a partnership with a generic company, right?

A.   That's the most common way.

Q.   When a brand company does that, again, in a standalone case, right, the brand typically keeps 85 percent or more of the profits, right?

A.    Yeah, somewhere in that range.

Q.    Okay.  And that's outside of the litigation context, right?  That's what we're talking about, just a standard commercial deal, right?

A.    Yes.

Q.    Okay.  So I made a slide to illustrate this.

MS. SHORES:  Can we pull up our slide one?

Q.    And you see there I have outside litigation?  You understand that to mean outside the litigation context?  This is the way profits are split up, most to the brand, a little to the generic?

A.    Yes.

MS. SHORES:  Your Honor, may I publish this to the jury?

THE COURT:  Yes.

Q.    Now, sometimes in Hatch-Waxman patent settlements there are provisions allowing the generic company to sell and distribute the brand's authorized generic, right?

A.    Yes.

Q.    So sometimes we can see this in a litigation context or a settlement context, right?

A.    You're not seeing this split.  You're just saying we see this occur?

Q.    Yes.

A.    Yes.

Q.    Okay.  In that context, when it happens in the context of a settlement, the brand typically keeps a lower share of the profits, right?

A.    Yes.

Q.    And in that case, and, again, this is a standard Hatch-Waxman settlement, no reverse payment in it, what you would expect to see is a profit split where the generic keeps 90 percent or so and ten percent less to the brand?

A.    Or the generic might keep 100 percent.

Q.    Yes.  It could be as little as 100 percent.  In other words, the majority, the biggest piece of the pie, right, would go to the generic in the settlement context?  That's what you would expect to see, right?

A.    Yes.

Q.    So if you think of this as a pizza, when you're in the litigation context, the generic gets almost all the slices, right?

A.    Okay.

Q.    Now, in the settlement at issue here, it was divided in half, right?

A.    That's right.

Q.    Okay.  So given that this was a litigation context, Par got less pizza than you would have expected, right?

A.    Yes.

Q.    So there was a value transfer from Par to Sucampo of

40 percent of the pizza?

A.   No.  I disagree with that.

Q.   Okay.

     MS. SHORES:  We can take it down.

Q.   Now, the third question you asked, were asked to address, was did the reverse payment have the potential to inflict anticompetitive harm to U.S. purchasers, right?

     MS. SHORES:  We can pull up slide two.

Q.   That was the third question you were asked to address?

A.   Yes.

Q.   You testified you analyzed, right, the potential effects of the settlement on competition?  Do you recall that?

A.   Yes.

Q.   Okay.  And so I think Mr. Sobol asked you this, but I want to confirm.  You're not offering an opinion on damages or overcharges today?

A.   No, I'm not.

Q.   You're not offering an opinion on what the actual harm to purchasers was from the settlement, right?

A.   Right.

Q.   Okay.

     MS. SHORES:  Take it down.

Q.   All right.  Now I'm going to ask you some questions about your alternative settlement analysis.

     So is it fair to describe that as a model that you

created?

A.    Are you talking about when I was calculating the likely entry date?

Q.    Yes.

A.    It's -- I wouldn't say I created the model, but it is --

Q.    You used a model?

A.    Sure.

Q.    Okay.  Fine.  You used that model and methodology that you described to estimate how generic entry would have played out with a settlement that did not contain the royalty provisions, right?

A.    Yes.

Q.    So I want to show you one of the slides you used.

        MS. SHORES:  Can we turn to slide eight of Dr. Ruhm's dec.

Q.    So this is one of your general methodology slides, right?

A.    Yes.

Q.    And I think we saw this in the opening statement as well. This slide shows conceptually what should happen in a competitor settlement, right?

A.    That's right.

Q.    So this is what should happen in a settlement without a so-called reverse payment, correct?

A.    That's correct.

Q.    Okay.  So, as I understand it, what you explained is the

parties sit down and negotiate an entry date and the brand has its bottom line, which is the earliest generic entry date it would agree to in a settlement, right?

A.    Yes.

Q.    And that's represented by the dotted line sort of in the middle on the left, right?

A.    Yes.

Q.    Okay.  And the generic comes to the table with its bottom line, right?

A.    That's right.

Q.    And that is indicated by the dotted line on the right, right?

A.    Yes.

Q.    And the idea I think that you presented is if the parties can't agree to some date between those dotted lines, they'll just continue to litigate, correct?

A.    That's not quite right.  What I -- what I said was that there has to be this bargaining range.  This could be a case where those dates don't have that range.  So you don't have to have a situation where you would bargain to an agreement.

