**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| IN RE AMITIZA ANTITRUST LITIGATION | ) ) ) ) | Civil Action No. 21-11057-MJJ |

**CHARGE TO THE JURY**

May 15, 2026

JOUN, J.

## Table of Contents

**INTRODUCTION** .......... 4
**GENERAL RULES** .......... 4
**Duty of The Jury to Find Facts and Follow the Law** .......... 4
**THE PARTIES** .......... 5
**BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE** .......... 8
**EVALUATING EVIDENCE** .......... 8
**The Evidence** .......... 8
**What is Not Evidence** .......... 9
**Kinds of Evidence—Direct and Circumstantial** .......... 10
**Credibility of Witnesses** .......... 11
**Prior Inconsistent Statements** .......... 13
**Deposition Testimony** .......... 14
**Expert Opinion Testimony** .......... 14
**Documents** .......... 15
**Summaries and Charts** .......... 16
**Note-Taking / No Transcript** .......... 17
**OVERVIEW OF THE CASE AND THE PARTIES' POSITIONS** .......... 17
**Patents and Patent Litigation** .......... 20
**The Hatch-Waxman Act** .......... 21
**FDA Approval of Brand Drugs** .......... 22

**FDA Approval of Generic Drugs (ANDAs)** ........ 22
**Paragraph IV Certifications** ........ 23
**Authorized Generics** ........ 24
**Patent Litigation Between Brand and Generic Drugs** ........ 25
**The Par-Patent Litigation** ........ 26
**Relationship Between Patent and Antitrust Laws** ........ 27
**PLAINTIFFS' CLAIMS** ........ 27
**SHERMAN ACT, SECTION 1** ........ 28
**Market Power – What Is It?** ........ 28
**Direct Evidence of Market Power** ........ 29
**Indirect Evidence of Market Power** ........ 30
**Rule of Reason** ........ 33
**Step 1: Did the conduct substantially harm competition?** ........ 34
**Payment** ........ 34
**The "Reverse Payment" Provisions In The Settlement Agreement** ........ 34
**The Declining Royalty Provision In The Settlement Agreement** ........ 35
**Construction of the Settlement Agreement** ........ 36
**"Large" and "Unjustified" Reverse Payment** ........ 38
**Anticompetitive Effects** ........ 38
**Existence of the No-AG Agreement** ........ 39
**Step 2: Did Takeda have a good reason?** ........ 40
**Step 3: Was there a less harmful way to do it?** ........ 41
**Step 4: Weigh everything.** ........ 41
**INSTRUCTIONS ON SPECIFIC EVIDENCE** ........ 41
**INJURY AND CAUSATION** ........ 43
**Injury & Causation Element 1: Injury-in-Fact** ........ 44
**Injury & Causation Element 2: Material Cause** ........ 45
**STATE ANTITRUST AND CONSUMER PROTECTION LAWS** ........ 46
**DAMAGES – INTRODUCTION** ........ 46
**Damages for the Federal Claim** ........ 47
**Damages for the State Claims** ........ 48
**Damages – Other Findings and Enhancements** ........ 48
**DELIBERATIONS** ........ 49
**Foreperson's Role; Unanimity** ........ 49

**Duty to Deliberate and Reaching Agreement** ..... 50
**Implicit Bias** ..... 50
**Communications with the Court** ..... 51
**Return of Verdict Form** ..... 52

## INTRODUCTION

Members of the jury:

Now that you have heard all of the evidence and the closing arguments of the attorneys, I now instruct you on the law. You will then begin your deliberations.

My instructions will be in four parts: first, I will instruct you on the general rules that define and control the duties of a jury in a civil case; second, I will instruct you on how to evaluate the evidence that has been presented to you here during this trial; third, I will explain the rules of law that you must apply to answer the questions presented to you on the Verdict Form; and finally, I have some guidelines that will govern the conduct of your deliberations.

Because of the nature of the claims, my instructions are necessarily long, and so what I have decided is to give each of you a written copy of these instructions. Even though you will have them in the jury room with you as you deliberate, you should nonetheless listen very carefully to all the instructions as I give them to you now. It is your choice as to whether to follow along using the written instructions. You are not required to. As a matter of personal preference, some of you may find reading along helpful, while others may understand better if they just listen to the oral instructions.

## GENERAL RULES

### Duty of The Jury to Find Facts and Follow the Law

It is your duty to find the facts from all the evidence in the case. I will describe the law to you, and you must apply the law to the facts as you find them. You must follow the law as I describe it, whether or not you personally agree with the wisdom of the law. This is a fundamental part of our system of government by law. It is your duty as jurors to decide the case fairly and impartially, regardless of any personal likes or dislikes, opinions, prejudices, biases, or

sympathies. You must make your decision based solely on the evidence before you, and according to the law.

In following my instructions, you must follow all of them and not single out some and ignore others. They are all equally important. The lawyers were allowed to comment on the evidence and on the rules of law in their opening and closing statements. But if what they have said about the evidence differs from your memory, let your collective memory control. If what they have said about the law seems to differ in any way from my instructions, you must be guided only by my instructions that I give now.

You must not read into anything that I may have said or done during the course of the trial – indeed even the tone of my voice or facial expressions if I had any –as any indication or suggestion from me as to what your verdict should be. That is a matter entirely for you to decide. Yesterday during closing arguments, one of the lawyers for the Purchasers told you that "“the judge has reviewed the evidence and let this case go to trial." That argument was improper and misleading. Let me be very clear: I have no opinion as to the merits of the purchasers' case or what your verdict should be. The verdict is yours, and yours alone, to decide as the finders of the facts.

**THE PARTIES**

The "plaintiff," you will recall, is the name we give to the person or entity who brings a lawsuit. In this case, there are three groups of plaintiffs in this case. Two of these groups bring their lawsuits as "class actions." A class action is a lawsuit that has been brought by one or more plaintiffs on behalf of a larger group of entities that have similar legal claims. All of the entities together are called a "class," and the specific plaintiffs who bring the lawsuit on behalf of a class are called the "class representatives."

The fact that some of the claims in this case are proceeding as class actions does not mean that any decision has been made about the merits of those claims. You must not infer anything about the merits of the case based on the fact that the claims in this case include class action claims.

The first group of plaintiffs is the “Direct Purchaser class.” This is a class of entities in the United States that, from as early as 2016 through 2023, purchased the brand drug Amitiza directly from Takeda or purchased a generic version of Amitiza from certain generic manufacturers. The Direct Purchaser class includes approximately two dozen entities that are drug wholesalers, distributors, and retail pharmacy chains. The Direct Purchaser class representative— a member of the class that the Court has approved to represent the interests of the entire class in this litigation — is KPH Healthcare Services, also known as Kinney Drugs. KPH is an “assignee,” meaning an entity whose right to bring claims was transferred to it from companies that purchased brand Amitiza directly from Takeda or generic lubiprostone during the class period. When I refer to the “Direct Purchasers,” I am referring to both the class representative and the other members of this class. The Direct Purchasers bring their claims under federal antitrust laws.

The second group of plaintiffs is the “Retailers.” The Retailers are Walgreen, Kroger, Albertsons, H-E-B, and CVS. These entities have assignments that grant them the right to sue on behalf of the wholesalers from whom they purchased brand or generic Amitiza. Like the Direct Purchasers, the Retailers bring their claims under federal antitrust laws. However, the Retailers filed separate lawsuits and are not part of the Direct Purchaser class.

The third group of plaintiffs is the “End-Payor class.” This group consists of entities sometimes referred to as third-party payors or “TPPs” or “EPPs” which consist of self-funded

employers, union health and welfare funds, and non-profit and profit health care plans that provide prescription drug insurance. The End-Payor class does not include the individual patients to whom Amitiza was dispensed. End-Payors pay for some or all of the price of health care transactions entered into by their members, enrollees, or beneficiaries. The End-Payors are a class of entities who paid for Amitiza and generic lubiprostone in eighteen states and the District of Columbia beginning on either October 1, 2016, or, for some states, on a later date. The End-Payor class representative is Premera Blue Cross. When I refer to the "End-Payors," I am referring to both the class representative and the other members of this class. The End-Payor Purchasers bring their claims under state antitrust and consumer protection laws.

Collectively, the Direct Purchasers, the Retailers, and the End-Payors, I will refer to them as the Purchasers. Yesterday, counsel for the Purchasers told you that they represent American consumers of Amitiza. Let me be clear, they do not represent any consumers or patients. The Plaintiffs' lawyers represent only Direct Purchasers, the Retailers, and the End-Payors.

The "defendant" is the name we give the person or entity that is sued. In this case, the defendant is Takeda.

The law treats the parties in this case as equals. You should consider and decide this case as a dispute between parties of equal standing in the community, of equal worth and holding, the same or similar stations in life.

The fact that corporations or companies are involved as parties in this case must not affect your decision in any way. As a reminder, under the law, all persons and businesses are equal before the law, and all parties are entitled to a fair trial regardless of whether they are a person, a small business, or a large business. When a company is involved, of course it may act only through people as its employees; and, in general, a company is responsible under the law for

the acts and statements of its employees that are made within the scope of their duties as employees of the company.

**BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE**

As I explained in my preliminary instructions, the burden of proof in a civil case is called the "preponderance of the evidence" which is a lower standard of proof than that of "proof beyond a reasonable doubt," the very high standard that we apply in a criminal trial. The Purchasers bear the burden of proving the claim. They do not need to prove their claim to any degree of mathematical certainty. Rather, they must produce evidence which, when considered in the light of all the facts and evidence in the case, leads you to believe that each element of their claim is more likely true than not.

If you recall the example I gave you, if you were to put all the evidence on a given issue that supports the Purchasers on one side of a scale, and all the evidence on that issue that supports Takeda on the opposite side, if the scale tips, even ever so slightly, in the Purchasers' direction, the Purchasers have met their burden of proof. On the other hand, if you find that the credible evidence on a given issue is exactly evenly divided between the parties—that it is as equally probable that one side is right as it is that the other side is right—or, the scale tips in Takeda's direction, then you must decide that issue against the Purchasers.

**EVALUATING EVIDENCE**

Before I turn to how to evaluate the evidence, let me first briefly review for you what is and what is not evidence in this case.

**The Evidence**

The following are evidence that you may consider in your deliberations, and you should give the evidence whatever weight you deem proper:

- The sworn testimony of witnesses, regardless of who may have called them, whether given during direct-examination or during cross-examination;

- Exhibits received in evidence, regardless of who may have produced them;

- Deposition or prior sworn testimony read or played during the trial; and

- Any facts that have been admitted or stipulated to by the parties. Admitted or stipulated facts are facts that you must accept as true and conclusive in your consideration of this case. These facts are in a document called Established Facts and has been entered in evidence as Exhibit JX000A. You are to treat these facts as undisputed and you need not deliberate about it.

**What is Not Evidence**

Certain things are not evidence, and should have no influence on your verdict:

- Arguments and statements by lawyers are not evidence. You may find what the lawyers have said over the course of the trial to be helpful, even persuasive, but the facts are to be determined from your own evaluation of the evidence, and from any reasonable inferences that you choose to draw from the facts as you find them.

  If the lawyers ever expressed their own opinions in this case, you are to disregard it. They Their personal opinions have no place in your deliberation. You are to be guided only by the evidence in the case.

- Questions to witnesses by lawyers, standing alone, are not evidence. The questions may only be considered to the extent that they give context or meaning to a witness's answer.

- Objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe that a question is improper under the rules of evidence. You should not be influenced by the fact that an objection was made. If I sustained the objection, you should ignore the lawyer's question, and any assertion of fact it might have contained, and you should not speculate or guess what the answer might have been. If I overruled the objection, you should treat the witness's answer like any other answer.

- Testimony that has been stricken or excluded is not evidence and may not be considered by you in rendering your verdict. You may not speculate about why testimony was stricken or excluded or draw any inference, favorable or unfavorable, from the fact that the testimony was stricken or excluded. Also, if certain testimony was received for a limited purpose—such as for the purpose of assessing a witness's credibility—you must follow the limiting instructions that I gave.

- You should also ignore editorial comments made by the attorneys during their presentations, particularly those intended to characterize the testimony of witnesses.

Whether or not a witness's testimony was believable on any particular point is a determination that only you can make.

- Notes, if you have kept them, are not evidence. They are a personal memory aid to be used to refresh your recollection of the evidence during the deliberations.
- Anything you may have seen or heard outside the courtroom during the course of the trial is not evidence. You must decide the case solely on the evidence received at trial.

**Kinds of Evidence—Direct and Circumstantial**

Now that you know what is and what is not evidence, let me talk to you about how to evaluate the evidence. In any case, there are always two types of evidence: direct and circumstantial. Direct evidence is direct proof of a fact, usually presented through the testimony of a person who claims to have seen or heard or felt with his or her own senses. When you evaluate direct evidence, your decision is fairly straightforward: do you believe what the witness has told you is accurate? Circumstantial evidence on the other hand is indirect evidence. It is the proof of a chain of circumstances or a set of facts from which you could infer or conclude that another fact is true even though you have no direct evidence of that second fact.

Let me give you an example. You come home one day, and a family member tells you that she saw the postal worker at your mailbox. That is direct evidence that the postal worker was at your house. On the other hand, she might only tell you that she brought the mail in from the mailbox. That is circumstantial evidence that the postal worker was at your house; no one saw the postal worker, but you can reasonably infer that the postal worker was at your house since there was mail in the mailbox.

There are two rules to keep in mind about circumstantial evidence. The first rule is that you are permitted to draw reasonable inferences only from the facts that have been proven to you. Inferences may not be based on speculation or conjecture. The second rule is that any inferences you draw must be reasonable and natural based on your common sense and life

experience. In deciding whether to draw an inference, you must look at and consider all of the facts in the case in light of reason, common sense, and your own life experience.

Neither type of evidence, direct or circumstantial, is considered superior or inferior to the other. Both types of evidence may be considered in reaching your verdict and may be given whatever weight that you, as the finders of fact, deem any particular evidence to be worth.

**Credibility of Witnesses**

Most of the evidence that was received at this trial was offered through the testimony of witnesses, whether that was in-court or by video deposition. As the jury, you are the sole judges of the credibility, the believability, of these witnesses. If there are inconsistencies in the testimony, it is your function to resolve any conflicts and to decide where the truth lies. You are not required to believe the testimony of any witness simply because that witness was under oath. You may choose to believe everything that a witness said, only part of it, or none of it. It is your job to determine the credibility of each witness and then reach a verdict based on the believable evidence in the case.

Often it may not be what a witness says, but how he or she says it, that might give you a clue as to whether or not to accept the witness's version of an event as believable or credible. You may consider factors such as, but not limited to:

- a witness's character;
- his or her appearance and demeanor on the witness stand;
- his or her frankness or lack of frankness in testifying;
- whether the witness was contradicted by anything that he or she said before the trial;
- whether his or her testimony is reasonable or unreasonable, probable or improbable, in light of all the other evidence in the case;

- how good an opportunity the witness had to observe the facts about which he or she testified; and
- whether his or her memory seems accurate.

In deciding whether to believe a witness, you may specifically note any evidence of hostility or affection which the witness may have towards one of the parties. Likewise, you may consider evidence of any other interest or motive that the witness may have in cooperating with a particular party, including an interest in the outcome of the case. It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony. If you find that a witness is biased, you should view that witness's testimony with caution, weigh it with care, and subject it to close and searching scrutiny. Keep in mind, however, that it does not automatically follow that testimony given by an interested witness is to be disbelieved. There are many people who, no matter what their interest in the outcome of the case may be, would not testify falsely. It is for you to decide, based on your own perceptions and common sense, to what extent, if any, a witness's interest has affected his or her testimony.

In deciding whether or not to believe a witness, keep in mind that people sometimes forget things, get confused, or remember an event differently. Memory is not always reliable, and when someone recounts a story twice, it will seldom be identical in every detail. Even a truthful witness may be nervous and contradict him or herself. But sometimes, people just lie. In considering how much significance to give any such discrepancies, you should consider whether a discrepancy has to do with an important fact or only a small detail, and whether the discrepancy results from innocent lapses of memory or intentional falsehood. It is for you to decide, based on your total impression of the witness, how to weigh any discrepancies in his or her testimony. You should, as always, use common sense and your own good judgment.

The weight of the evidence does not necessarily depend on the mere number of witnesses testifying for one side or the other. During closing arguments yesterday, the lawyers argued that the other side should have called certain witnesses and asked why certain witnesses were not here at trial. This argument was improper. It is improper because it suggests that only one party has the ability to call certain witnesses. That is not the case. Both parties had equal ability to call witnesses. The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters at issue in this trial. For this reason, you may not speculate what testimony a missing witness would have given and you may not hold the absence of a witness against any party. Nor does the law require any party to produce as exhibits all papers and things mentioned by the witnesses in the case. When we say "weight of the evidence," the weight does not mean the amount of evidence; weight means your judgment about the credibility and importance of the evidence.

**Prior Inconsistent Statements**

The testimony of a witness may be discredited or impeached by showing that he or she previously made statements that are inconsistent with his or her present testimony. If a witness is shown to have given inconsistent statements concerning any relevant matter, you have a right to distrust that witness's testimony in other respects. You may reject all of the testimony of that witness or give it such credibility as you may think it deserves. Again, people sometimes make innocent mistakes, particularly as to unimportant details, and not every contradiction or inconsistent statement is necessarily important, but sometimes people do not tell the truth. If you find that a witness has made inconsistent statements under oath on an earlier occasion, such as in

a deposition, you may also consider that earlier statement for its truth or falsity, the same as any testimony at trial.

**Deposition Testimony**

Some of the testimony came in the form of depositions which have been received in evidence. A deposition, as I've told you, is simply a procedure where, before this trial, the attorneys questioned a party or a witness under oath before a court stenographer or court reporter either as part of pretrial discovery or instead of having the witness actually appear at trial. You are to treat the deposition testimony in the same way as if the testimony had been given here in court. As with all witnesses, it is for you to determine how believable and how significant that testimony is.