Q.    Okay.  But I thought your whole explanation was that's how these cases settle --

A.    Right, if they settle, but I'm saying they don't have to settle.  There could be a situation where they look and say, no, we don't agree, we're going to litigate.

Q.   That's exactly what I was trying to get at.  If they don't agree to a date in this range, they might just decide to keep litigating, right?

A.   Well, you wouldn't actually see this bargaining range.  This bargaining range is the overlap where there's a potential increase in profits for both sides.  You could have a case where they don't see that, there -- that bargaining range doesn't exist.  So then you would not see them in the green.

Q.   But it's fair to say either the parties are going to settle the case or they're going to continue to litigate it, right?

A.   Yes.

        MS. SHORES:  You can take that down.

Q.   Now I want to turn to how you applied that methodology, that concept, to the facts in this case.

        So, again, you're a modeler or the model that you use estimated an entry date for Par's product in an alternative settlement that did not contain the royalty provisions, right?

A.   Yes.

Q.   Okay.  So if you imagine your alternative settlement agreement, you just take out the royalty provisions and everything remains the same except for the entry date, right, because the entry date is what you're trying to control for, right?

A.   I'm not following you.  The bargaining range we saw

earlier was the case without the challenged provisions.

Q.   I understand that.  So I'm just trying to understand what the terms of your alternative settlement are, right?  You take out the challenged provisions?

A.   Right, and then you calculate the expected profits with the different entry dates --

Q.   Right, and then --

A.   -- the bargaining range.  And then you come up with that area somewhere in the middle.

Q.   Fair enough.  But in terms of what the alternative settlement would look like, it would be you leave everything the same except you take out the royalties and now the license effective date or the entry date is going to change, right?

A.   It -- the entry -- so in a settlement -- in a simple settlement where you're just bargaining, say, over the entry date, that's where you get that October 19th entry date.

Q.   Okay.  So -- so, again, the anticompetitive elements I think you said in the settlement agreement at issue in this case are contained in the royalty provisions, correct?

A.   Yes.

Q.   And let's just bring that up.

        MS. SHORES:  If you could bring up the settlement agreement, which is JX0.

Q.   That's Tab 3 in your binder.  You can see it here.

        MS. SHORES:  And if we could move to Section 3.13.

214

It's longer than this.  Maybe you can zoom out.

Q.    But this is the section of the settlement agreement that contains the royalty provisions, right?  And if you want to look at it, like I said, Tab 3 in your binder.

A.    Okay.  I'll use this for now, but if I need to go to the binder, I will.

Q.    Okay.  So in your alternate settlement agreement, you would take out Section 3.13 and then estimate what you would expect would happen to the entry date or license effective date in the agreement, right?

A.    I mean, I don't recall if Section 3.13 is the only one that's relevant here, but yes.  You would take out the royalty terms.

Q.    Wherever the royalty terms are, that's what you would take out and everything else is the same except for the entry date?

A.    I believe so.

Q.    Okay.  And so I think you said now the next step is to estimate the entry date as you figured out what the range would be that the parties would be negotiating within, right?

A.    Yes.

Q.    Okay.

        MS. SHORES:  So can we pull up slide 13 from Mr. Ruhm's dec.

Q.    That's what you did in this slide, right?

A.    Well, this slide actually has more.  The entry date, the

competitive entry date, is that point A.  Then we're looking at what the actual entry date was.

Q.   Okay.  Great.  So the competitive entry date that you found your model generated October of '19, that's designated by "A" here, right?

A.   Yes.

Q.   And then the actual entry date is designated with the letter "B", right?

A.   Exactly.

Q.   All right.  Now, I want to just focus your attention on the horizontal timeline in the middle that goes across the page, right?

A.   Okay.

Q.   Your slide's zoomed in on the years 2019, 2020 and a little of 2021, correct?

A.   Yes.

Q.   So you cut out a bunch of years on the left-hand side and you cut out a bunch of years on the right, right?

A.   That's correct.

Q.   All right.  So let's see -- we made a slide to see what it would look like if you didn't leave those years out.  So I'll show you that.

        MS. SHORES:  Can we look at slide four.

Q.   This is what it would look like if you actually included all the years.  Would you agree?

A.    Sure.

Q.    Okay.  And there were 13 years between the settlement agreement and the time that the patents expired, right?

A.    Yes.

Q.    In this slide, your competitive entry date, right, is in October of 2019?  So that's where "A" is, correct?

A.    Yes.

Q.    And the actual entry date in the settlement is "B", January 1, 2021, right?

A.    That's correct.

Q.    Okay.  And so just looking at the actual entry date, "B", that's about six and a half years or so after the settlement agreement, right?