**Expert Opinion Testimony**

Some of the testimony came from witnesses who had first-hand knowledge of the facts that they testified about. But some of the witnesses told you about opinions or conclusions they reached based on some special knowledge, skill, training or experience. These witnesses were allowed to testify on the theory that someone who is experienced and knowledgeable in the relevant field can assist you in understanding the evidence or in reaching an independent decision on the facts.

But even if a witness has some special knowledge, skill, training or experience, that does not necessarily make the witness's testimony any more believable or more important than other testimony or exhibits. As with all other witnesses, you must decide whether you believe the witness and how much importance to give to the witness's testimony. You should consider all the factors I have previously mentioned, including whether the witness had a motive to testify in a certain way or some other bias that could have influenced the witness's testimony.

In addition, as you evaluate a witness's opinions or conclusions, you should also ask:

- Was the witness's testimony supported by the facts of this case?
- Did the witness use guesswork or assumptions that you do not find to be convincing or are not consistent with the facts?
- Did the witness have sufficient education or experience?

As with all witnesses, you may decide to accept all, some, or none of the opinions or conclusions offered by an expert witness. Please remember that witnesses, even those with special training or experience, do not decide cases; juries do. It is up to you to decide whether you accept or reject any opinion or conclusion that an expert witness offered during the trial. You should not substitute their opinion or conclusion for your own reason, judgment, and common sense. The determination of the facts rests solely with you.

**Documents**

A number of documents have been received into evidence. You will have all of them with you in the jury room available for your review. The numbers assigned to the exhibits are for convenience in order to ensure an orderly procedure. You should draw no inference from the fact that a particular exhibit was assigned a particular number, or that there may be gaps in the number sequence. Additionally, you may have noticed in some of the documents that there are blanks, gaps, or redactions. Certain portions of documents have been taken out or redacted based on our rules of evidence and other applicable laws. Please do not speculate what was taken out or redacted or the reasons for the blanks, gaps, or redactions and please do not hold the blanks, gaps, or redactions against any party. Also, the parties were not required to submit a complete set of any records. Please do not make any inference, one way or another, from the fact that only portions of certain records were admitted in evidence.

With regard to the exhibits themselves, you decide the weight, if any, to give to each document. That is, you may credit all of a document, a portion of a document, or none of a document. In evaluating the believability of the statements or assertions in a document, you should consider all of the surrounding circumstances. Among other factors, you may consider: the author of the document; the believability of the author; when the document was created; the purpose for which the document was created; whether the document was created in anticipation of litigation; whether the statements in the document are contradicted by anything else; and whether the statements in the document are reasonable or unreasonable, probable or improbable in light of all the other evidence in the case.

**Summaries and Charts**

The parties have presented exhibits in the form of charts and summaries. I decided to admit some of these charts and summaries in evidence in place of the underlying documents that they represent in order to save time and avoid unnecessary inconvenience. You should consider these admitted charts and summaries as you would any other evidence.

Certain charts, summaries, and other graphics were shown to you during the trial to help explain or illustrate the contents of books, records, documents, testimony, or other evidence in this case, but they themselves were not received in evidence. I have also allowed some of these summaries to be sent to the deliberation room so that you can refer to them. You will recall I said I was doing that because you will not be able to remember all of those numbers. As I said then, these charts and summaries are not themselves proof of any facts. They are not binding on you in any way. If they do not correctly reflect the facts shown by the evidence in the case, you should disregard these charts and summaries, and you should determine the facts from the actual evidence.

## Note-Taking / No Transcript

As I indicated at the beginning of the trial, you have been permitted to take notes, but I remind you of some of the cautions I gave you. You should bear in mind that not everything that is written down is necessarily what was said. Notes are an aid to recollection, nothing more. The mere fact that something is written down in someone's notes does not mean that it is necessarily accurate. It is your collective memory of the evidence, not any of the notes, that controls.

As I also mentioned, you will not be given a transcript of the trial. It is not possible to create an official transcript that we can all agree on in time for deliberations. Since you will not have a transcript, you should rely on your collective memory of the evidence.

## OVERVIEW OF THE CASE AND THE PARTIES' POSITIONS

This is an antitrust case. What does that mean? To put it simply, the Purchasers allege that Takeda did something to unreasonably limit competition to its brand drug Amitiza. They say Takeda did this when it included anticompetitive provisions in a settlement agreement with a company called Par in a patent case. Because this antitrust case arises out of the settlement of that Par-Patent case, we need to understand what happened in the Par-Patent case. As you will recall, Takeda, Sucampo, and Par were involved in a patent lawsuit. Sucampo and Takeda had sued Par for patent infringement after Par challenged the patents covering Amitiza. Par had challenged Sucampo's patents as invalid—that is, as not meeting patent requirements. In other words, Par challenged Sucampo and Takeda's ability to use the patents to keep Par off the market, and Par sought to get its competing product on the market before the patents' expiration dates. Sucampo and Takeda, for their part, argued the patents were valid and sought to enforce the patents to keep Par off the market. Sucampo and Takeda and Par eventually settled in 2014.

I will now give you a summary of the parties' positions. They are only allegations. They are not evidence.

The Purchasers allege that, from as early as 2016 through 2023, they overpaid by hundreds of millions of dollars for the drug Amitiza. According to the Purchasers, Takeda—the brand company that sells Amitiza—violated federal and state antitrust laws by entering into an agreement with Sucampo Pharmaceuticals and generic company Par Pharmaceutical to delay generic competition for Amitiza for many years. The Purchasers allege that, if Takeda had competed with Par, instead of entering into an agreement with it, generic competition would have started as early as 2016 and would have included multiple generic companies competing on price, thereby lowering the cost of Amitiza and its generic equivalents for purchasers across the United States.

The Purchasers allege that the September 2014 Settlement Agreement included a payoff in exchange for Par delaying its launch of generic Amitiza until 2021—a seven-year delay. According to the Purchasers, Sucampo and Takeda accomplished this payoff through provisions inserted into the Settlement Agreement for a 50/50 gross profit split on Par's eventual generic sales and a declining "royalty" structure both of which, taken separately and together, ensured that Par's generic would not face competition from an AG, an authorized generic. The Purchasers further allege that, as a result of the likely tens of millions of dollars more that Par would earn as a result of not having to compete for generic sales, Par dropped its patent challenge and agreed to defer its entry until 2021. The Purchasers allege that, following settlement, events occurred as planned: Par dropped the patent challenge, Par deferred entry for seven years, and generic profits were split between the brand and generic companies while no second generic competed in the U.S. marketplace. The Purchasers allege that the 50/50 profit-

split and the declining "royalty" arrangements amounted to an unlawful Pay-For-Delay payment under antitrust law. The Purchasers seek to get back the alleged overcharges that they paid for Amitiza.

Takeda, on the other hand, denies that the Settlement Agreement with Par was unlawful, denies that absent the Settlement Agreement Par would have been able launch a generic Amitiza product before January 2021, and denies that the Purchasers suffered any overcharges for their purchases of brand or generic Amitiza. Takeda contends that the Settlement Agreement between Sucampo, Takeda, and Par ending the patent case was negotiated at arms-length, resolved risks faced by both sides, was procompetitive, and struck a reasonable compromise in that the settlement allowed Par to enter the market with a generic Amitiza product in January 2021—an entry that was six years before the expiration of the Sucampo patents Par had challenged.

Takeda contends neither the royalty rate nor the decline of the royalty rate was a payment for delay. In addition, Takeda contends that the decline of the royalty upon the entry of more generic products into the market was not triggered under the plain terms of the Settlement Agreement when Par was selling Sucampo-supplied AG Amitiza product. It is Takeda's position that the royalty provisions of the Settlement Agreement were lawful and neither the royalty provisions nor anything else about the settlement constitutes a payment for delay under the antitrust laws. Takeda also contends that there were legitimate business reasons that neither it nor Sucampo launched an AG that were unrelated to the September 2014 Settlement Agreement.

Finally, Takeda disagrees that the Settlement Agreement itself caused any delay in Par's launch of a generic Amitiza product or injury to the Purchasers. Takeda argues that without the Settlement Agreement in place, Par faced many barriers to launching its own generic Amitiza product and would not have been able to launch its own generic before January 2021, such as

invalidating the patents covering Amitiza, receiving FDA approval to launch its own generic Amitiza, and having the ability to manufacture and launch generic Amitiza. For the same reasons, Takeda does not believe the Purchasers can prove they suffered an injury caused by the Settlement Agreement or that they suffered any damages in the form of overcharges.

**Patents and Patent Litigation**

Because this is an antitrust case, and not a patent litigation case, you are not here to determine the validity or invalidity of any patents. Rather, to understand the context from which this antitrust case arises, we need to understand some principles of patent law.

I'll start by telling you what a patent is in a general sense, before I talk about how it works for brand and generic drugs. A patent is basically a government-issued protection for an invention. In the United States, the government office that handles patents is the Patent and Trademark Office, or the PTO. If you invent something new, and you want to protect that invention, you apply to the PTO for a patent. The process of obtaining a patent is called "patent prosecution."

So, what does having a patent mean in practice? It means the inventor, now called the patent holder, has the exclusive right to the invention for a set amount of time, usually 20 years. When I say exclusive right, it means the patent holder has the right to exclude all others from making, using, or selling the invention without the patent holder's permission for 20 years.