A.    Yes.

Q.    And about six years or so before the patents expire, right?

A.    Roughly, yes.

Q.    Okay.  But, in your opinion, a competitor settlement would have had Par enter the market back in October of 2019, right?

A.    Yes.

Q.    Okay.  Now, I think you testified to this, but you would agree that when you're using an alternative settlement model, the party's chances of winning are key input, right?

A.    Yes, they are.

Q.    Okay.  And you would agree, I think you might have

testified to, that your estimation of an entry date in an alternative settlement turns heavily on assumptions about, in this case, Par's chances of winning the litigation, right?

A.    Yes.

Q.    And I think the way you put it is that a key assumption that you need in order to run this model as an input is what the party thought about their chances of winning, right?

A.    Yes.

Q.    You were instructed by plaintiffs' counsel in this matter to assume that Par had at least a 60 percent chance of winning, right?

A.    Yes.

Q.    And that was based on the opinion of Dr. Davitz, who we heard from this morning, right?

A.    I assume that's what it was based on.

Q.    All you were told is use 60 percent, right?

A.    Yes.

Q.    Again, you testified earlier you saw a proposal from Par and it was the first proposal -- you accepted my representation there were no more, but you didn't see any other proposal from Par except for they wanted to come in in October of 2020, right?

A.    You -- I did see that proposal.  I don't recall what else there might have been.

Q.    Okay.  All right.  So turning back to what we see here,

the entry date that's designated by "A", that depends on Dr. Davitz's percentages of Par's winning, right?

A.   Yes.

Q.   So you -- you're aware that Takeda has an expert that says that, actually, Par's chance of winning wasn't 60 percent.  It was 40 percent.  Do you remember that?

A.   I don't recall the number but I remember it was a lower probability.

Q.   And I think you said that what was important for you for running this model is the parties' assumptions about their chances of winning, correct?

A.   Yes.

Q.   But you just used the plaintiffs' number.  You didn't use our number, right?

A.   Well, what I'm using -- yeah, I'm using the 60 percent.

Q.   Okay.  So let's see what happens if we do that.  You're aware that Dr. Saravia, who is defendants' expert economist, that she did that?

A.   I know she did a number of calculations.

Q.   And you explained this model you can change the assumptions easily, right?

A.   Yes.

Q.   So let's see what happens when you use 40 percent for Par's chances.  And turns out, if you do that, your model would predict that the parties would settle on November 1, 2021,

right?

A.    I don't know the answer to that.

Q.    You never tried using any other assumption other than the 60 percent that you were given by plaintiffs' counsel?  Is that your testimony?

A.    I did not use those numbers.

Q.    You would agree here, if I'm correct, and Dr. Saravia used your model to estimate a bargaining range, used our patent expert's estimate of Par's chances of winning of 40 percent, that you would get a predicted entry date under the settlement of November 1, 2021?  You're aware of that, right?

MR. SOBOL:  Objection.

THE COURT:  Overruled.

A.    I can't comment on the accuracy of Dr. Saravia's numbers there.  I can say there are other parts of her report that seemed quite incorrect.  I don't know if these were or in the.

Q.    Well, you didn't -- you had a chance to write a rebuttal report in this case, right?

A.    Yes.

Q.    And you responded to what Dr. Saravia put in her report, right?

A.    I responded to her criticisms of my report.

Q.    Okay.  You didn't take any issue with the way she ran her model in your rebuttal report, did you?

A.    No, I didn't take issue with it.

Q.   And what she predicted, you'll recall, is that the bargaining range would have been, to make the record clear because I think I screwed this up earlier, the brand's bottom line would have been November 1, 2021.  Generic's bottom line would have been April 1, 2022.  You recall that?

A.   I don't recall.  I'm not saying it's not possible.  I just don't recall.

Q.   The gray horizontal slide in this slide, that's time, right?

A.   Yes.

MS. SHORES:  And so let's look back at Dr. Ruhm's slide No. 6.

Q.   This is going back to your methodology slide, right?

A.   Okay.

Q.   And, again, the gray line in the middle, that's a horizontal timeline, right?

A.   Yes.

Q.   And, again, you were explaining this is conceptually what you do?  This is your methodology slide, right?

A.   Yes.

Q.   All right.  So now I want to apply that to the facts of this case.  And I'll show you a slide that we made.  If you can look at our slide seven.

And this leaves everything the same except we put actual years in here.  Instead of a gray line, we have actual

years.  Do you see that?