With that overarching framework for patent law, let's now talk about how that works with brand drugs and generic drugs. When a company invents a new medication, it can apply for patents that block competitors from copying it right away. Brand drugs are typically protected by one or more patents. Those patents might be for the active chemical ingredient in the drug, how it is made, how it is used, or its formulation (for example, a time-release or an extended-release

version). During the time that the patents are in effect, if the patents are unchallenged or proven not invalid or infringed, generic companies cannot make or sell a proposed generic version if that version uses the invention described in the patent. Because of that, the brand company can, and often does, charge higher prices.

If a generic company wants to make a generic version of the brand drug without having to wait 20 years, it potentially faces different legal obstacles. Remember, I said earlier that a patent holder has the exclusive right, the right to exclude all others from making or selling the invention, without the patent holder's permission. This is also called a patent license. So a generic company can ask for permission. If the brand company gives a generic company a patent license, then there is no problem. But if the brand company does not give a patent license, which a patent holder has every right to do, then the generic company cannot make, use, or sell the same drug during those 20 years. If, without a patent license, a generic company seeks to make or sells a generic version of a brand drug, the generic company files an application for approval to do so and challenges the brand's patents. The brand company can then sue the generic company for what is called patent infringement. This type of litigation is sometimes referred to as "Hatch-Waxman litigation."

**The Hatch-Waxman Act**

Let me pause here to explain what the Hatch-Waxman Act is. Congress passed the Hatch-Waxman Act, named after the two lawmakers who worked together to pass it, and it is a law that attempts to strike a balance between two policy goals: (1) encouraging research and development of new drugs, and rewarding drug companies for inventing new medicines, and (2) encouraging generic versions of those drugs to the market, and making it easier and faster for generic companies to make cheaper generic drugs.

**FDA Approval of Brand Drugs**

To explain how the Hatch-Waxman Act makes it easier and faster for generic companies to market cheaper, generic versions of drugs, I have to explain how drugs come to market.

Before a drug company can lawfully sell a drug in this country, the Food and Drug Administration ("FDA") must approve the drug. A drug company seeking FDA approval of a new drug must submit a "New Drug Application" or "NDA." In its NDA, the drug company must provide the FDA with the patent number and the expiration date of any patent which claims the drug or method of using the drug for which it is seeking approval. The FDA publishes this list in what you've heard referred to as the "Orange Book." The NDA process also requires that the drug company submit test data, usually from a series of clinical studies that demonstrate safety and efficacy. If, after reviewing the NDA, the FDA determines that the drug is safe and effective, it will approve the NDA, and the company may then market the drug. Drugs approved through NDAs are often called "brand" drugs because companies sell them under a brand name rather than the chemical name of the drug's active ingredient. Amitiza, the drug at issue in this case, is an example of a brand drug; the chemical name of its active ingredient is lubiprostone.

**FDA Approval of Generic Drugs (ANDAs)**

Before Congress passed the Hatch-Waxman Act into law, companies seeking to market a generic version of a brand drug had to repeat the full clinical trials that the brand company did, which made the process slow and expensive. After the law was passed, instead of redoing all the clinical trials, a generic company can file with the FDA an "Abbreviated New Drug Application," or "ANDA," and only need to show that a generic drug is just as safe and effective as the brand drug—and that it is chemically the same and that it works the same in the body—in

other words, that the generic drug is "bioequivalent" to the brand drug. This saves a lot of time and money.

The FDA can give final or tentative approval to an ANDA. If the FDA grants "final approval," the generic company may launch the generic drug in the United States immediately. If the FDA grants "tentative approval," that means there is still an impediment that prevents a generic manufacturer from launching its product immediately.

**Paragraph IV Certifications**

When a company seeking to market a generic version of an approved brand drug submits an ANDA to the FDA, the Hatch-Waxman Act requires the generic company to tell the FDA and the brand company which patents listed in the Orange Book it intends to challenge, if any. This is called a "Paragraph IV certification."

In a Paragraph IV certification, the generic company certifies that one or more of the patents listed in the Orange Book for the brand drug should not prevent the launch of the generic because the patents are invalid or will not be infringed by its generic product. The generic company's filing of an ANDA seeking FDA approval before the patents listed in the Orange Book expire is a technical act of patent infringement by a generic company that gives the brand company the right to sue the generic company for patent infringement. If the brand manufacturer brings a patent infringement lawsuit within 45 days after it receives the Paragraph IV certification, it automatically triggers a 30-month stay where the FDA must withhold approving the generic drug, while the parties litigate patent validity or infringement in court.

As indicated earlier, Paragraph IV litigation puts the patent's validity at issue, as well as its actual preclusive scope, and so the preclusive scope of the patent is that it may or may not be valid and may or may not be infringed. Paragraph IV litigation does not begin with the baseline

assumption that a patent is valid. As a result, only a patent adjudicated not to be invalid and to be infringed precludes the generic company from using the invention in the patent.

We call the first generic company to file an ANDA with a Paragraph IV certification, the "first-filer." The Hatch-Waxman Act says that the first-filer gets 180 days of exclusivity, meaning it is the only generic on the market during that 180-day period. The FDA cannot approve any other ANDA for the same branded drug. The 180-day exclusivity period belongs only to the first-filer. However, the 180-day period of exclusivity does not prevent the brand patent holder from selling its own generic.

**Authorized Generics**

Which leads me to tell you about "authorized generics," or "AGs". An AG is a generic version of a brand-name drug that is actually made by the brand company itself. A normal generic is made by a different company and, as we talked about, comes in by filing an ANDA and can enter the market once the ANDA is approved by the FDA, either after the patents have expired or after they are successfully challenged. But because the brand company already has FDA approval of its NDA, it does not need to file an ANDA to sell an AG version of its brand-name drug. Because a generic is allowed or authorized by the brand company under the brand's NDA, it is called an "authorized generic."

An AG is the same the same drug as the brand drug, made by the brand company, only sold under a generic label. An AG also is the same exact drug as the brand drug that is made by or distributed by a partner or some other company with the brand company's permission, or license. In other words, a brand company can sell the AG itself or hire another company to distribute it. Either way, it is the exact same formula, and the exact same manufacturing, just

marketed as a lower cost generic. One way to think about this is that an ANDA generic is a copy of the brand drug while an AG is literally the same drug as the brand.

As mentioned, the first-filer gets 180 days of exclusivity but the brand company can market an AG during those 180 days. The 180-day exclusivity period only prevents the FDA from approving another ANDA generic during that time. So, although we say that the first-filer is the "exclusive" generic, it can suddenly have competition from the brand company for market share. The brand company can, but is not required to, sell or permit an AG whenever it wishes to, including during the first-filer's 180-day exclusivity period.

**Patent Litigation Between Brand and Generic Drugs**

So, with that, let's get back to what happens when a brand company sues a generic company over its patents, called "Hatch-Waxman litigation."

The brand company must prove that the generic company is infringing its patents by making, using, or selling the proposed generic drug, and the brand company must prove, by a preponderance of the evidence, that it is more likely than not that infringement occurred. The generic company may defend itself by arguing that there is no infringement or that the patents are not valid. The generic company, as the party challenging the validity of the patents, must prove invalidity by clear and convincing evidence. Clear and convincing means highly probable.

As you may recall from my preliminary instructions, the "clear and convincing evidence" standard is somewhere between the preponderance of the evidence standard—which simply means more likely than not—and proof beyond a reasonable doubt—which is our highest standard we have in the law. Somewhere in between those two standards, is the standard by which the generic company has to prove that the claimed invention in the brand drug patents is invalid.

**The Par-Patent Litigation**

All that brings us to the Par-Patent case. As I mentioned when I started, this case arises out of a settlement in the Par-Patent case. To recap, Sucampo submitted an NDA for the brand-name drug Amitiza, and in 2006, the FDA approved the brand drug Amitiza for the treatment of chronic idiopathic constipation in adults. Sucampo gave the FDA a list of patents that claim the drug Amitiza (lubiprostone) or an approved method of using Amitiza. The FDA published those in the Orange Book.

In 2012, Par sought to market a generic version of Amitiza and pursued an application with the FDA for approval to sell its generic version of Amitiza in the United States. As part of its ANDA application, Par told Sucampo, Takeda, and the FDA that it would wait to sell its generic Amitiza until one of the listed patents expired on July 14, 2014. Additionally, with respect to the other listed patents, Par served a Paragraph IV certification asserting that Par's proposed generic product would not infringe any valid Amitiza patents. In February 2013, Sucampo and Takeda sued, alleging Par was infringing seven of the thirteen patents Par challenged. Each patent was set to expire at different times, from as early as September 2020 to as late as October 2027. During the patent litigation, Par maintained that the asserted patents were invalid.

During the trial, you may have heard argument and testimony as to whether any of the claims of the patents asserted against Par was found invalid which suggested that the patents were litigated to conclusion, and ultimately upheld as valid because no claims were found invalid. That implication is incorrect. The Par-Patent case ended in 2014 with a settlement before any court decided, one way or another, whether the patents had been proven invalid or not proven invalid.