A.    Yes.

Q.    And on the left, you see where it's indicated the day of the settlement agreement, 2014?  You see that?

A.    Yes.

Q.    And 2027, on the right, is when the challenged patents expired in the Par litigation, right?

A.    I believe that was the last of the challenged patents, yes.

Q.    And 2021, the entry date of the Par settlement falls right in the middle, correct?

A.    You're saying in the middle of this 2014 to 2027 period?

Q.    I'm saying the middle of this slide, the middle of the bargaining range and the middle of the years 2014 going out to 2027 falls right in the middle, correct?

A.    Looks like it's close to the middle.  I don't know that it's exactly in the middle.  It's somewhere near the middle.

Q.    Yeah.  Actually, we just didn't change the line on your slide, but the line on your slide is a little later than 2021 in the actual settlement, correct?

A.    I'm sorry.  Which line?

Q.    You see the line that says "Generic Entry Begins"?

A.    Yes.

Q.    That points down to the year 2021?

A.    Yes.

Q.    In the actual settlement, the parties agreed to the beginning of 2021 for product to enter --

MR. SOBOL:  Objection, your Honor.

A.    I'm sorry --

*** Beginning of sidebar ***

THE COURT:  All right.  So are these numbers that come from your expert?

MS. SHORES:  There are some from ours.

THE COURT:  The new numbers.  He said what each party's bottom line number and days are.  Now you're pointing out a new bottom line.

MS. SHORES:  Yes.  I'm coming at our expert's bottom line that he responded to in his report.

MR. SOBOL:  No.  This is not in her report.  What they have done here is they took Dr. Ruhm's diagram that was just saying something theoretically, superimposed dates on it and --

THE COURT:  I'm trying to figure out where do these dates come from, these new dates.

MR. SOBOL:  They just superimposed dates on his slide.

THE COURT:  Does your expert say that this is the bottom line date for?

MS. SHORES:  Let me just show you the slide so we know which slide we're talking about.

THE COURT:  I assumed you knew about it.

MR. SOBOL:  No.  I haven't seen this slide before.

THE COURT:  Forget the slide.

MS. SHORES:  This is her range.

THE COURT:  Does she say that this is the date?

MS. SHORES:  She gives a range.  She doesn't give an exact date.  She says it's between these two dotted lines.

THE COURT:  As long as her expert has given these two dates of April 1st and November 1, 2021, they can superimpose on them.

MR. SOBOL:  But they're trying to suggest his model came to the same result, which it didn't, because they just superimposed.

THE COURT:  I think they're saying it doesn't come to the same exact.

MR. SOBOL:  I think we know what's going on but I move to strike it.

THE COURT:  Well, that's denied if those numbers are from your expert --

MS. SHORES:  Yeah, ranges.

THE COURT:  Okay.

                    *** End of sidebar ***

THE COURT:  Miss Shores, you've got two minutes.

MS. SHORES:  I'm going to beat that record, I swear.

Q.   Just to be clear, so you understand what we did with there slide.  All we did was put in years on top of your methodological theoretical slide, right?  That's all we did.

MS. SHORES:  So we can look at his slide.  Let's just show it again.

Q.   You just had a gray line when you were talking about this conceptually?

A.   Yeah.

Q.   You understand what we did was put years on top of that gray line?

A.   You're saying with Dr. Saravia's estimates, not mine. That's what I wasn't following.

Q.   No.  If I said that, I apologize.  I do not mean to suggest that Dr. Saravia did what we just did.  Dr. Saravia did.

MS. SHORES:  If you could go two slides back.

Q.   Just so we're clear, Dr. Saravia came up with the bargaining range using our patent experts' chances of Par's winning the patent case.

A.   Okay.

Q.   And the bargaining range that she came up with was between November 1st, the dotted line on the left --

A.   Okay.

Q.   -- and the blue line on the right.

A.   Okay.

Q.   So I don't mean to suggest --

A.   But now on the next slide you were showing me, these were not -- go back.

Q.   No.   The next slide is -- that's just, you know -- all we did was take your theoretical slide -- admittedly, I did not mean to suggest you meant this anything other than --

A.   I'm saying the next slide though.

Q.   All we did was put years on the axis.   That's all we did.

A.   But these are not -- these are not -- this is not my bargaining range.   I did not have generic entry.

Q.   I didn't mean to suggest it was.   All I did was take your theoretical model and put superimposed years on the time.

THE COURT:   Hold on a second.   I want to see you back at sidebar.

*** Beginning of sidebar ***

THE COURT:   Those dates don't match up with what your expert said.

MS. SHORES:   I know.   I'm trying to make it clear.