In addition to the asserted patents, in the Summer of 2014, after Par's 2012 ANDA but before the September 30, 2014 Settlement Agreement between Sucampo and Takeda and Par, the PTO had granted Sucampo two additional patents covering Amitiza: the '481 and '187 patents. The '481 patent was to expire on September 1, 2025. The '187 patent was to expire on January 23, 2027. These patents were not part of the Par-Patent litigation but the Settlement Agreement provided Par a license to these two additional patents, and Sucampo and Takeda promised not to sue Par for infringing these two patents.

**Relationship Between Patent and Antitrust Laws**

Patent law and antitrust law can feel like opposites, but in certain ways, they actually work together to balance innovation and competition. Patent law gives inventors a temporary exclusivity, so they have an incentive to create new things. Antitrust law prevents companies from abusing that power in a way that harms competition. Together, they aim to reward innovation without allowing abuse of that reward to crush competition.

The antitrust issue before you cannot be answered simply by reference to what the holder of a valid patent could do. You must consider this case under the antitrust rule of reason that I will explain to you. The question you, the jury, must answer is whether, by the Par-Patent settlement agreement, Takeda unreasonably restrained trade. As I explained, at its core, antitrust is about unreasonably limiting competition.

**PLAINTIFFS' CLAIMS**

The Purchasers have brought federal antitrust claims, state law antitrust claims, and state law consumer protection claims. The Direct Purchaser and the Retailers bring claims based on federal antitrust law. The End Payors bring their claims based on state antitrust and consumer

protection laws. I will begin by instructing you on the federal law, and then I will instruct you regarding the state law claims.

The Direct Purchasers' and the Retailers' federal antitrust claims are based on Section 1 of the Sherman Act. Section 1 of the Sherman Act prohibits agreements that unreasonably restrain competition. The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality, and the greatest material progress.

## SHERMAN ACT, SECTION 1

To establish a violation of Section 1 of the Sherman Act, the Purchasers must prove two things:

(1) the existence of a contract, combination, or conspiracy between the Sucampo, Takeda, and Par that unreasonably restrained trade; and

(2) that the restraint caused the purchasers to suffer an injury to their business or property.

Element 1 asks you to determine whether Takeda engaged in anticompetitive conduct. Element 2 asks you to determine whether any anticompetitive conduct caused injury or harm to the Purchasers. This is sometimes referred to as "antitrust injury." To decide whether the purchasers have proven by a preponderance of the evidence these two things, you will need to answer the questions on the Verdict Form. I will hand out copies of the Verdict Form for you to follow along.

## Market Power – What Is It?

First, you must determine whether Takeda had market power. So, what is that? "Market Power" means a company has enough control in a market to raise prices by reducing output

without losing too many customers to competitors. Let me explain why that matters. In a normal competitive market, if one company raises its prices, customers will switch to other options. To keep its customers, the company has to keep its prices competitive. But when a company has market power, customers may not have real alternatives, and the company is able to charge higher prices and still keep its business. For example, if one gas station raises its prices, you can usually go to another—that means no market power. But if there's only one gas station for miles and you have no other options to buy gas, that's market power.

Market power can be shown either through direct evidence or indirect evidence. Either form of evidence is sufficient; the purchasers do not need to show both. If you find that the purchasers have shown, by a preponderance of the evidence, direct evidence of market power, you need not consider whether there was also indirect evidence of market power. In other words, you will consider whether the purchasers have shown indirect evidence of market power only if you have not found direct evidence of it.

**Direct Evidence of Market Power**

Direct evidence of market power includes proof of "supracompetitive prices" and "restricted output." A "supracompetitive price" simply means a price that is higher than what you would expect in a normal, competitive market. In a healthy market, many sellers compete with each other, which keeps prices relatively competitive. But when competition is blocked or when a company has monopoly power, prices can rise above those competitive levels. "Restricted output" means the amount of a product being sold is limited, allowing a dominant company to reduce the supply quantity and charge higher prices without losing many customers. To show market power, it is important to see both: (1) that the company charged prices well above the competitive price, and that it was protected from competitors who might otherwise

have entered the market or expanded and drove those prices back down, and (2) that the company maintained those supracompetitive prices by restricting output.

For example, if a company tries to raise prices above normal competitive levels but cannot keep them high—because new competitors enter the market or existing competitors win away customers—then the company does not have market power. But if the company can keep prices significantly higher than competitive levels for a meaningful period of time without losing many customers to competitors, then it does have market power.

You might be asking, what does "competitive level" mean? The Purchasers and Takeda disagree about that. The Purchasers say the competitive level is the price that purchasers would pay for generic lubiprostone once it was launched in a market with competition. Takeda say it should not be limited to the generic price and should instead be based on prices within a broader market for constipation drugs. It is up to you to decide what the competitive level is, based on all the evidence you heard.

**Indirect Evidence of Market Power**

Indirect evidence of market power means showing that a company has market power by looking at the structure of the market, rather than directly proving high prices and restricted output. There is indirect evidence of market power when the evidence shows that a company has a large share of the relevant market, that it is difficult for new competitors to enter, that competition is limited, and that the market is controlled by only one or a few companies whose competitors cannot quickly increase their output. While direct evidence asks, "Did this company actually charge high prices and restrict output?" indirect evidence asks, "Did this company have the ability to do so based on its position in the market?"

Because indirect evidence of market power focuses on the structure of the market, you must determine what the relevant antitrust market is. That market consists of two parts: (1) the geographic market, and (2) the product market. The geographic market is the area where competition occurs. In this case, the parties agree that the geographic market is the United States and its territories. So, your task is to determine the product market—that is, whether Product A and Product B compete in the same market.

There are two steps to determine the relevant product market: (1) first, what other products customers could switch to—in other words, whether there are reasonable substitutes for the product, known as "therapeutic interchangeability," and (2) then second, how customers respond to price changes—specifically, whether they would switch to another product if this one becomes more expensive, known as "economic interchangeability" or "the cross-price elasticity of demand." Therapeutic interchangeability is not enough; to be in the same relevant market, two products must exhibit cross-price elasticity. This analysis focuses on the consumer's perspective, not the manufacturer's.

The first step is "therapeutic interchangeability." This means whether buyers see different products as reasonable substitutes—in other words, whether the products compete with each another. The key question is: Can customers switch between these products and still meet their needs? If so, those products belong in the same product market. The products do not have to be identical. They just need to be close enough, from the buyer's point of view, to serve as substitutes. For example, if someone wants to store leftover food, they might use aluminum foil, plastic wrap, or a reusable container. Even though these items are different, if customers see them as good alternatives, they would all be part of the same product market. In this case, the purchasers argue that the relevant product market includes only Amitiza and its generic versions,

with no other substitutes. Takeda disagrees and argues that the relevant product market also includes other brand medications used to treat constipation. It is up to you to decide what the relevant product market is based on the evidence you heard at trial.

Once you have a group of therapeutic interchangeability candidates, the next step is to analyze “cross-price elasticity.” It can also be called “economic interchangeability.” It sounds complicated, but the idea is simple. It just means: Will people switch to another product if the price goes up? For example, if beef gets more expensive, will people buy more chicken instead? If so, then beef and chicken are in the same relevant market. If not, beef and chicken are in different markets. So, the key question is: If the price of one thing goes up, what do people do? If two products are very similar, even a small price change in one will cause customers to switch to the other. When that happens, we say they are close economic substitutes and that the cross-price elasticity of demand is high. Another way to think about it is this: If a store raises the price of Product A, will people keep buying it, or will many switch to Product B? If lots of people switch, then the store can’t keep the higher price, and the products are in the same market. If people don’t switch, then the products are in different markets.

Keep in mind that, when defining the relevant antitrust market, it is not enough to show that certain drugs can be used for the same purpose. To define the relevant antitrust market, there must also be a showing that consumers would actually switch between them if prices change—that is, there must be cross-price elasticity (or economic interchangeability). In evaluating whether various products are reasonably interchangeable or reasonable substitutes for each other, you may also consider: customers’ views on whether the products are interchangeable, the perceptions of the industry and the public as to whether the products are in separate markets,

views of the Purchasers and Takeda regarding who the competitors are, and whether the products have the same or different potential customers.

**Rule of Reason**

The Purchasers allege that Takeda did something to unreasonably limit competition to its drug Amitiza. They say Takeda did this when it agreed to particular provisions in a settlement agreement with Par in the Par-Patent case. It is anticompetitive for a brand-name drug company and a generic company to settle a patent dispute in a way that involves the brand paying the generic—whether in cash or some other form of value—to delay entering the market. Such a payment allows the brand company to avoid the risk of competition from generic companies. To determine anticompetitive conduct, we apply what is called the “rule of reason.” That means we do not automatically say that the conduct is unlawful. Instead, we look at all the facts and ask whether, on balance, the conduct harms competition substantially more than it helps it.

The rule of reason involves several steps, with the burden shifting between the parties:

Step 1: Did the challenged conduct substantially harm competition? The Purchasers must first show that the conduct harmed competition as a whole—not just a single competitor.

Step 2: Did Takeda have a good reason for the challenged conduct? If the Purchasers satisfy their burden in step 1, the burden shifts to Takeda and it can explain that it had a valid business reason for the conduct and that its conduct had pro-competitive benefits.