MR. SOBOL:   I'd like to strike it.

THE COURT:   Okay.

MS. SHORES:   You're going to strike all that?

THE COURT:   Yes.

*** End of sidebar ***

THE COURT:   Ladies and gentlemen, there was some confusion but now we've figured it out.   All this testimony with regard to this slide that you're looking at is stricken from the record.   It's no longer evidence.   All the testimony about this slide is not evidence.

It's 4:01, so I'm going to dismiss the jury today. We'll continue tomorrow.

Please do not conduct any investigation on your own. Do not discuss the case with anyone.  I'll see you tomorrow morning at 9 o'clock.

THE CLERK:  All rise for the jury.

(Jury exits.)

THE COURT:  Everybody have a seat for a few minutes. I want to clean up the record about what we were discussing at sidebar, which is, I initially was under the impression -- sorry.

THE WITNESS:  Do I need to leave?

THE COURT:  You don't have to leave.  Do you want him to leave?

MR. POLONSKY:  No.  We want to go home.

THE COURT:  I was under the impression and I had asked where are these numbers coming from, where are these bottom line dates coming from.  And if it was coming from your expert and you're simply superimposing her bottom line dates over his model, I would have allowed it, but these dates don't match up with what your expert has said either.

MS. SHORES:  Right.  I tried to clear that up and I made a mess of it, apparently, when I got back up.  I tried to clear up.

All we did was take his, that one slide with the date,

and just put years in, not suggesting that this is what our expert found the range would be or that he found that to be the range in this case.

THE COURT:  Right, but I don't know where those numbers come from.  It sort of misleads -- if I'm sitting on the jury, I'm looking at this graphic and I'm thinking this is one way to look at it from a different expert, and that's not true.

MS. SHORES:  Okay.  I think the previous slide should have made that.  I'll certainly try to sort that out.

THE COURT:  We can try to redo it tomorrow.

Do you want to talk?

MR. SOBOL:  I'm okay.

MR. BARLOW:  If he's going to appear tomorrow, there's a lot in dispute.  I don't know where we are in the schedule.

MS. SHORES:  Perhaps we could let the witness go.  And if he could be reminded to not talk to counsel.

MR. SOBOL:  He should be admonished, your Honor.

THE COURT:  Mr. Ruhm, overnight -- obviously, you're going to continue your testimony tomorrow.  So please do not have any conversations with lawyers from either side.  Okay?

THE WITNESS:  Yes.  Am I allowed to ask things like address of the court because somebody brought me here today?

THE COURT:  Yes, as long as you're not talking about your testimony.

THE WITNESS:  Okay.

MR. SOBOL:  So I think after Dr. Ruhm, there's Miss Marchetti.  Is Broxson right after that?

MR. BARLOW:  He could be.  The issue with Mr. Broxson, he's a civilian, so to speak, so he lives 100 plus miles away.  I'd rather -- if there's a way to accommodate, he could go on and off in a day.  I'm wondering if that's possible not tomorrow.

MR. SOBOL:  Yeah.  I have to speak to my folks.  Let's see if counsel can work it out so he's in and out on Wednesday and we'll do what we can to do that.  I don't know the logistics.  We have to figure that out.  I'll get back to Mr. Barlow and his team.

MR. BARLOW:  In the meantime, there are 20 some-odd exhibits, some pretty complicated privileged issues embedded in those exhibits.  There's a lot to discuss.

I understand the Court doesn't want to do that now.  If he goes Wednesday, that will leave more opportunity to do that.

THE COURT:  I would defer that.  Have a good night.

THE CLERK:  All rise.  This Court's in recess.

(The Honorable Court exited.)

(Adjourned, 4:05 p.m.)

INDEX


WITNESS                                                              PAGE


DR. MICHAEL DAVITZ

    Direct Examination By Ms. Johnson                                 17
    Cross-Examination by Mr. Wu                                       81
    Redirect Examination By Ms. Johnson                             108
    Recross-Examination By Mr. Wu                                    117

DR. CHRISTOPHER RUHM

    Direct Examination By Mr. Sobol                                 119
    Cross-Examination By Ms. Shores                                 186


E X H I B I T S


Exhibit No.                                                      Received

CERTIFICATION

          We certify that the foregoing is a correct transcript

of the record of proceedings in the above-entitled matter to

the best of our skill and ability.


/s/Jamie K. Halpin                    April 27, 2026
Jamie K. Halpin, RPR, RMR, CRR        Date
Official Court Reporter


/s/Kristin Kelley                     April 27, 2024
Kristin Kelley, RPR, CRR              Date
Official Court Reporter