Step 3: Was there a less harmful way to do it? If Takeda provided evidence that it had a valid business reason for the conduct and that its conduct had pro-competitive benefits, then the burden shifts back to the Purchasers to demonstrate that the procompetitive benefits could have been achieved in a way that was less harmful to competition.

Step 4: Weigh everything. This is the last step, and it is a balancing step, does the anti-competitive harm substantially outweigh the pro-competitive benefits? If benefits win, conduct is not unlawful. If harm wins, conduct is unlawful.

So, let's begin looking at all of the facts.

**<u>Step 1: Did the conduct substantially harm competition?</u>**

For Step 1, to determine whether the conduct substantially harms competition, we have to look at the facts surrounding the Par-Patent case and the settlement agreement. We start there because that is where the Purchasers say the unlawful anticompetitive conduct happened. The Purchasers say the settlement agreement included payments that had the effect of substantially limiting competition to its brand drug Amitiza. Before getting into these details, it is important to understand what a "payment" is.

**<u>Payment</u>**

A payment does not have to be money—it can be anything of value.

A "reverse payment" occurs when the patent holder, sometimes called the patentee, gives something of value to the alleged infringer in exchange for delaying its entry into the market. In this case, the purchasers claim there are two provisions in the Settlement Agreement that, separately or together, constitute a reverse payment. The first is the 50/50 profit split. The second is the declining-royalty provision. You must decide whether either of these provisions qualify as a reverse payment.

**<u>The "Reverse Payment" Provisions In The Settlement Agreement</u>**

The Purchasers claim that the Settlement Agreement between Takeda and Sucampo and Par was anticompetitive because it included an implicit agreement that Takeda and Sucampo would not market an authorized generic, or "AG." There is no explicit provision in the

agreement saying they would not do so. Instead, the Purchasers argue that the 50/50 profit split and the declining royalty—either on their own or taken together—disincentivized Takeda from launching a second generic and effectively created that agreement.

Some key facts are not in dispute:

- Under the Settlement Agreement, Par was allowed to start selling a generic version of Amitiza on January 1, 2021.
- Par had two options: it could sell its own FDA-approved generic product (an ANDA product), or it could sell an authorized generic supplied by Sucampo.
- In either case, Par agreed to pay Sucampo a 50% royalty on its sales.
- Par chose to sell an authorized generic supplied by Sucampo when it launched on January 1, 2021.

The Purchasers rely on two theories to argue that the Settlement Agreement included a reverse payment that delayed generic competition, equivalent to an implicit agreement by Takeda and Sucampo not to launch an AG. First, they argue that the 50% profit split itself was a reverse payment. Second, they rely on what is called the declining-royalty provision. The parties agree about how the 50% profit split is described in the settlement, but they disagree about how the declining-royalty provision should be interpreted.

**The Declining Royalty Provision In The Settlement Agreement**

Sections 3.13(b) and 3.13(c) of the Settlement Agreement say that the royalty rate drops if additional generics enter the market alongside Par's "Generic Equivalent." This is the declining-royalty provision. Under this provision, if one additional generic entered the market, Par's royalty would drop from 50% to 15%. If two or more generics entered, Par's royalty would drop to zero. The parties disagree about the meaning of the provision.

Takeda argues that these reductions apply only when Par is selling its own "Generic Equivalent," which the agreement defines as an ANDA product. Because Par instead sold an

authorized generic, an AG, supplied by Sucampo, and not its own ANDA product, Takeda argues that the declining-royalty provision was never triggered. According to Takeda, that means the declining-royalty provision could not have discouraged Takeda or Sucampo from launching another authorized generic.

The Purchasers, on the other hand, point to a different part of the Settlement Agreement—Section 3.12—and argue that the declining-royalty provision would apply whenever another generic entered the market, regardless of whether Par was selling its own ANDA product or an authorized generic. Based on that interpretation, the purchasers argue that the provision gave Takeda and Sucampo a reason not to launch another generic product and therefore functioned as an agreement to delay competition in exchange for Par waiting until January 1, 2021 to enter the market.

You must decide whether the "declining royalty structure applies regardless of Par launching either an ANDA or an AG." Since you are being called on to interpret the settlement agreement, we need to pause here so I can explain how to interpret the settlement agreement. I will first give you those instructions, and then I will return to explaining how to determine whether a reverse payment is unlawful.

**<u>Construction of the Settlement Agreement</u>**

A settlement agreement is a method for the parties involved in a lawsuit to resolve a dispute without going to trial. There may be many reasons that both parties in a lawsuit find it beneficial to settle a lawsuit rather than go to trial. You must keep in mind that the fact that parties decide to settle a lawsuit does not amount to an admission by either party that one party is liable. Like any lawsuit, many Hatch-Waxman lawsuits end in settlement before trial. There is

nothing wrong with settling a Hatch-Waxman lawsuit. However, a settlement agreement that ends a Hatch-Waxman lawsuit that contains an anticompetitive agreement is unlawful.

A settlement agreement is a type of contract. A contract is a legally binding agreement between two or more parties, and each party must follow its terms. When interpreting a contract, your goal is to carry out the reasonable shared expectations of the parties at the time they made the agreement. You begin with the contract's actual words. Those words should be understood based on their ordinary meaning, as a reasonable third person would read them. You must read the contract as a whole, giving effect to all of its parts. You should avoid any interpretation that makes a word or provision meaningless. If there is a conflict between general language and more specific language, the specific language controls.

Contract terms may be either clear (unambiguous) or unclear (ambiguous). I have already determined, as a matter of law, that the declining royalty provision is ambiguous. Because of that, you should apply the following rules:

First, read the contract as a whole and try to give meaning to all of its provisions. Do not interpret one part in a way that conflicts with the overall purpose of the agreement.

Second, if a provision can reasonably be understood in two ways, you should choose the interpretation that makes the contract fair, customary, and reasonable, rather than one that makes it unfair or unusual.

Third, do not interpret the contract in a way that leads to absurd or unreasonable results.

Fourth, to determine what the parties intended, you may consider objective evidence surrounding the agreement. This can include what the parties said and did, how the contract was drafted, the business context, prior dealings between the parties, how they performed under the contract, and business customs and usage in the industry.

Fifth, you may not consider anyone's private, personal beliefs about what the contract meant.

Finally, you may consider the circumstances that existed when the contract was made to help determine what the parties likely intended.

If, after applying all of these rules, the contract is still unclear and there is no single shared meaning, you may consider the parties' subjective understanding in a limited way. If one party had a reasonable understanding of the contract, and the other party knew or should have known about that understanding, then you may adopt that interpretation.

**"Large" and "Unjustified" Reverse Payment**

With that, let's return to reverse payments. Not every reverse payment is automatically unlawful under the Sherman Act. To be unlawful, the payment must be "large" and "unjustified."

To determine whether a payment is "large," you may consider whether the payment is greater than what Takeda and Sucampo and Par would have spent to continue litigating the patent case. You may also consider whether the payment is large enough to induce a generic manufacturer to drop its patent challenge and stay out of the market. For example, you might conclude that the payment is large if the generic company made more from the reverse payment than it would have even if it won the case.

An "unjustified" payment is one that is not explained by ordinary settlement reasons, such as litigation costs, fair value for services, or other legitimate business considerations.

**Anticompetitive Effects**

In deciding whether the payment had anticompetitive effects, you may consider the size and overall scale of the payment, how it compares to the expected cost of continuing the patent

lawsuit, whether it was tied to any real services, and whether there is any other convincing explanation for it.

**Existence of the No-AG Agreement**

The Purchasers must prove, by a preponderance of the evidence, that Takeda agreed not to launch its own authorized generic (AG). The Settlement Agreement itself explicitly states that Takeda and Sucampo retained the right to launch its own AG at any time, and does not contain an explicit promise by Takeda not to do so. Instead, the Purchasers argue that the 50/50 profit split and/or the declining-royalty provisions in the Settlement Agreement disincentivized, or made it economically irrational, for Takeda from launching its own AG.

Those provisions, and the Settlement Agreement as a whole, may serve as circumstantial evidence of such an agreement—but that alone is not enough. The Purchasers must also show that the agreement was not simply the result of each company acting independently in its own business interest. In other words, there must be evidence that Takeda coordinated with Sucampo and Par to achieve this result. When determining what the parties agreed to here, you are not limited to the written agreement. You may consider all of the evidence before you.

In cases like this, there is rarely direct evidence—such as a secret handshake or a clear statement that Takeda said, "we will not launch our own AG." So, you must decide, based on all the evidence, whether Takeda's agreement to these terms was an implicit agreement not to launch an AG, and whether those terms were not the result of chance, coincidence, independent business decisions, or independent actions by Takeda, Sucampo, or Par. In other words, if these entities acted similarly but independently of one another, without any agreement among them, then there would not be a conspiracy. For example, everyone might open their umbrellas on a rainy day, but that similar behavior would not necessarily mean that they conspired to open their

umbrellas. A business may lawfully adopt the same prices or other practices as its competitors as long as it does so independently and not as part of an agreement with one or more of its competitors.

If you conclude that a conspiracy not to launch an AG did exist, you should determine whether Takeda knowingly became a member of that conspiracy with the intent to further its purposes.

**Step 2: Did Takeda have a good reason?**

Next, the burden shifts to Takeda under the second step of the rule of reason. Takeda must provide evidence that the Settlement Agreement had procompetitive benefits. It is not enough for Takeda to simply say it had "business reasons" for entering into the Settlement Agreement. Takeda must provide evidence that the settlement actually helped competition in some way—such as by lowering prices, improving quality, or increasing consumer choice.

For example, a procompetitive benefit might be that the settlement allowed a generic drug to enter the market earlier than it otherwise would have based on the strength of the patent, thereby increasing competition. Another example could be that the agreement allowed the brand company to devote more resources to developing or offering new and lower-cost drugs.

Takeda does not need to show that each individual provision—such as the alleged reverse payment terms, including the 50% profit split or the declining royalty—provided procompetitive benefits on its own. Keep in mind that you may consider the Settlement Agreement as a whole when evaluating procompetitive benefits. Your task is to decide whether Takeda has provided evidence that the Settlement Agreement produced procompetitive benefits.

**Step 3: Was there a less harmful way to do it?**

In the third step of the rule of reason, the burden shifts back to the Purchasers. They must either challenge the procompetitive benefits identified by Takeda or show that those same benefits could have been achieved in a way that was less harmful to competition. In other words, the Purchasers must prove, by a preponderance of the evidence, that the alleged reverse payment provisions were not necessary to achieve those benefits, and that there were alternative ways to achieve the same results with less harm to competition. Takeda is not required, however, to use the least restrictive way of achieving legitimate business purposes.

**Step 4: Weigh everything.**

If you find that the challenged conduct was reasonably necessary to achieve the procompetitive benefits, you must then weigh those benefits against the harm to competition caused by the same conduct.

If the harm to competition substantially outweighs the benefits, then the conduct is unreasonable. If it does not, then the conduct is reasonable.

The Purchasers have the burden of proving, by a preponderance of the evidence, that the anticompetitive harm substantially outweighs any procompetitive benefits.

**INSTRUCTIONS ON SPECIFIC EVIDENCE**

There was some evidence in this case that I allowed for one purpose only and for no other purposes. But during the trial, the lawyers made certain arguments that were improper and misleading.

First, you heard evidence that Takeda asked Sucampo to indemnify it for any damages arising out of any lawsuit that might claim that the 2014 Settlement Agreement with Par violated the antitrust laws, that Sucampo refused to grant such indemnification because it believed that

Takeda was involved in the negotiation of the Settlement Agreement, and that Takeda and Sucampo ultimately negotiated an agreement providing that Sucampo shall pay "fifty percent (50%) of the reasonable attorneys' fees and costs and expert witness fees incurred by Takeda" in the event of a lawsuit alleging that the Settlement Agreement is anticompetitive under state or federal law." During closing arguments, counsel for the Purchasers argued that this evidence shows what Takeda was thinking about, hoping that they would not get caught for illegal activity, and who would pay if they got caught; that Takeda knew that the Settlement Agreement violated antitrust law, and that this indemnity provision was protection for full coverage for their illegal agreement. This was improper argument. It violated my instructions to the lawyers. The argument is improper because it relies on the lawyer's speculation as to the motives and actions of the parties, rather than the evidence before you. It is also counter to the instructions I am about to give you. Therefore, I am striking this argument and you may not use, or in any way consider, this evidence as proof that the Settlement Agreement was unlawful or that Takeda's conduct was unlawful. Whether the Settlement Agreement contained anticompetitive provisions is a question you will have to answer, but proof of that must come from elsewhere, not from the indemnity provision.

Second, you heard evidence that Sucampo and Takeda submitted their Settlement Agreement with Par to the Federal Trade Commission ("FTC") and the Department of Justice ("DOJ"), Antitrust Division. During closing, counsel for Takeda argued that, from this fact, you may conclude that Takeda "had nothing to hide." This was improper argument. I am striking this argument and you may not infer, from the submission, that the Settlement Agreement was lawful. Takeda and Sucampo were required by federal law to submit the Settlement Agreement to the FTC and the DOJ. You also may not infer that the Settlement Agreement was lawful from

the lack of evidence about whether and how the FTC or the DOJ responded to the submission. The FTC and the DOJ are not required to comment on or to take any action on settlement agreements that are submitted to them. It is your responsibility to determine whether the terms on which Takeda settled the patent litigation with Par violated the antitrust laws, and the action or inaction of the FTC or the DOJ is irrelevant to that determination.

Lastly, you heard evidence of a non-compete provision in a Memorandum of Agreement ("MOA") between Sucampo and Takeda. You may not infer from this that the non-compete provision is anticompetitive or violates antitrust laws, or that the Settlement Agreement contained any anticompetitive provisions or that it violates antitrust laws. Again, it is your responsibility to determine whether the terms on which Takeda settled the patent litigation with Par violated the antitrust laws, and the non-compete provision in a MOA is irrelevant to that determination.

With regard to all of this evidence, you may consider it for only one purpose: to evaluate whether and to what extent Takeda participated or was involved in the negotiation of the Settlement Agreement. You may not use or consider it for any other purpose.

## INJURY AND CAUSATION

If you find that the Purchasers have proven that Takeda engaged in anticompetitive conduct, then the first element of the Sherman Act is satisfied. Once you have made that determination, you must next consider the second element—whether that conduct caused injury or harm to the Purchasers. You may hear this referred to as "causation." Only if you find that Takeda's anticompetitive conduct caused injury to the Purchasers should you proceed to determine the amount of damages to award.

The Purchasers are entitled to recover damages if they prove, by a preponderance of the evidence, two elements related to injury and causation:

1. that they were actually injured as a result of Takeda's alleged violation of the antitrust laws (sometimes called "injury in fact"); and

2. that Takeda's alleged unlawful conduct was a material cause of that injury.

I will now explain each of the elements in more detail.

**Injury & Causation Element 1: Injury-in-Fact**

The first element is often called "injury in fact." To recover damages, the Purchasers must show that they were actually injured as a result of Takeda's anticompetitive conduct. They do not need to prove the amount of damages at this stage—only that they were, in fact, harmed by Takeda's conduct.

So how do you determine whether the plaintiffs were "in fact" injured? You must decide whether they have shown, by a preponderance of the evidence, that (1) they were overcharged for Amitiza or paid an inflated price for Amitiza, and (2) they paid that inflated price because of Takeda's antitrust conduct. To evaluate whether any overcharge resulted from Takeda's conduct, you must consider what would have happened in a "but-for world"—that is, a world without the alleged anticompetitive conduct. In doing so, you should consider what reasonable, law-abiding companies in Takeda's position would have done in the absence of the reverse payment. Because no one can know with certainty what would have happened in that hypothetical world, the question of causation is necessarily based on a reconstruction of what likely would have occurred.

Here, the Purchasers contend that, absent Takeda's alleged anticompetitive conduct, generic entry would have occurred before January 2021 and they would not have paid inflated prices for brand or generic Amitiza. The Purchasers offer two alternative theories of what would

have happened in the "but-for" world. First, they argue that, without the anticompetitive settlement agreement, Par would have continued the patent litigation and could have won, could have obtained FDA approval, and could have had the capability to launch its own generic product, allowing earlier market entry. Second, they argue that Takeda and Sucampo and Par would have settled the patent litigation, but on terms that did not include the anticompetitive provisions that Plaintiffs say were an unlawful reverse payment. The Purchasers are not required to prove both theories; establishing either one is sufficient to show delayed generic entry.

The Purchasers contend that, in a world without the alleged anticompetitive conduct, generic competition would have occurred earlier than it did in the real world. As a result, they claim they paid higher prices for brand and generic Amitiza because generic entry was delayed. Takeda on the other hand, argues that even without the anticompetitive conduct, generic entry would not have happened any earlier, and therefore the Purchasers suffered no injury. It is for you to decide, based on the evidence, whether Plaintiffs were in fact injured.

Keep in mind that this is a class action with numerous members who make up the Direct Purchaser Plaintiffs and End Payor Plaintiffs. You must find it is more likely than not that each member of the classes suffered an injury in fact.

**Injury & Causation Element 2: Material Cause**

Second, the Purchasers must prove, by a preponderance of the evidence, that Takeda's anticompetitive conduct was a material cause of their injury. By "material," I mean that the Purchasers must show their damages resulted primarily from Takeda's conduct, rather than from some other cause. The Purchasers are not required to prove that Takeda's conduct was the sole cause of their injury, nor must they rule out every other possible cause. It is sufficient if they establish that Takeda's conduct was a material cause of their harm. However, if you find that

other, different, or intervening factors actually caused Plaintiffs' injuries, then you must find for Takeda.

*****

In summary, if you find that the Purchasers have proven they were in fact injured by Takeda's anticompetitive conduct and that the conduct was a material cause of their injury, then the Purchasers are entitled to recover damages, and you may proceed to determine the amount of damages owed to the Purchasers.

## STATE ANTITRUST AND CONSUMER PROTECTION LAWS

Before you do that, I note that the End-Payors have brought antitrust claims under certain state laws. Each of those states, as well as the District of Columbia, has its own antitrust statutes. However, those laws parallel the federal Sherman Act. Accordingly, as a matter of law, if you found that Takeda violated the federal law, and that Takeda caused injury or harm to End-Payors, then Takeda has also violated the corresponding state laws applicable to those End-Payors. Similarly, End-Payors have brought consumer protection claims under certain state laws. If you found that Takeda violated the federal law, and that Takeda caused injury or harm to End-Payors, then Takeda's conduct constitutes unfair competition under the state consumer protection laws applicable to those End-Payors. Conversely, if you found that Takeda did not violate the federal law, then you should find that Takeda has not violated any state law.

## DAMAGES – INTRODUCTION

If you find that Takeda caused injury or harm to the Purchasers, you must then consider damages and determine the amount, if any, that Plaintiffs are entitled to recover. My instructions on damages do not suggest any view as to whether Takeda should be found liable; they are provided only in the event you find Takeda liable under the instructions I have already given.

"Damages" refers to the amount of money that will reasonably and fairly compensate the Purchasers for any injury you find was caused by Takeda. The purpose of damages is to compensate the Purchasers for their harm, not to reward them or to punish Takeda. The Purchasers bear the burden of proving damages by a preponderance of the evidence—that is, they must show that it is more likely than not that Takeda's conduct caused those damages. It is for you to determine what damages, if any, have been proven.

In calculating damages, you may make just and reasonable estimates, including with respect to class claims. You are not required to determine damages with mathematical certainty or precision. However, your award must be based on fair and reasonable conclusions drawn from the evidence, not on speculation or guesswork. The amount of damages you award is up to your judgment as jurors.

**Damages for the Federal Claim**

As I explained, the Purchasers contend that they were injured because, in a world without the alleged anticompetitive conduct—the "but-for world"—generic competition would have occurred earlier than it did in reality. As a result, they claim they paid higher prices for Amitiza in the real world. In other words, the Purchasers allege they were overcharged.

An overcharge is measured by the difference between (1) the price the Purchasers actually paid for Amitiza in the real world and (2) the price they would have paid had the antitrust violation not occurred (i.e., in the "but-for" world). The Purchasers' claimed damages depend on the generic entry date you determine for the but-for world, as well as the number of generic manufacturers that could and would have entered the market at that time.

You heard about rebates, coupons, and discounts. In order to avoid unnecessary inconvenience, you are not being asked to account for any such rebates, coupons, discounts, or

other offsets. Instead, I instruct you to award the full measure of damages based on the evidence. From any such award, after your verdict, I will address any rebates, coupons, discounts, or other offsets. Similarly, whether the Purchasers passed on any overcharge to others in the distribution chain is a question that I will address after your verdict. Therefore, for you, none of this is relevant and you must not consider them in determining damages.

**Damages for the State Claims**

As I previously instructed, if you find that Takeda violated the federal antitrust law, and if you find that Takeda caused injury or harm to End-Payor Plaintiffs, then, as a matter of law, Takeda also violated the corresponding state antitrust laws. However, to recover damages, the End-Payor Plaintiffs must also prove, by a preponderance of the evidence, that:

- For each of the following states—California, the District of Columbia, Hawaii, Iowa, Minnesota, Nebraska, Nevada, New Mexico, North Dakota, Rhode Island, South Dakota, Tennessee, and Vermont—at least one class member purchased brand Amitiza or generic Amitiza in each of those states from October 1, 2016 through March 31, 2024.

- For Connecticut, at least one class member purchased brand Amitiza or generic Amitiza in Connecticut after November 30, 2020.

- For Maryland, at least one class member purchased brand Amitiza or generic Amitiza in Maryland after October 1, 2017.

**Damages – Other Findings and Enhancements**

To assist the Court with certain post-trial matters concerning the End-Payor class, if you reach the issue of damages, you will also be asked to answer two additional questions.

First, did the End-Payors prove, by a preponderance of the evidence, that the violation was willful? The word “willful” means intentional.

Second, did the End-Payors prove, by a preponderance of the evidence, that the violation was flagrant? The word “flagrant” means shocking, outrageous, or conspicuously or outstandingly bad.

If you find that Takeda's conduct was willful or flagrant, the laws of certain states require you to consider awarding additional damages beyond the amount of overcharges you found that the End-Payors proved. In total, you may award up to, but no more than, three times the actual damages for any of the scenarios proposed by the End-Payors.

## DELIBERATIONS

Let me get to the fourth part of my instructions which is some guidance about how you should conduct your deliberations because you will soon begin that process. Please listen to these special instructions about those deliberations and your communications with the Court during your deliberations.

### Foreperson's Role; Unanimity

When you retire, you will discuss the case with the other jurors to reach agreement on a verdict. As your first order of business, you should select a foreperson. The foreperson's duties are administrative; the foreperson will have the same voice and the same vote as the other deliberating jurors. The job does not come with extra pay or extra prestige. The fact that one of you is foreperson does not give that person special status in your deliberations. You are all equal. The foreperson will act, to the extent helpful, as the moderator of the discussion and will serve as the jury's spokesperson. The foreperson's most important obligations are to ensure that all jurors deliberate together; to ensure that each juror has a full and fair opportunity to express their opinion; to submit any questions the jury may have; and to record the jury's decision on the Verdict Form, so that the verdict may be announced in the courtroom.

Your verdict must be unanimous as to each of the questions on the Verdict Form; that is, all of you must agree on the verdict.

**Duty to Deliberate and Reaching Agreement**

All of you have a duty to deliberate. That is, each of you have a duty to consider and express your own views. And each of you has a duty to listen and to consider the views of your fellow jurors. Do not be afraid to change your opinion if you decide you are wrong or think you might be wrong after hearing the opinions of your fellow jurors. But do not come to a decision simply because other jurors insist that it is right, and do not surrender an honest belief about the weight and effect of the evidence just to reach a verdict. How you deliberate is entirely up to you; I only suggest that it be done respectfully and cordially.

As I mentioned, we expect you to deliberate all day, meaning 9:00 a.m. to 5:00 p.m., until you reach a decision, although the schedule is ultimately up to you. Collectively, if you all agree to stay later than 5:00 p.m., you can; if you want to end early to sleep on something, you can do that too. Do not discuss the case during times when not all jurors are present. All your discussions of the case should occur only when all nine of you are together and your foreperson has indicated that deliberations may proceed.

As you have seen, this case has taken a great deal of time and effort to prepare and try. There is no reason to think that it could have been better tried, or that another jury would be better qualified than you are to decide it. It is important therefore that you reach a verdict if you can do so conscientiously.

**Implicit Bias**

All people deserve fair and equal treatment in our system of justice, regardless of their race, national origin, religion, age, ability, gender, sexual orientation, education, income level, or any other personal characteristic. When we began this trial, I discussed with you about implicit bias and the difficulty that presents from our own built-in expectations and assumptions. I told

you that we all have it, including judges. Let me share some strategies that we judges have found useful.

First, slow down; do not rush to a decision. Hasty decisions are the most likely to reflect stereotypes or hidden biases. Take time to consider all the evidence.

Second, as you start to draw conclusions, consider what evidence, if any, supports the conclusions that you are drawing and whether any evidence casts doubt on those conclusions. Double check whether you are actually using unsupported assumptions instead of the evidence.

Third, as you think about the people involved in this case, consider them as individuals, rather than as members of a particular group.

Fourth, I might ask myself: Would I view the evidence differently if the people were from different groups, such as different racial, ethnic, or gender identity groups?

Fifth, listen to your fellow jurors. They may have different points of view. They may help you determine whether you are focusing on the facts or making assumptions, perhaps based on stereotypes. Of course, your fellow jurors could be influenced by their own unstated assumptions, so don't be shy or hesitate to speak up. You should participate actively, particularly if you think the other jurors are overlooking or undervaluing evidence you find important. In fact, when you explain your thoughts out loud to other jurors, you are also helping yourself to focus on the evidence, instead of assumptions.

If you use these strategies, then you will do your part to reach a decision that is as fair as humanly possible. That is your responsibility as jurors.

**Communications with the Court**

If it becomes necessary during your deliberations to communicate with me, you may do so by sending a note through the jury officer. No member of the jury should ever attempt to

communicate with me, except by such a signed writing. If you send out a question, I will consult with the attorneys before I answer it, which may take a little bit of time. You may continue with your deliberations while waiting for an answer to any question. When you are communicating with me, do not tell me, or anyone else, how the jury stands, either numerically or otherwise, or how the jury is leaning. On matters touching simply on the arrangements for your meals, schedule, and convenience, you are free to communicate with the jury officer or Mr. York, orally rather than in writing. You are not to communicate with anyone outside the jury room about the case but me, and then only in writing.

## **Return of Verdict Form**

When you have reached your verdict, your answers will be recorded by your foreperson on what is called the Verdict Form. This is simply the written notice of the decision you reach in this case. After you have reached unanimous agreement on the verdict, your foreperson will fill in the form that has been given to you, sign and date it, and advise the jury officer outside your door that you are ready to return to the courtroom. After you return to the courtroom, your foreperson will deliver the completed verdict form as directed in open court.

You may go to the jury room to begin your deliberations. You have these instructions; you may take them with you and refer to them as you deliberate. I will send in shortly the exhibits and the Verdict Form.

Thank you.